**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

|  |  |
|---|---|
| Benton Gene Baskin, | No.  CV-21-01890-PHX-SPL (JFM) |
| Plaintiff, | |
| v. | **ORDER AND** |
| | **ORDER TO SHOW CAUSE** |
| Todd Thomas, et al., | |
| Defendants. | |

Plaintiff Benton Gene Baskin, who is confined in the Hutchinson Correctional Facility (HCF) in Hutchinson, Kansas, brought this pro se civil rights action pursuant to 42 U.S.C. § 1983 based on his alleged injuries from being confined in overtight restraints during his transport from the HCF to the CoreCivic Saguaro Correctional Center (SCC) in Eloy, Arizona and improper medical care after his arrival at the SCC. Defendant TransCorporation of America (TCA) Supervisor Westbrook filed a Motion to Dismiss for lack of personal jurisdiction, improper venue, and failure to comply with the statute of limitations pursuant to Federal Rules of Civil Procedure 12(b)(2), (3), and (6).  (Doc. 20.) Kansas Department of Corrections (KDOC) Defendants HCF Lt. Giaboian, and HCF Sgt. Diaz separately filed a Motion to Dismiss for lack of personal jurisdiction, improper venue, and failure to exhaust administrative remedies pursuant to Federal Rules of Civil Procedure 12(b)(2), (3), and (6) or, in the Alternative, to Transfer Plaintiff's claims against them to the District of Kansas.  (Doc. 21.)  Plaintiff was informed of his rights and obligations to

respond to both Motions (Docs. 23, 24), and he did not file timely responses despite being granted two extensions of time to do so.  (Docs. 28, 34.)[1]

The Court will grant the Motions in part and order Plaintiff to show cause why this action should not be dismissed instead of transferred to the District of Kansas.

**I.    Background**

In his three-count Complaint, Plaintiff relevantly alleged the following facts:

At 3:00 a.m. on October 23, 2019, Plaintiff was escorted from his Kansas cell for processing prior to being transported to Salina, Kansas, and eventually to SCC pursuant to an Interstate Corrections Compact.  Special Operations Response Team (SORT) officer Defendant Giaboian ordered Plaintiff to hold his arms level with his waist and applied waist, wrist, and ankle restraints.  Plaintiff asked Giaboian to loosen the waist and wrist restraints because he had difficulty raising his arms high enough for Giaboian to secure the restraints.  Giaboian unsuccessfully attempted to place a finger between Plaintiff's wrists and the restraints.  Plaintiff asked Giaboian to loosen them because they were too tight, and Giaboian responded the cuffs were "not built for comfort" and ordered Plaintiff to board a transport vehicle.

After being seated in the transport vehicle, Plaintiff asked Defendant Diaz to loosen the restraints because they were cutting into his arms and wrists.  Diaz asked Plaintiff why he had not asked Giaboian.  Plaintiff responded that he had, but Giaboian had refused.  Diaz made no further response.  About five minutes later, Diaz and an unknown SORT officer left the transport vehicle and then reboarded 15−20 minutes later.  They brought a milk

_____

[1] On March 24, 2023, the Court gave Plaintiff a second extension of time, until April 5, 2023, to respond to the Motions, which was two months past the original due date of February 6, 2023, but Plaintiff did not timely file responses or seek additional time to do so.  Instead, on May 30, 2023, some 54 days after the extended deadline to respond, Plaintiff filed his Responses (Docs. 36, 35), which were dated May 5, 2023, one month after the extended deadline. (Docs 35, 36.)  Plaintiff did not offer excusable neglect for his failures to timely respond, and the Court struck his Responses as delinquent.  (Doc. 37.)  In its discretion, the Court has reviewed Plaintiff's Responses to verify that Plaintiff continues to oppose dismissal or transfer of this action.

crate and cooler containing sack lunches for later distribution. Plaintiff again asked Diaz to loosen his wrist restraints, but Diaz did not respond. Plaintiff then asked how he was supposed to eat his meal when he could not lift his hands to his mouth, but Diaz did not respond.

Plaintiff and another prisoner, Bemis, noticed that Plaintiff's arm had become swollen "enormously," and the cuff on Plaintiff's right wrist had begun cutting into the wrist. In obvious pain, Plaintiff again implored Diaz to adjust his wrist restraints. Diaz told Plaintiff, "Be patient, we have a short ride ahead of us, we will get you taken care of then." (Doc. 1 ¶ 24.) Plaintiff was forced to endure the 90-minute trip in pain while the transport vehicle went to the El Dorado Correctional Facility (EDCF) to pick up more prisoners.

At about 4:30 a.m., when the vehicle arrived at the EDCF, Plaintiff "irritably" complained to Diaz and the unknown SORT officer about his swollen wrists and pain, but both ignored his request to loosen the cuffs. (*Id.* ¶ 26.) After passing the inspection point, Diaz drove the transport vehicle into the sally port and docked it. After waiting 15−20 minutes, the prisoners exited the vehicle and entered the EDCF. Once inside in the light, Plaintiff and other prisoners could see how swollen Plaintiff's arms and wrists were. Plaintiff spoke through the crack of the holding cell door attempting to get the attention of SORT officers, without success, and another 15−20 minutes passed.

Plaintiff then spotted HCF SORT Officer Reau, who signaled for the holding cell door to be opened and directed Plaintiff to a seating area, where Reau tried to remove the wrist restraints to adjust them. After some difficulty, Reau was able to remove the restraints and saw the swelling and redness of Plaintiff's wrists and arms. After having difficulty re-applying the restraints, Reau concluded the restraints were too small. Reau successfully re-applied the wrist and waist restraints, but he again said the restraints were too small and told the EDCF SORT officers that Plaintiff needed bigger handcuffs and described the state of Plaintiff's arms and wrists. Plaintiff was briefly returned to the holding cell, then an EDCF officer took Plaintiff to the nurse's station where Plaintiff's

vital signs were taken.  The medical provider asked Plaintiff if he was taking blood pressure medication because his blood pressure was "extremely high" and asked Plaintiff if he was "okay."  (*Id.* ¶ 33.)  Plaintiff responded negatively and said that he was having an anxiety attack due to the restriction of blood flow to his arms, wrists, and hands.

Plaintiff asked the provider and the EDCF officers to fit him with larger hand cuffs, but they "deflected" responsibility to Defendant Diaz and said there was nothing they could do about the swelling or the cuffs cutting into Plaintiff's wrists and arms.  (*Id.* ¶ 34.)  They escorted Plaintiff back to the holding cell.

At about 6:00 a.m., the prisoners, Defendant Diaz, and the unknown SORT officer departed from the EDCF.  Plaintiff again asked the officers to adjust his waist and wrist restraints because of the swelling of his arms and wrists, but they turned up the radio and heater and ignored Plaintiff.

At about 8:00 a.m., Plaintiff and the other prisoners arrived at the Salina airport, and Plaintiff again pointed out the effects of his tight restraints and again asked Defendant Diaz how he was supposed to eat meals when he could not reach his mouth.  Diaz again ignored Plaintiff.

After about 30 minutes, two unknown men boarded the transport vehicle and identified themselves as TCA employees.  The supervisor identified himself as Mr. Westbrook.  Plaintiff informed Defendant Westbrook about the tight restraints causing swelling of his arms and wrists.  Westbrook responded that, as soon as the plane was ready for boarding, his employees would make necessary adjustments to each prisoner's wrist restraints.  Plaintiff had to wait at least another 90 minutes while other transport vehicles arrived.  Plaintiff asked Westbrook if he could bring his sack meal aboard the plane, but Westbrook said no.  Non-party TCA employee Payne opened some of the items in the sack meal and helped Plaintiff eat them.  The remainder was discarded.

Before exiting the transport vehicle, Plaintiff was chained to prisoners Bemis and Moore.  Plaintiff asked the TCA staff to check how tight his wrist restraints were and to adjust them.  An unknown TCA officer said that someone would take care of Plaintiff after

he was on the plane. Defendant Westbrook also told Plaintiff that the restraints would be adjusted on the plane. At approximately 9:00 a.m., after being seated on the plane, Plaintiff complained to TCA staff about his pain and swelling from the restraints, but they ignored him.

At about 11:30 a.m., Defendant Westbrook advised everyone to secure their seatbelts. As the plane readied for take-off, Westbrook announced that he and his staff would begin adjusting the prisoners' restraints that were too tight. TCA employees began adjusting restraints from the front of the plane. As Westbrook walked down the aisle towards where Plaintiff was sitting, Plaintiff pointed out the swelling to his arms and the cuffs cutting his wrists. Westbrook told Plaintiff that if he asked one more time about his restraints, Westbrook would leave them as they were.

At some point, a TCA employee told Plaintiff, Bemis, and Moore to unfasten their seat belts and step into the aisle so that he could access their restraints. The employee saw the injuries to Plaintiff's wrists and "extreme swelling" of Plaintiff's arms and told Defendant Westbrook that he needed some "big-boy cuffs" for Plaintiff. Westbrook responded that he did not have any on him, and the employee stated there were some up front. Westbrook told the employee to remove the wrist restraints and then re-apply them with just one click. The employee did so but saw that it did not resolve Plaintiff's issues. The employee reapplied Plaintiff's waist and wrist restraints, while telling Plaintiff he would get larger cuffs from up front as soon as Westbrook authorized him to do so. Plaintiff asked the employee to at least place the waist chain above his stomach, which would allow him to eat the sack lunch that was being provided, and the employee did so. Plaintiff, Bemis, and Moore were rechained and sat back down.

Plaintiff, still in pain, nevertheless fell asleep. When he awoke, prisoner McCaslin raised his arms to show Plaintiff that he had exchanged his restraints for plastic zip ties and told Plaintiff to make TCA staff change his. After spotting the unknown TCA employee, Plaintiff asked to either receive larger steel cuffs or plastic zip ties. The employee

apologized but said they had given them all out. Plaintiff continued to suffer in pain throughout the plane trip.

After the plane landed in Arizona, the prisoners waited on the plane for 90 minutes before they were loaded onto transport vehicles. Plaintiff again complained to Defendant Westbrook and the unknown TCA officer about his overtight cuffs, and Westbrook told Plaintiff they would be removed after he arrived at SCC. A TCA nurse told Plaintiff to be patient and warned him not to act up because of possible retaliation from staff. About 90 minutes later, Plaintiff arrived at SCC, where he continued to be cuffed for another hour until he had passed through security checks, when the restraints were finally removed.

On screening pursuant to 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated an Eighth Amendment threat-to-safety claim against Defendants Giaboian, Diaz, and Westbrook based on their repeated failures to adjust Plaintiff's restraints for hours, particularly their failures to adjust his wrist restraints. (Doc. 14.) The Court required these Defendants to respond and dismissed the remaining claims and defendants. (*Id.*)

## II. Personal Jurisdiction

### A. Legal Standard

"When no federal statute governs personal jurisdiction, the district court applies the law of the forum state." *Freestream Aircraft Ltd. v. Aero Law Group*, 905 F.3d 597, 602 (9th Cir. 2018). Arizona's long-arm jurisdictional statute is co-extensive with federal due process requirements; therefore, the analysis of personal jurisdiction under Arizona law and federal due process is the same. Ariz. R. Civ. P. 4.2(a); *Doe v. Am. Nat' l Red Cross*, 112 F.3d 1048, 1050 (9th Cir. 1997). "Constitutional due process requires that a defendant 'have certain minimum contacts' with the forum state 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Freestream*, 905 F.3d at 602 (internal citation and quotation marks omitted) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

The "minimum contacts" standard may be satisfied in two ways. First, a court may exercise general jurisdiction where a defendant has "substantial" or "continuous and

systematic" contacts with the forum state. *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1171 (9th Cir. 2006) (citation omitted). General jurisdiction is an exacting standard; it exists where the defendant's contact with the forum state approximates "physical presence" in the state. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004).

Second, a court may exercise specific jurisdiction. The Ninth Circuit employs a three-pronged test to determine whether specific jurisdiction exists: (1) a defendant has purposefully directed its activities at residents of the forum or performed an act by which it purposefully avails itself of the privileges of conducting activities in the forum; (2) the claim arises out of or relates to the defendant's activities; and (3) the exercise of personal jurisdiction is reasonable. *Id.* at 802. The plaintiff bears the burden on the first two prongs of the test, and, if those two prongs are satisfied, the burden shifts to the defendant to present a compelling case that personal jurisdiction is not reasonable. *Id.*

In determining personal jurisdiction, a court may consider evidence presented in affidavits. *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001). Even though the defendant is the moving party on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate. *Rio Properties, Inc. v. Rio Int'l. Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002) (citation omitted). If a court makes a jurisdictional decision based on the pleadings and affidavits and does not conduct an evidentiary hearing, the plaintiff need only make a *prima facie* showing that the court has personal jurisdiction. *Id.* On a Rule 12(b)(2) motion, the court accepts uncontroverted allegations in the complaint as true and resolves any conflicts between the parties' affidavits in the plaintiff's favor. *See Boschetto v. Hansin*, 539 F.3d 1011, 1015 (9th Cir. 2008).

### B. General Personal Jurisdiction

There is no evidence to support the Court has general personal jurisdiction over KDOC Defendants Giaboian and Diaz. In his Complaint, Plaintiff identified Defendants Giaboian and Diaz as SORT Officers employed by HCF in Hutchinson, Kansas. (Doc. 1

¶¶ 8, 9, 17.) Plaintiff did not allege any facts or produce any evidence that these Defendants were ever in Arizona or directed any activities there, much less had "substantial" or "continuous and systematic" contacts with Arizona approximating "physical presence" in the state. *Tuazon*, 433 F.3d at 1171; *Schwarzenegger*, 374 F.3d at 801.

The facts also do not support a finding of general personal jurisdiction over Defendant Westbrook. In his Complaint, Plaintiff identified Westbrook as a TCA Supervisor responsible for Plaintiff's transport from Salina, Kansas to Eloy, Arizona. (Doc. 1 ¶ 7.) He alleged that Westbrook travelled to Arizona while overseeing the in-flight transport of Arizona-bound prisoners, including Plaintiff, and Plaintiff's injuries arose, in part, from Wesbrook's deliberate indifference to Plaintiff's overtight restraints, prior to and during the flight and after the plane landed in Eloy, Arizona. (*Id.* ¶¶ 39−58.) Absent more, these facts do not show that Westbrook had either systematic or substantial and continuous contacts with Arizona. Further, Westbrook produced evidence that he is a resident of Clarksville, Tennessee, and although he oversees the operations of five TCA field offices in other states, two of which are in Arizona, he does not have an office, residence, or any property in Arizona; does not travel or intend to travel to Arizona for personal reasons; and his job responsibilities take him to Arizona less than ten times per year. (Doc. 20 at 5−6.) At most, these facts show that Westbrook's contacts with Arizona are occasional and sporadic, not constant and pervasive. This is not enough to establish the Court's general personal jurisdiction over Westbrook.

### C. Specific Personal Jurisdiction

#### 1. Purposeful Direction/Arising from State-Directed Activities

KDOC Defendants Giaboian and Diaz argue that the Court also does not have specific personal jurisdiction over them because, although they participated in Plaintiff's extradition to Arizona by transporting Plaintiff from the HCF in Hutchinson, Kansas to the airport in Salina, Kansas, they had no contact with anyone in Arizona related to the extradition, so their actions were not "purposefully directed at Arizona." (Doc. 22 at 7.) . . . .

The Ninth Circuit has found that officers who are "directly and significantly involved" in a prisoner's cross-state extradition, including by travelling to the forum state to take custody of the out-of-state prisoner, have "purposefully availed themselves of the privilege of conducting activities in [the forum state]." *Lee v. City of Los Angeles*, 250 F.3d 668, 694 (9th Cir. 2001) (New York officers who travelled to California and escorted a prisoner back to New York could not have done so "without actively seeking and receiving the aid and cooperation of California officials and making use of California's administrative and judicial extradition procedures").

Plaintiff does not allege Defendants Giaboian and Diaz were involved in arranging Plaintiff's extradition to Arizona, and there is no evidence these Defendants took any actions, themselves, that created a substantial connection with Arizona. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (although physical presence in the forum state is not required for personal jurisdiction, "the contacts [must] proximately result from actions by the defendant *himself* [to] create a "substantial connection" with the forum state) (emphasis in original). Absent a showing that these Defendants either purposefully directed any activities at Arizona or purposefully availed themselves of the privileges of conducting activity in Arizona, Plaintiff cannot meet the first prong of specific personal jurisdiction. Lacking both general and specific personal jurisdiction, the Court does not have personal jurisdiction over these Defendants and must either dismiss Defendants Giaboian and Diaz or, if dismissal is not otherwise warranted, transfer Plaintiff's claims against them to a court with jurisdiction.

Defendant Westbrook also claims he did not purposefully direct any activities at Arizona or purposefully avail himself of the privileges of conducting activity in Arizona. (Doc. 20 at 7.) This is because, he argues, Plaintiff only alleges Westbrook failed to loosen Plaintiff's overtight restraints during the flight from Kansas to Arizona, and the only action Westbrook allegedly took after the transport plane landed in Arizona was to tell Plaintiff his restraints would be removed after he arrived at SCC. (*Id.* at 7−8.) Westbrook relies on *In re Western States Wholesale Natural Gas Antitrust Litigation*, 605 F. Supp. 2d 1118,

1140 (D. Nev. 2009) to argue that this response was not "expressly aimed" at Arizona, and he cites to *Morrill v. Scott Financial Corporation*, 873 F.3d 1136, 1143 (9th Cir. 2017) for the proposition that the mere fact that a defendant's conduct has foreseeable effects in the forum state or impacts someone with connections to that state is not enough to confer personal jurisdiction. (*Id.* at 8.)

*In Re Western States* held that a defendant is not subject to personal jurisdiction in a forum state simply because his actions *outside* that state caused or contributed to an effect inside the state, even if that effect was predictable; instead, the defendant "must choose to direct his activities at the forum in causing the effect in the forum." 605 F. Supp. 2d at 1140. *Morrill* similarly found that a defendant DEA agent who seized $97,000 cash from Nevada residents at an airport in Atlanta, Georgia was not subject to personal jurisdiction in Nevada for his out-of-state conduct just because the plaintiffs were Nevada residents. 873 F.3d at 1143. The court reasoned that the agent, who allegedly falsified a probable cause statement when effecting the seizure, "had not expressly targeted the state of Nevada" or formed "any jurisdictionally relevant contacts with Nevada." *Id.* It further reasoned that the harm the agent allegedly inflicted was not connected to Nevada because the plaintiffs would have experienced the same injury—lack of access to their funds—in any state where they chose to travel. *Id.* at 1143−44.

Neither of these cases applies to the facts presented here because, even though Defendant Westbrook's alleged deliberate indifference to Plaintiff's injuries began outside Arizona, it was not limited to out-of-state conduct. Plaintiff alleges that after the prisoner transport plane from Salina, Kansas arrived in Arizona, Westbrook again denied Plaintiff relief in deliberate indifference to Plaintiff's pain and injuries, telling him only that SCC staff would remove his restraints when he arrived at the prison facility, which did not happen for up to four hours after the plane landed in Arizona. (Doc. 1 ¶¶ 57−59.) The alleged harm to Plaintiff during this time was also directed at Arizona because, unlike the plaintiffs in *Morrill* whose money was seized outside the forum state and who could have suffered the effects of that loss anywhere they travelled, Plaintiff came to Arizona as a

prisoner, and as the one overseeing that transport, Westbrook knew Plaintiff would be booked into SCC and would therefore necessarily suffer the effects of his injuries in Arizona. Westbrook also allegedly made a deliberate choice to leave it to prison officials in Arizona to address Plaintiff's injuries, telling Plaintiff he needed to wait for SCC staff to provide relief, even though Plaintiff had complained to Westbrook of his injuries multiple times, even before the prisoner transport plane left Kansas. Westbrook's alleged deliberate indifference to the risks to Plaintiff was therefore not limited to out-of-state conduct, and it did not merely have a happenstantial effect inside Arizona. Rather, it continued after Plaintiff arrived in Arizona, and for all practical purposes, was directed at Arizona while "causing the effect in th[at] forum." *In Re W. States* 605 F. Supp. 2d at1140.

Defendant Westbrook's alleged role as the TCA Supervisor responsible for overseeing the transport of prisoners from Kansas to Arizona is itself sufficient to show that Westbrook both directed activity at Arizona and availed himself of the privileges of conducting activity in the state. Construed in Plaintiff's favor, Westbrook directed activity—an influx of 120 KDOC prisoners—at Arizona. (Doc. 20 at 7.) Even if Westbrook was not personally involved in arranging for these extraditions, his supervisory role in bringing Kansas prisoners to Arizona is enough to show he directed activity at the state. Westbrook's conduct within the state while prisoners awaited further transport and booking into SCC, including telling Plaintiff to wait for SCC to remove his restraints, is also enough to show both that Westbrook purposefully directed activity at Arizona and purposefully availed himself of the privileges of acting within the state. Relatedly, Plaintiff's injuries due to Westbrook's alleged deliberate indifference to Plaintiff's overtight restraints arise out of or relate to Westbrook's activities directed at and within the state, so the first and second prongs of the minimum contacts test are met.

In the alternative, Westbrook's alleged deliberate indifference to Plaintiff's injuries after the transport plane landed in Arizona is enough to satisfy both the first and second prongs of this test. "Generally, the commission of an intentional tort in a state is a purposeful act that will satisfy the first two requirements of the minimum contacts test."

*Freestream*, 905 F.3d at 603. In *Freestream*, the Ninth Circuit found that the "effects test" set forth in *Calder v. Jones*, 465 U.S. 783 (1984), which assesses whether conduct that occurs solely *outside* the forum state has sufficient effects inside the state to confer personal jurisdiction, does not apply to intentional torts committed *inside* the forum state. *Freestream*, 905 F.3d at 603−604. The court reasoned that, when a "non-resident has voluntarily entered a state and invoked the protections of its laws, it does not in our view offend traditional notions of fair play and substantial justice to require the non-resident to answer in the courts of that state for any tortious acts committed while there." *Id.* at 606 (internal citation and quotation marks omitted).

In summary, the first and second components for specific personal jurisdiction— whether Defendant Westbrook purposefully directed his actions at Arizona or availed himself of the privileges of conducting activity in Arizona, and whether Plaintiff's injury arose out of Westbrook's actions in or directed at the state—are both met. *Id.* at 603.

### 2. Whether Personal Jurisdiction is Reasonable

Because Plaintiff's allegations regarding Defendant Westbrook's actions satisfy the first two prongs of the minimum contacts test, Westbrook must present a compelling case that would render personal jurisdiction over him in Arizona unreasonable. *Freestream*, 905 F.3d at 607.

> To evaluate reasonableness, [the court applies] a seven-factor balancing test that weighs:
>
> (1) the extent of the defendant's purposeful interjection into the forum state's affairs;
>
> (2) the burden on the defendant of defending in the forum;
>
> (3) the extent of conflict with the sovereignty of the defendant's state;
>
> (4) the forum state's interest in adjudicating the dispute;
>
> (5) the most efficient judicial resolution of the controversy;
>
> (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and
>
> (7) the existence of an alternative forum.

*Id.*

### a.      Purposeful Interjection

"Even if there is sufficient interjection into the state to satisfy the [purposeful interjection prong], the degree of interjection is a factor to be weighed in assessing the overall reasonableness of jurisdiction under the [reasonableness prong]." *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1488 (9th Cir. 1993) (alteration in original) (internal quotation marks and citations omitted).

As discussed, Defendant Westbrook traveled to Arizona as a TCA Supervisor with the express purpose of transporting KDOC prisoners to Arizona and, by doing so, purposefully interjected himself into Arizona's affairs. Even so, the degree of Westbrook's interjection into state affairs was relatively modest. Based on the allegations in the Complaint, Plaintiff's injuries when he arrived at SCC and had his restraints removed were not severe and required only basic medical care. (Doc. 1 ¶¶ 61–69 (alleging "enormous swelling" of the arms, blisters, and cuts, for which Plaintiff requested bandages, gauze, and antibiotic ointment).)[2] The degree of Westbrook's interjection in Arizona affairs related to his allegedly deliberately indifferent conduct in this action was therefore minor, and this factor weighs only slightly against Westbrook.

### b.      Burden on Defendant

"A defendant's burden in litigating in the forum is a factor in the assessment of reasonableness, but unless the inconvenience is so great as to constitute a deprivation of due process, it will not overcome clear justifications for the exercise of jurisdiction." *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1323 (9th Cir. 1998) (internal citations and quotation marks omitted).

---

[2] Plaintiff alleged that SCC medical providers denied his requests for medical care in deliberate indifference to his serious medical needs, and he named Licensed Practical Nurse Gerald Walker and Registered Nurse Marci Gottfredson as Defendants, but the Court found on screening that Plaintiff failed to allege facts showing he suffered a serious medical need or that these providers' determinations that Plaintiff's injuries would heal on their own and did not require the requested medical treatment were no more than mere differences of opinion that did not equate to deliberate indifference. (Doc. 14 at 13.)

Defendant Westbrook argues that traveling to Arizona to litigate this action would place a heavy burden on him because doing so would detract from his personal duties at home and would keep him from critical employment duties. (Doc. 20 at 10.) He claims that, as a TCA Director of Operations, he cannot leave Tennessee for extended periods of time without compromising TCA's daily operations. (*Id.*) Westbrook also points out that Plaintiff has been returned to HCF custody, which he argues weighs against keeping this case in Arizona. (Doc. 20 at 10.)

Defendant Westbrook would be burdened by having travel to Arizona, but this is not such an inconvenience to constitute a deprivation of due process. "Modern advances in communications and transportation have significantly reduced the burden of litigating in another forum." *Freestream*, 905 F.3d at 608; *Sher v. Johnson*, 911 F.2d 1357, 1365 (9th Cir. 1990) ("In this era of fax machines and discount air travel, requiring the [Florida-based] partnership to defend itself in California . . . would not be so unreasonable as to violate due process."). Additionally, although Plaintiff's place of residence is relevant, "lack of residence [by the plaintiff] will not defeat jurisdiction established on the basis of [the] defendant's contacts." *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 780 (1984).

This factor weighs in Defendant Westbrook's favor, but only slightly.

### c. Conflict with the Sovereignty of the Defendant's State

Defendant Westbrook argues that Tennessee has an interest in adjudicating matters involving its own residents and the employees of a company headquartered in that state. (Doc. 20 at 10.) Although Tennessee has some interest in adjudicating this action, Arizona also has an interest in adjudicating injuries that occur within its borders, and Tennessee's interests would not be significantly impaired by allowing the action to proceed in Arizona. *See Brand v. Menlove Dodge*, 796 F.2d 1070, 1076 n.5 (9th Cir. 1986) ("conflict with the sovereignty of the defendant's state is not a very significant factor in cases involving only U.S. citizens; conflicting policies between states are settled through choice of law analysis, not through loss of jurisdiction."). This factor is neutral.

. . . .

### d. Arizona's Interest

Defendant Westbrook argues that Arizona does not have a strong interest in this lawsuit because Plaintiff is not an Arizona resident, the primary events underlying Plaintiff's claim occurred outside Arizona, and Westbrook's alleged conduct in Arizona was not substantial. Although Arizona does not have a strong interest in many of the underlying events in this action, it "does have an interest in torts allegedly committed within its borders." *Freestream*, 905 F. 3d at 608. Additionally, while Westbrook's alleged actions in Arizona were minimal, injury to a prisoner being transported to an Arizona facility has an impact on that facility. Accordingly, like the degree of personal interjection, this factor weighs against Westbrook, but only slightly.

### e. Efficient Resolution

Efficient resolution depends primarily on where the witnesses and evidence are located, but this factor is lessened when the witnesses reside in several different fora and is "no longer weighed heavily given the modern advances in communication and transportation." *Freestream*, 905 F.3d at 609 (internal citation omitted). Because most of the allegations underlying Plaintiff's deliberate indifference claim occurred outside Arizona, and both Plaintiff and Defendant Westbrook are outside of Arizona, this factor weighs in favor of Westbook.

### f. Convenience to Plaintiff

Defendant Westbrook argues that, because Plaintiff is a Kansas resident who was only briefly incarcerated at SCC, is currently incarcerated at HCF, and has not alleged any other connections to Arizona, litigating in Arizona does not promote Plaintiff's interest in convenient and effective relief. (Doc. 20 at 11.) Plaintiff has not alleged or presented any evidence to the contrary. This factor weighs in favor of Westbrook.

### g. Alternative Forum

Defendant Westbrook asserts that the Middle District of Tennessee, where Westbrook resides, is an alternative forum. (*Id.*) KDOC Defendants argue that the District of Kansas is an alternative forum. (Doc. 22 at 15.) Because Westbrook's encounter with

Plaintiff and alleged deliberate indifference to Plaintiff's injuries began in Kansas, it appears the District of Kansas is also an alternative forum. Plaintiff bears "the burden of proving the unavailability of an alternative forum." *Freestream*, 905 F.3d at 609. Plaintiff has not done so. Accordingly, this factor weighs in favor of Westbrook.

### h. Balancing the Factors

Upon review, two factors—the degree of Defendant Westbrook's purposeful interjection into Arizona and Arizona's interest in adjudicating actions occurring within its borders—weigh against Westbrook and in favor of keeping this action in Arizona, but only slightly. The remaining five factors—the burden on Westbrook, the sovereign interests of Westbrook's home state, efficient resolution of this action, convenience to Plaintiff, and the existence of an alternative forum—are either neutral or weigh slightly or entirely in Westbrook's favor. Westbrook has therefore made a compelling case that requiring him to defend this action in Arizona is unreasonable.

The Court also finds little reason for keeping this action in Arizona when the record shows Plaintiff has been transferred back to Kansas, particularly where the bulk of the underlying allegations against Defendant Westbrook and KDOC Defendants occurred outside Arizona, involved out-of-state Defendants, and Plaintiff has not alleged or shown that any witnesses or sources of relevant evidence are in Arizona. Although Plaintiff chose this forum at the time of filing, it is undisputed that he is now back at HCF, and he presents no reason why it would be favorable to him to continue litigating this action in Arizona.

As with the KDOC Defendants, the Court must either dismiss Defendant Westbrook or, if dismissal is not otherwise warranted, transfer Plaintiff's claim against Westbrook to an alternative forum.

### III. Failure to Exhaust

KDOC Defendants argue that Plaintiff failed to exhaust his available administrative remedies before filing this action, so the claims against them should be dismissed pursuant to Rule 12(b)(6) for failure to exhaust and not transferred to the District of Kansas. (Doc. 22 at 9–13, 15.)

Under the Prison Litigation Reform Act, a prisoner must exhaust "available" administrative remedies before filing an action in federal court. *See* 42 U.S.C. § 1997e(a); *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926, 934-35 (9th Cir. 2005). The prisoner must complete the administrative review process in accordance with the applicable rules. *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006). Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).

On a motion for summary judgment, the defendant bears the initial burden to show that there was an available administrative remedy and that the prisoner did not exhaust it. *Albino v. Baca*, 747 F.3d 1162, 1169, 1172 (9th Cir. 2014); *see Brown*, 422 F.3d at 936-37 (a defendant must demonstrate that applicable relief remained available in the grievance process). Once that showing is made, the burden shifts to the prisoner, who must either demonstrate that he, in fact, exhausted administrative remedies or "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." Albino, 747 F.3d at 1172. The ultimate burden, however, rests with the defendant. *Id.* Summary judgment is appropriate if the undisputed evidence, viewed in the light most favorable to the prisoner, shows a failure to exhaust. *Id.* At 1166, 1168; *see* Fed. R. Civ. P. 56(a).

In a limited number of cases, the failure to exhaust may be clear from the face of the complaint; however, "such cases will be rare because a plaintiff is not required to say anything about exhaustion in his complaint." *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014); *see Jones v. Bock*, 549 U.S. 199, 216 (2007) (failure to exhaust is an affirmative defense and a prisoner is not required to plead or demonstrate exhaustion in the complaint). In the rare case where failure to exhaust is clear from the face of the complaint, the defendant may move to dismiss under Rule 12(b)(6). *Albino*, 747 F.3d at 1169. To properly be considered on a Rule 12(b)(6) motion, the nonexhaustion defense must raise no disputed Issues of fact. *See Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984)

(affirmative defense may be raised by motion to dismiss only if "the defense raises no disputed issues of fact"). Typically, to show that a prisoner has failed to exhaust remedies, a defendant will have to present probative evidence on a motion for summary judgment under Rule 56. *Albino*, 747 F.3d at 1169.

According to the Kansas Administrative Regulations, to complete the KDOC administrative grievance process, a prisoner must first attempt informal resolution with unit team members. Kan. Admin. Regs. § 44-15-101(b). If this attempt fails, the formal grievance process contains three additional levels of review: (1) submit a grievance to a unit team member, (2) submit a grievance to the facility warden, and (3) appeal to the Kansas Secretary of Corrections. *Id.* § 44-15-101(d)

Plaintiff alleged in his Complaint that, from October 23, 2019 through November 16, 2019, he "satisfied the [KDOC] Informal Resolution requirements," and on November 14, 2019, he filed a an Inmate Grievance but received no response within the timeframe required for a response. (Doc. 1 ¶¶ 89−90.) Because Plaintiff submitted his grievance to SCC staff to scan and send to HCF in Kansas and did not receive a response, he believed he needed to resubmit his grievance through a KDOC "Contract Monitor" to have it scanned and transmitted, which he did on December 3, 2019 by giving the grievance to Contract Monitor Lindsey Wildermuth. *Id.* ¶¶ 91−92.) On December 30, 2019, after the time for an answer/appeal expired, Plaintiff spoke to Contract Monitor Mr. Moore, and Mr. Moore told him he was authorized to proceed to "the next phase for any further legal proceeding deemed necessary, due to the nature that the time limit to answer and appeal the Grievance had expired; and further that the Administration seemingly did not care to entertain or answer the Grievance." (*Id.* ¶ 93.)

KDOC Defendants argue that it is clear from the allegations in the Complaint that Plaintiff only completed the first two steps of the four-step KDOC grievance process and therefore did not exhaust his administrative remedies before filing this action. (Doc. 22 at 12.)

Plaintiff's allegations about his conversation with Contract Monitor Moore appear to suggest that Plaintiff waited too long the second time he failed to receive a response to his Inmate Grievance from HCF to proceed with an appeal and therefore failed to exhaust. Nonetheless, a prisoner is only required to exhaust such administrative remedies as are "available" to him. 42 U.S.C. § 1997e(a); *Vaden*, 449 F.3d at 1050; *Brown*, 422 F.3d at 934−35. Plaintiff's allegations also suggest that SCC failed to transmit his Inmate Grievance to HCF, causing Plaintiff to have to resubmit that grievance a second time through Contract Monitor Wildermuth. HCF staff's failure to respond to either of these attempts, and Contract Monitor Moore's statement that "Administration seemingly did not care to entertain or answer the Grievance," raise questions of fact about whether the KDOC administrative remedy process was available to Plaintiff. Further, while not entirely clear, Plaintiff appears to allege that Moore told him he did not need to continue the administrative grievance process before pursuing legal action, which also raises factual issues about whether administrative remedies were available to Plaintiff to grieve the alleged actions of KDOC Defendants and whether Plaintiff was misinformed by a corrections official about what he needed to do to exhaust. *See Brown*, 422 F.3d at 937 ("information provided [to] the prisoner is pertinent because it informs our determination of whether relief was, as a practical matter, 'available'") (internal citation omitted).

Construing the factual allegations in Plaintiff's favor, the Court is unable to conclude that KDOC's administrative remedies were available to Plaintiff at SCC and that Plaintiff failed to exhaust his available remedies before filing this action. Accordingly, this is not one of those "rare" instances where failure to exhaust is clear from the face of the complaint, and the Court will deny KDOC Defendants' Motion to Dismiss on this ground.

## IV. Statute of Limitations

Defendant Westbrook argues that Plaintiff's claim against him should be dismissed because Plaintiff failed to comply with the two-year statute of limitations for filing this claim. (Doc. 20 at 3.)

. . . .

Title 42 U.S.C. § 1983 does not include its own statute of limitations.  *TwoRivers v. Lewis,* 174 F.3d 987, 991 (9th Cir. 1999).  Therefore, federal courts apply the statute of limitations governing personal injury claims in the forum state, "along with the forum state's law regarding tolling, including equitable tolling, except to the extent any of these laws is inconsistent with federal law."  *Butler v. Nat' l Cmty. Renaissance of Cal.*, 766 F.3d 1191, 1198 (9th Cir. 2014) (citation omitted).  In Arizona, the limitations period for personal injury claims is two years.  *TwoRivers*, 174 F.3d at 991; *see also* Ariz. Rev. Stat. § 12-542 (providing that actions for personal injury must be commenced within two years after the cause of action accrues).  "If the defendant establishes a *prima facie* case that the statute was applicable, the burden of going forward shifts to the plaintiff to show [his] claims fall within a recognized exception to the statute."  *Kiley v. Jennings, Strouss & Salmon*, 927 P.2d 796, 799 (Ariz. Ct. App. 1996).

Although the statute of limitations applicable to § 1983 claims is borrowed from state law, federal law continues to govern when a § 1983 claim accrues.  *Wallace v. Kato*, 549 U.S. 384, 388 (2007); *TwoRivers*, 174 F.3d at 991.  Under federal law, a claim accrues "when the plaintiff knows or has reason to know of the injury which is the basis of the action."  *TwoRivers*, 174 F.3d at 991; *Kimes v. Stone*, 84 F.3d 1121, 1128 (9th Cir. 1996).

Based on the allegations in the Complaint, Plaintiff's injuries occurred on October 23, 2019, meaning Plaintiff's claim against Defendant Westbrook accrued that day.  Plaintiff filed this action on November 8, 2021, with a postmark of November 2, 2021.  Because the date of filing exceeds the two-year statute of limitations by ten days, Westbrook argues that Plaintiff's claim against him must be dismissed.  (Doc. 20 at 4.)

Defendant Westbrook fails to account for any time in which the statute of limitations was tolled during the mandatory exhaustion of administrative remedies.  *See Brown*, 422 F.3d at 943 ("we agree with the uniform holdings of the circuits that have considered the question that the applicable statute of limitations must be tolled while a prisoner completes the mandatory exhaustion process").  Plaintiff was not required to allege specific facts about exhaustion in his Complaint, but he alleged that he completed the first two steps of

SCC's administrative remedy process, and SCC Warden Thomas impeded his ability to complete the final step of that process. (Doc. 1 at 5.) The Court infers in Plaintiff's favor that these attempts to complete the SCC administrative grievance process took more than ten days, which would account for the time between October 23, 2021, when the two-year statute of limitations elapsed, and November 2, 2023, when Plaintiff mailed his Complaint. The Court therefore cannot conclude on the face of the Complaint that Plaintiff's Complaint was untimely and will deny Westbrook's Motion to Dismiss on statute of limitations grounds.

**V.    Dismissal or Transfer**

Because the Court lacks personal jurisdiction over Defendants in this action, it must determine whether the action should be dismissed or transferred to another Court where jurisdiction is proper. *See Hays v. Postmaster General*, 868 F.2d 328, 331 (9th Cir. 1989); 28 U.S.C. § 1631. In making this determination, courts consider whether the action would have been timely if it was filed on the same date in the proper forum and, if so, whether it is "in the interest of justice" to transfer it. *Hays*, 868 F.2d at 331.

Under 28 U.S.C. § 1391(b), a civil action can be brought in federal district court: (1) in a judicial district in a state where all defendants reside, (2) in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or (3) if no judicial districts meet these requirements, any judicial district in which any defendant is subject to the court's personal jurisdiction. 28 U.S.C. § 1391(b)

KDOC Defendants argue that the District of Kansas meets these requirements for Plaintiff's claims against them because they reside in Kansas and all the allegations against them occurred in Kansas. (Doc. 22 at 8.) The District of Kansas is also an alternative available forum for Plaintiff's claim against Defendant Westbrook because, even though Westbrook is a resident of Tennessee, not Kansas, a substantial part of the allegations against him occurred in Kansas. Based on the allegations in the Complaint, Plaintiff first complained to Westbrook about his overtight restraints when Westbrook boarded the KDOC transport vehicle at the airport in Salina, Kansas around 8:30 a.m. on October 23,

2019 and identified himself as the TCA supervisor.  (Doc. 1 ¶¶ 38−39.)  Then, during the next approximately 30 minutes before the prisoners boarded the transport plane, and for an additional 90 minutes before the plane took off around 11:30 a.m., Westbrook and other TCA staff under his direction repeatedly ignored, put off, or denied Plaintiff's requests to loosen his restraints or find him larger cuffs.  (*Id.* ¶¶ 40−48.)  Right before takeoff, Westbrook also allegedly told Plaintiff, "If you ask me one more time about lo[o]sening those cuffs, I will leave them like they are."  (*Id.* ¶ 49.)  Because these actions all occurred in Kansas and allegedly resulted in continued pain, cuts, and swelling to Plaintiff, both throughout and after his flight to Arizona, a substantial part of the events or omissions giving rise to Plaintiff's claim against Westbrook occurred in Kansas, where all the alleged actions underlying Plaintiff's claims against KDOC Defendants also occurred.  The District of Kansas is therefore an alternative available forum for Plaintiff's claims against all Defendants.[3]

Because Plaintiff allegedly suffered pain and injuries from being forced to remain in overtight cuffs for several hours, during which Defendants were allegedly deliberately indifferent to the threat of harm to Plaintiff, the interest of justice would also be served by the transfer of this action to the District of Kansas rather than outright dismissal of Plaintiff's Eighth Amendment claims.

The Court will nonetheless not direct the transfer of this action to the District of Kansas at this time because Plaintiff has not requested transfer of this action, and he has not shown that this action, if originally filed in the District of Kansas, would be timely.  Timeliness for Plaintiff's § 1983 claims in the District of Kansas would, as in Arizona, depend on the statute of limitations for personal injury claims set forth in state law.  By

---

[3] Because the District of Kansas has personal jurisdiction over the KDOC Defendants, who are Kansas residents, the third option, allowing an action to be brought in "any judicial district in which any defendant is subject to the court's personal jurisdiction" also makes the District of Kansas an appropriate venue for Plaintiff's claims.  28 U.S.C. § 1391(b).

failing to timely respond to Defendants' Motions to Dismiss, Plaintiff has not made any showing regarding the statute of limitations for personal injury claims in Kansas to show that his claims would be timely if originally filed in the District of Kansas; nor has Plaintiff expressed any desire to litigate his claims in an alternate available forum. Upon review of Plaintiff late-filed Responses, Plaintiff did not address this issue except to summarily claim that transfer to an alternate forum would be "unreasonable." (Doc. 35 at 9.)

Because the Court's only other option is to dismiss this action entirely, which would deprive Plaintiff of having his claims addressed on the merits, the Court will give Plaintiff 15 days to respond to this Order, showing cause why this action should be transferred to the District of Kansas instead of dismissed. If Plaintiff seeks transfer of this action to the District of Kansas, he must also show that this action would be timely if originally filed in that district. If Plaintiff does not respond to this Order within 15 days or does not show cause why this action should be transferred to the District of Kansas, the Court will dismiss this action in its entirety for lack of personal jurisdiction.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendant Westbook's Motion to Dismiss and KDOC Defendants' Motions to Dismiss or Transfer to the District of Kansas (Docs. 20, 21).

(2)     Defendants' Motions (Doc. 20, 21) are **granted in part** insofar as the Court finds it lacks personal jurisdiction and venue over Plaintiff's claims, and these claims must be transferred or dismissed; the Motions are otherwise **denied**.

(3)     Within **15 days** of this Order, Plaintiff must **show cause** in writing why this action should be **transferred** to the District of Kansas instead of **dismissed**.

. . . .

. . . .

. . . .

. . . .

. . . .

(4)     If Plaintiff does not **respond** to the Order to Show Cause within **15 days** or does not show cause why this action should be transferred to the District of Kansas instead of dismissed, the Court will dismiss this action in its entirety for lack of personal jurisdiction over Defendants.

Dated this 17th day of July, 2023.

Honorable Steven P. Logan
United States District Judge