## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **BENTON GENE BASKIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case. No. 23-3212-JAR-ADM** |
| | ) | |
| **TODD THOMAS,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MOTION FOR SUMMARY JUDGMENT

Defendants Armen Gaboian and Javier Diaz (the "KDOC Defendants") respectfully

request, through Assistant Attorney General Matthew L. Shoger, that this Court grant summary

judgment in their favor pursuant to Fed. R. Civ. P. 56. The KDOC Defendants attach ten new

exhibits, outlined in the table below, and state the following in support.

### INDEX OF EXHIBITS

| Exhibit | Description |
|---|---|
| A | KASPER Information Sheet |
| B | Declaration of Armen Gaboian |
| C | Declaration of Javier Diaz |
| D | Declaration of Pat Douglas |
| E | Declaration of Joel Hrabe |
| F | Declaration of Doug Burris |
| G | Declaration of Melissa Waldock |
| H | Declaration of Vicki Brungardt |
| I | **(Sealed)** Declaration of Dr. Harold Stopp DO |
| J | **(Sealed)** IMPP 12-110A<br>*all versions in effect since: April 23, 2019* |

### NATURE OF THE CASE

Plaintiff Benton Gene Baskin – currently incarcerated at Hutchinson Correctional Facility

(HCF) – alleges that on October 23, 2019 – while being transported from HCF to Saguaro

Correctional Center (SCC) in Arizona – his restraints were put on him too tightly, damaging his wrists and preventing him from consuming part of a meal. He alleges that the actions of Gaboian in placing restraints on him and the actions of Gaboian and Diaz in not adjusting his restraints constitute cruel and unusual punishment in violation of the Eighth Amendment.

Baskin filed his Complaint (Doc. 1) on November 8, 2021, in the United States District Court for the District of Arizona. On screening under the Prison Litigation Reform Act, the court dismissed Counts I (regarding medical care) and III (regarding deliberate indifference) along with four defendants (three Arizona defendants and the HCF warden) on October 4, 2022. (Doc. 14 at 3, 14; *see also* Doc. 1 at 5, 7, 23.). Although the court dismissed Count III regarding deliberate indifference, the court described the remaining claims under Count II as follows:

> Plaintiff sufficiently alleges facts to support that Defendants Giaboian, Diaz, and Westbrook acted with deliberate indifference to a threat to Plaintiff's safety by repeatedly failing to adjust Plaintiff's restraints, particularly the failure to adjust his wrist restraints for hours.

(Doc. 14 at 14[1]; *see also* Doc 1 at 7, 22.) As discussed herein, many cases analyzing an alleged failure to loosen handcuffs do so under the framework of excessive force. So the remaining claims after screening are for Eighth Amendment violations (either deliberate indifference or excessive force) by Gaboian, Diaz, and Westbrook for not adjusting Baskin's restraints.

In September 2023, the District of Arizona, ruling on motions to dismiss or transfer by the remaining defendants, transferred the case to the District of Kansas because the District of Arizona lacked personal jurisdiction and venue over the case. (Docs. 40, 50–52.) Before transferring, the court denied the KDOC Defendants' motion to dismiss – which had raised

---

[1] Although the District of Arizona referred to an alleged collective failure to adjust Baskin's wrist restraints "for hours," the Complaint has not alleged that Defendant Gaboian interacted with Baskin for more than a few minutes. (*See* Doc. 1 at ¶¶ 20-21.)

failure to exhaust administrative remedies as a defense – along with the KDOC Defendants' motion to reconsider, but did so without prejudice to defendants raising an exhaustion defense on summary judgment. (Doc. 40 at 16-19; Doc. 50 at 6 ("KDOC Defendants will have the opportunity to litigate this issue on summary judgment, and the District of Kansas, which has personal jurisdiction over Defendants, is an appropriate forum to consider their arguments").) The KDOC Defendants now file their motion for summary judgment.

Baskin's medical records show no injuries beyond bruises, blisters, and abrasions on his wrists. (Sealed Exhibit I.) KDOC policy and safety-and-security reasons prohibited Defendant Diaz from entering the rear cabin of the transport bus while inmates were being transported. (Exhibit C at ¶¶ 17-19; *see also* Sealed Exhibit J at 10-11, 29-30, 48-49.) Before and after each leg of the transport, Baskin's restraints were checked and adjusted by the appropriate officers. (Exhibit B at ¶¶ 3-9, 13; Doc. 1 at ¶¶ 21, 30-32; Exhibit D at ¶¶ 7-8; Exhibit C at ¶¶ 20, 25.)

The KDOC Defendants are entitled to summary judgment due to Eleventh Amendment immunity, § 1983 not supporting individual-capacity injunctive or declaratory relief, lack of constitutional standing for injunctive or declaratory relief, failure to establish an Eighth Amendment violation, and failure to exhaust administrative remedies. Baskin has failed to establish an Eighth Amendment violation in light of qualified immunity due to the KDOC Defendants' actions not violating clearly established law, Baskin experiencing no more than de minimis injuries, lack of a serious medical need, and the KDOC Defendants not having a sufficiently culpable state of mind. Alternatively, Baskin is not entitled to punitive damages due to lack of the requisite subjective intent.

## STATEMENT OF MATERIAL FACTS AS TO WHICH
## NO GENUINE ISSUE EXISTS

1. On or around October 23, 2019, Baskin was housed at Hutchinson Correctional Facility (HCF). (Exhibit A at 4; Doc. 1 at ¶¶ 17-18.)

### *Admissions and Discharge at HCF*

2. On or around October 23, 2019, Defendant Gaboian, a corrections officer at HCF, helped prepare a group of inmates at HCF to travel to Saguaro Correctional Center (SCC), a private prison facility in Arizona. (Exhibit B at ¶¶ 1, 10; Exhibit D at ¶ 5; *see also* Doc. 1 at ¶¶ 17-18, 59.)

3. Gaboian was assigned to the Special Security Team at HCF and his responsibilities included preparing inmates for transportation in and out of the facility. (Exhibit B at ¶ 2.)

4. Defendant Gaboian assisted in the Admissions and Discharge section of HCF, where he and other officers placed restraints on the inmates heading to the Arizona facility from HCF. (Exhibit B at ¶ 11; Exhibit C at ¶ 7.)

5. Gaboian placed many restraints on inmates that day and does not recall whether he placed restraints on Baskin. (Exhibit B at ¶ 12.)

6. Per Baskin's statement, Gaboian was the officer that placed restraints on Baskin that day. (Doc. 1 at ¶¶ 20-21.)[2]

7. As part of Gaboian's duties as a corrections officer on the Special Security Team, Gaboian routinely placed belly irons and leg irons on inmates in their preparation for transport. (Exhibit B at ¶ 3.)

---

[2] Some facts are undisputed for the limited purpose of this motion for summary judgment.

8.  Gaboian never put belly irons or leg irons on an inmate too tightly for inmates being transported in or out of the facility. (Exhibit B at ¶¶ 4, 12.)

9.  Gaboian always made sure they were properly secured for the individual and created a routine to check their security to ensure they were done correctly every time. This was influenced by his experience in the military, which required safety checks and procedures for every task. (Exhibit B at ¶ 4.)

10. Gaboian's safety check and procedure included: putting one of his fingers between the handcuffs and the inmate's wrist while putting the handcuffs on the inmate. After tightening the handcuffs, a sufficient gap would remain for Gaboian to slip his finger out. This gap ensured that the handcuffs would not be too tight. This allowed about one inch of mobility for the inmate to use their hands for proper transportation. Once completed, Gaboian would double lock the cuff so it would not tighten. (Exhibit B at ¶ 5.)

11. If the handcuffs were too small to accomplish this, Gaboian would use leg irons instead, which are larger. (Exhibit B at ¶ 6.)

12. If the inmate requested that Gaboian adjust the handcuffs, Gaboian would redo the handcuffs. (Exhibit B at ¶ 7.)

13. If the inmate requested that Gaboian adjust the handcuffs again, Gaboian would tell the inmate to check with another corrections officer and that the other officer could redo the cuffs if the inmate felt they were improperly applied. (Exhibit B at ¶ 8.)

14. Gaboian would only place handcuffs on an inmate tightly if circumstances demanded it, such as when he needed to quickly get someone out of a fight or when an inmate became violent or belligerent. (Exhibit B at ¶ 9.)

15. Gaboian followed his usual procedure of ensuring a one-finger gap when placing handcuffs on each inmate transported that day. (Exhibit B at ¶ 13; *see also* Doc. 1 at ¶ 21.)

16. If an inmate had requested medical treatment, Gaboian would have referred the inmate to medical immediately. (Exhibit B at ¶ 14.)

### *Bus Transport*

17. The inmates were then escorted to a bus where Defendant Diaz, a Corrections Officer at HCF, was waiting as the driver. (Exhibit C at ¶¶ 2, 6-8.)

18. The front cabin of the bus was separated from the rear cabin of the bus by a partition with a window in it. (Exhibit C at ¶ 9.)

19. In the front cabin of the bus, Diaz sat in the driver's seat and another officer sat in the passenger seat of the bus as Diaz's partner. (Exhibit C at ¶ 10.)

20. The inmates sat in the rear cabin of the bus behind the partition. (Exhibit C at ¶ 11.)

21. Diaz and the other officer could communicate with the inmates in the rear cabin through the window between the cabins. (Exhibit C at ¶ 12.)

22. Once inmates were on the bus, at least one of the two officers would have stayed with the bus at all times. (Exhibit C at ¶ 13.)

23. KDOC often provided sack lunches to inmates when transporting them between facilities if they would otherwise miss a meal. (Exhibit C at ¶ 14; *see also* Sealed Exhibit J at 6, 26, 44-45.)

24. Diaz does not recall providing sack lunches to inmates on that particular day. (Exhibit C at ¶ 15; *see also id.* at ¶ 5.)

25. Per Baskin's statement, he was provided with a sack lunch for breakfast that day. (Doc. 1 at ¶¶ 20, 23, 38, 42.)

26. Diaz was not aware of any complaints by the inmates until the inmates were loaded onto the transport bus and the bus started pulling away from HCF. At that point, Diaz recalls that Baskin started to complain about his handcuffs being too tight. (Exhibit C at ¶ 16; *see also* Doc. 1 at ¶ 22 (Baskin had boarded and was seated on the transport bus when he complained to Diaz about his restraints).)

27. Under strict KDOC policy, which Diaz had been trained on, once the bus had started moving, the officers conducting the transport were not permitted to enter the rear cabin. This policy exists to ensure safety and security. For example, a complaint about tight restraints could be a ploy to set up an ambush on officers, which could then potentially allow inmates to escape. (Exhibit C at ¶ 17; *see also* Sealed Exhibit J at 10-11, 29-30, 48-49.)

28. For security reasons, the inmates being transported did not know long in advance, if at all in advance, that they were heading to Arizona. (Exhibit C at ¶ 18.)

29. Diaz knew from training and experience that inmates often did not like the change of moving to a different facility, especially when it is unexpected or sudden. For these reasons, Diaz believed some inmates were likely upset about going to Arizona. (Exhibit C at ¶ 18.)

30. In light of this, in addition to the strict KDOC policies prohibiting entering the rear cabin, knowing that inmates were likely upset about the transport gave Diaz an additional reason to believe, in light of his training and experience, that entering the rear cabin was inadvisable. (Exhibit C at ¶ 19.)

31. The proper officers to adjust handcuffs prior to transport would have been the team of officers who applied them in the secure environment of A&D. (Exhibit C at ¶ 20.)

32. Accordingly, Diaz asked Baskin why he had not raised the handcuffs issue earlier while he was in A&D. (Exhibit C at ¶ 20; *see also* Doc. 1 at ¶ 22.)

33. Diaz did not hear Baskin give any response. (Exhibit C at ¶ 21.)

34. Diaz does not recall taking the inmates to El Dorado Correctional Facility (EDCF) that day. (Exhibit C at ¶ 22; *see also id.* at ¶ 5.)

35. Per Baskin's statement, the transport bus stopped at EDCF, where the inmates disembarked and entered EDCF. (Doc. 1 at ¶ 28.)

36. Baskin's handcuffs were adjusted by Officer Reau at EDCF. (Doc. 1 at ¶¶ 30-32.)

37. Officer Reau concluded that the handcuffs were too small even at their loosest setting – not that they were adjusted too tightly. (Doc. 1 at ¶ 31.)

38. Officer Reau notified some other personnel at EDCF of the condition of Baskin's wrists and arms. (Doc. 1 at ¶ 32.)

39. Baskin received a medical evaluation at EDCF from a medical provider. Baskin was told there was nothing that the medical provider or EDCF personnel could do. (Doc. 1 at ¶¶ 32-34.)

40. The inmates then re-boarded the bus, which then continued on to the airport in Salina. (Doc. 1 at ¶¶ 35-36, 38.)

41. Diaz drove the transport bus that transported the inmates to the airport in Salina. (Exhibit C at ¶ 23; *see also* Doc. 1 at ¶ 36.)

42. After the bus departed, Baskin complained to Diaz about his restraints. (Doc. 1 at ¶¶ 36-37.)

43. At the airport, Diaz remained in the bus as other KDOC officers escorted the inmates from the bus. (Exhibit C at ¶ 24.)

*Flight to Arizona*

44. Pat Douglas has served as the Security and Emergency Manager for the Kansas Department of Corrections (KDOC) since July 2016. (Exhibit D at ¶¶ 1-4.)

45. Douglas was the coordinator for KDOC s operations and logistics for transportation to the airport, site security, and inmate movement to the airplane. (Exhibit D at ¶ 6.)

46. Once the airplane was loaded, Douglas observed the airplane transport by TransCor America (TCA). TCA was the third-party private security firm conducting the air transport. Douglas was on the flight as a "contract monitor" on behalf of KDOC to monitor the transport, to talk with the inmates, and to ensure that inmates had answers to their questions. (Exhibit D at ¶ 7.)

47. TCA checked all restraints prior to boarding, changed some, and handled all restraint and movement on the trip. (Exhibit D at ¶ 8; Exhibit C at ¶ 25.)

48. Douglas did not have a key to the inmates' restraints. (Exhibit D at ¶ 9.)

49. The restraints included belly chains and a pair of handcuffs attached at the front of the belly chain. (Exhibit D at ¶ 10.)

50. A rigid "black box" handcuff cover was placed in the middle of the handcuffs to prevent lock-picking. (Exhibit D at ¶¶ 11-12, 16.)

51. For the flight, the inmates were secured in groups of three by TCA, with chains connecting the restraints of each trio in a line. (Exhibit D at ¶¶ 13-14.)

52. The seating on the plane was in rows of six, divided by a central aisle into half-rows of three. Each trio of connected inmates sat in a half-row with the other inmates in that trio and were connected to each other at the sides with a plastic restraint by TCA. (Exhibit D at ¶¶ 15-16.)

53. The armrests on the plane happened to pull on the restraint between inmates, causing the restraint to restrict movement more. (Exhibit D at ¶ 17.)

54. TCA adjusted some restraints during the flight. (Exhibit D at ¶ 18.)

55. Douglas received some complaints from inmates near him on the flight regarding the tightness of their restraints. Douglas personally asked TCA staff to check those inmates' restraints. (Exhibit D at ¶ 19.)

56. Douglas remembers that several inmates who had come in on one particular bus (not from the Hutchinson or El Dorado Correctional Facilities) had their restraints placed incorrectly, and TCA staff had to adjust those restraints. (Exhibit D at ¶ 20.)

57. When they eventually arrived at SCC, all inmates received a medical intake check. (Exhibit D at ¶ 25; Sealed Exhibit I at ¶¶ 4-5, pgs. 4-8.)

58. Douglas did not personally check all of the inmates' restraints. (Exhibit D at ¶ 26.)

59. Douglas does not recall if he observed Baskin's handcuffs being too tight on the flight to Arizona or at any other time that day. (Exhibit D at ¶ 26.)

### *Saguaro Correctional Center*

60. From October 23, 2019 to December 2020, KDOC housed about 120 inmates, including Baskin, out of state in SCC. (Exhibit D at ¶ 27; Exhibit E at ¶ 5; Exhibit F at ¶ 5; Exhibit G at ¶ 6.)

61. Although these inmates were housed temporarily in SCC, their home facility remained the facility they were at prior to being transferred to SCC. For examples, these inmates had some of their property kept at their respective home facilities. (Exhibit E at ¶ 6.)

62. Although Baskin was housed in SCC, his home facility remained as HCF. (Exhibit E at ¶ 7.)

### *Baskin's Allegations of Injury*

63. Baskin complains that the handcuffs:

    a.   caused him pain (Doc. 1 at ¶¶ 22, 24-26, 35, 40-41, 48, 50, 54-56, 58, 89, 96, 99, 107);

    b.   caused him anxiety (Doc. 1 at ¶ 33);

    c.   caused redness of his wrists (Doc. 1 at ¶¶ 31);

    d.   caused swelling of his wrists (Doc. 1 at ¶¶ 24, 26, 28-29, 31, 34, 37, 40, 44, 48, 51, 54-55, 61-62, 66, 98, 100);

    e.   caused blisters on his wrists (Doc. 1 at ¶¶ 62, 64);

    f.   "cut into" his wrists (Doc. 1 at ¶¶ 22, 24, 34); and

    g.   cut his wrists and caused some bleeding (Doc. 1 at ¶¶ 48, 62, 65-66, 100).

64. Baskin complains that the tightness of his restraints made him unable to eat a portion of his breakfast "sack lunch." (Doc. 1 at ¶¶ 20, 23, 38, 42.)

65. But Baskin says a TCA employee adjusted Baskin's restraints so he *was* able to eat a sack lunch provided to him for lunch. (Doc. 1 at ¶ 53.)

### *Medical Records*

66. On October 23, 2019, Baskin's medical record shows that during his initial intake screening by a Registered Nurse (RN) at Saguaro Correctional Center (SCC), Baskin reported that he was not experiencing any pain. (Sealed Exhibit I at ¶ 4, pg. 5.)

67. Baskin also reported during that screening that he did not have any special health care needs or current medical complaints. (Sealed Exhibit I at ¶ 4, pg. 5.)

68. Baskin did report that he had bruises and "blisters on wrist," which the RN noted. (Sealed Exhibit I at ¶ 5, pg. 6.)

69. On November 15, 2019, Baskin's medical record shows that he had abrasions on both wrists. The abrasion on his right wrist measured 4 cm x 1 cm. The abrasion on his left wrist measured 3 cm x 1 cm. (Sealed Exhibit I at ¶ 6, pgs. 11-13.)

70. The RN who documented the abrasions noted they were "clean" and "well healing wounds." (Sealed Exhibit I at ¶ 7, pg. 13; *see also* Doc. 1 at ¶¶ 66, 102.)

71. Baskin reported to the RN, "When I was transferred over here the cuffs cut my wrists. I would like it documented." (Sealed Exhibit I at ¶ 8, pg. 12.)

72. The RN instructed the patient to keep the wound clean and dry and to notify medical if the condition worsened in any way. (Sealed Exhibit I at ¶ 9, pgs. 10, 14.)

73. On March 31, 2020, an RN documented "no injuries noted" during a pre-segregation health evaluation of Baskin. (Sealed Exhibit I at ¶ 10, pg. 19.)

74. On October 13, 2020, an Advanced Practice Nurse (APN) conducted a periodic appraisal of Baskin's health. (Sealed Exhibit I at ¶ 11, pgs. 22-26.)

75. In a box labelled "Present Complaints: Describe any current symptoms or complaints," the APN noted an elevated blood pressure but did not note any complaints by Baskin regarding his wrists. (Sealed Exhibit I at ¶ 12, pg. 22.)

76. The APN found Baskin's upper extremities – which includes the arms, forearms, wrists, and hands – to be within normal limits, without any abnormal findings. (Sealed Exhibit I at ¶ 13, pg. 24.)

77. The APN did not find any lesions (a term that includes wounds such as cuts, abrasions, bruises, or scabs) on Baskin's extremities. (Sealed Exhibit I at ¶ 14, pg. 25.)

### *Contract Monitors*

78. While inmates were housed in SCC, KDOC frequently sent representatives called "contract monitors" to SCC to meet with inmates housed there. From October 23, 2019,

12

to the end of 2020, this occurred about once a week. (Exhibit D at ¶¶ 28, 32-36; Exhibit E at ¶¶ 9, 13-14; Exhibit G at ¶¶ 12, 16.)

79. The KDOC staff members who served as contract monitors volunteered to do so. (Exhibit D at ¶ 29; Exhibit E at ¶ 10; Exhibit G at ¶ 13.)

80. One or two contract monitors would be sent at a time. (Exhibit D at ¶ 30; Exhibit E at ¶ 11; Exhibit G at ¶ 14.)

81. The contract monitors were responsible for talking with KDOC residents and ensuring that residents had answers to their questions. (Exhibit D at ¶ 31; Exhibit E at ¶ 12; Exhibit G at ¶ 15.)

82. Douglas served as a contract monitor four times, including on the flights to and from Arizona. For the return flight, he personally checked all of the inmates' restraints before the flight. (Exhibit D at ¶¶ 32-36.)

### *Grievance Process*

83. Baskin admits in the complaint that he did not complete the grievance process. (Doc. 1 at 5, 22-23.)

84. Inmates housed in SCC had access to KDOC's administrative remedy process while housed in SCC. (Exhibit G at ¶ 7.)

85. As part of KDOC's arrangement with SCC, inmates housed in SCC had access to Kansas regulations – including KDOC's grievance policy – as well as KDOC's grievance forms while housed in SCC, in both electronic and paper forms. (Exhibit G at ¶ 8; Exhibit F at ¶ 6.)

86. KDOC inmates housed at SCC had a computer kiosk for regular access to KDOC's Internal Management Policies and Procedures (IMPP's) as well as the Kansas Administrative Regulations. (Exhibit F at ¶ 6.)

87. Inmates housed in SCC also had access to a KDOC rulebook which covered the grievance timeframes and the next action to take if no response was made to a grievance at any step of the process. (Exhibit G at ¶¶ 9-10, pgs. 4, 11-12, 73-85.)

88. As part of KDOC's arrangement with SCC, all KDOC grievance forms received by SCC were to be electronically sent to KDOC. (Exhibit E at ¶ 8; Exhibit G at ¶ 11.)

89. With regard to the 15-day deadline to file a grievance regarding KDOC or KDOC personnel, KDOC gave more leeway to inmates housed at SCC than to other inmates. (Exhibit F at ¶ 7.)

90. KDOC even actively reviewed how SCC handled grievances regarding SCC or SCC personnel filed by KDOC inmates housed at SCC. (Exhibit F at ¶ 8.)

### *Baskin's Grievances*

91. KDOC does not have on file records of any grievances filed by Baskin while he was at Saguaro Correctional Center. (Exhibit H at ¶ 5.)

92. Baskin sought informal resolution of his concerns from October 23, 2019 through November 16, 2019. (Doc. 1 at ¶ 89.)

93. Baskin filed a grievance with KDOC on November 14, 2019. (Doc. 1 at ¶ 90-91, 75, 82.)

94. That grievance was scanned and e-filed to "Unit Team Supervisor Mr. M. Lamb" at HCF. (Doc. 1 at ¶ 82.)

95. Baskin received a copy of the e-filed grievance. (Doc. 1 at ¶ 82.)

96. Baskin resubmitted his grievance to a KDOC contract monitor in person on December 3, 2019. (Doc. 1 at ¶ 91-92, 74-76.)

97. Baskin also filed an unrelated grievance on November 16, 2019, with SCC regarding the "denial of Medical Treatment for Plaintiff Baskin" by "CoreCivic Health Care Provider(s)." (Doc. 1 at ¶ 72-75.)

98. Baskin did not receive a response to his grievance, and the time for the KDOC unit team to respond expired. (Doc. 1 at ¶¶ 90-91, 93, 110.)

99. Baskin admits that the time to appeal expired and he did not finish appealing any of his grievances to the highest administrative level. (Doc. 1 at ¶ 93, pgs. 5, 22-23.)

100. No evidence shows that Baskin timely filed an appeal of his KDOC grievance to the warden of HCF. (*See* Doc. 1 at ¶¶ 90-92, 74-76, 82, 110; pgs. 5, 22-23; Exhibit H at ¶ 5.)

101. Baskin admits that he did not file an appeal of his KDOC grievance to the Secretary of Corrections (the highest administrative level). (Doc. 1 at 5, 22-23.)

102. Baskin had previous experience with the grievance process, including appealing grievances to the highest administrative level. (Exhibit G at ¶¶ 18-19, pgs. 87-97.)

103. "Upon expiration of the answer/appeal time period" for the KDOC grievance, Baskin "conversed with Kansas Contract Monitor Mr. Moore" on December 30, 2019. (Doc. 1 at ¶ 93.)

104. An SCC official would not give Baskin a copy of his Arizona grievance on December 11, 2019. (Doc. 1 at ¶ 78; *see also id.* at ¶ 107.)

105. The same SCC official did not drop what he was doing to immediately talk to Baskin after Baskin made a general request to talk on December 23, 2019. (Doc. 1 at ¶¶ 85-86; *see also id.* at ¶ 107.)

106. The Arizona warden allegedly threatened Baskin with retaliation with regard to Baskin's Arizona grievance on December 30, 2019. (Doc. 1 at ¶¶ 87-88, 108; *see also id.* at 5, 22.)

## QUESTIONS PRESENTED

I.   Does the Eleventh Amendment bar Baskin's § 1983 claims against the KDOC Defendants in their official capacities?

II.  Are the individual-capacity claims under § 1983 for injunctive and declaratory relief

effectively official-capacity claims that are barred under the Eleventh Amendment?

III.   Does Baskin fail to establish constitutional standing for his claims for prospective and declaratory relief when he does not allege an ongoing injury?

IV.   Are the KDOC Defendants entitled to qualified immunity when their actions did not violate clearly established law of which reasonable state officials would have known?

V.   Does Baskin fail to establish an Eighth Amendment violation when he experienced no more than de minimis injuries, has not demonstrated a serious medical need, and the KDOC Defendants did not have a sufficiently culpable state of mind?

VI.   Are the KDOC Defendants entitled to summary judgment when Baskin failed to exhaust his administrative remedies under the Prison Litigation Reform Act (PLRA)?

VII.   Alternatively, should partial summary judgment be granted regarding punitive damages when Baskin cannot show the requisite subjective intent?

## ARGUMENTS AND AUTHORITIES

### *Summary Judgment Standard*

Summary judgment is appropriate when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018). The court views the evidence and draws all reasonable inferences in a light most favorable to the nonmoving party. *Id.* "[W]hile courts must construe pro se pleadings liberally, pro se plaintiffs may not rely on conclusory allegations to overcome their burden." *Hastings v. Campbell*, 47 F. App'x 559, 560 (10th Cir. 2002) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)). Facts must be shown through affidavits, deposition transcripts, or incorporated exhibits. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

> [T]he mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a genuine issue or dispute of material fact.

16

[citation omitted] To create a genuine issue, the nonmovant must present facts upon which a reasonable jury could find in favor of the nonmovant.

*Sinclair Wyo. Refin. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 765 (10th Cir. 2021).

### *Qualified Immunity Standard*

Qualified immunity protects from civil liability government officials whose actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). When a defendant raises the qualified immunity defense, it creates a presumption that the defendant is immune from suit. *Janny v. Gamez*, 8 F.4th 883, 913 (10th Cir. 2021). To overcome this presumption, the burden shifts to the plaintiff to show (1) the defendant's alleged conduct violated a federal statutory or constitutional right, and (2) that right was clearly established at the time of the alleged violation. *Id.* "The court has discretion to decide which of the two prongs of the qualified-immunity analysis to address first." *Grissom v. Roberts*, 902 F.3d 1162, 1167 (10th Cir. 2018) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). The clearly-established right must be clear from applicable case law, *Colbruno v. Kessler*, 928 F.3d 1155, 1161 (10th Cir. 2019), and must be defined with specificity, *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019).

## I.   The Eleventh Amendment bars Baskin's § 1983 claims against the KDOC Defendants in their official capacities.

"The Eleventh Amendment bars suits in federal court against a nonconsenting state brought by the state's own citizens." *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1212 (10th Cir. 2019) (citing *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974)). "This immunity extends to arms of the state and to state officials who are sued for damages in their official capacity." *Id.* As such, employees of KDOC share the state's immunity from suits against them in their official capacities for money damages or declaratory relief. *See White v. Colorado*, 82 F.3d 364, 366

(10th Cir. 1996). Because of the presumption that statutes do not abrogate this immunity, state agencies do not even count as "persons" amenable to suit under § 1983, and neither do state officials sued in their official capacities for monetary damages or declaratory relief. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 & n.10 (1989).

A narrow exception to sovereign immunity allows a plaintiff to seek prospective injunctive relief against a state official for ongoing violations of federal law. *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012) (citing *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). But the Eleventh Amendment bars claims for "retrospective declaratory relief" against state officials. *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1232 (10th Cir. 2004). "Once effectively asserted, Eleventh Amendment immunity constitutes a bar to the exercise of federal subject matter jurisdiction." *Williams*, 928 F.3d at 1212.

Here, Baskin requests monetary damages in the form of compensatory and punitive damages (Doc. 1 at ¶¶ 114, 116), which are barred by the Eleventh Amendment as asserted against the KDOC Defendants in their official capacities.[3] Baskin further requests a retrospective declaratory judgment stating that the KDOC Defendants violated his constitutional rights. (Doc. 1 at ¶ 112.) This too is barred by the Eleventh Amendment. And although Baskin requests prospective injunctive relief against the KDOC Defendants (Doc. 1 at ¶ 113), he does not allege an *ongoing* violation of federal law. He only alleges *past, completed* violations, so his request for injunctive relief is not exempt from Eleventh Amendment immunity. *See Johnston v. Prairie View, Inc.*, No. 19-2041-HLT, 2020 WL 1984287, at *3 (D. Kan. Apr. 27, 2020) (saying the

---

[3] Baskin's complaint seeks "Compensatory damages against defendant Thomas only" (Doc. 1 at ¶ 115), and defendant Thomas has been dismissed from the case (Doc. 14 at 14). But to the extent the Court interprets Baskin's complaint as making damages claims against Defendants Gaboian and Diaz, Eleventh Amendment immunity bars damages claims against them.

"ongoing violation" requirement relates to constitutional standing to invoke the exception).

Therefore, Baskin's claims against the KDOC Defendants in their official capacities should be

dismissed for lack of subject-matter jurisdiction due to Eleventh Amendment immunity.

## II. **Claims for injunctive and declaratory relief under § 1983 cannot be brought against a defendant in their individual capacity.**

Claims for declaratory or injunctive relief against government officials, even if phrased

as individual capacity claims, are effectively official capacity claims because "plaintiff seeks to

change the behavior of the governmental entity." *DeVargas v. Mason & Hanger-Silas Mason

Co.*, 844 F.2d 714, 718 (10th Cir. 1988). Accordingly, under § 1983, which necessarily involves

actions under the color of state law, "a plaintiff cannot sue an official in their individual capacity

for injunctive or declaratory relief." *Chilcoat v. San Juan Cnty.*, 41 F.4th 1196, 1214 (10th Cir.

2022), *cert. denied*, 143 S. Ct. 1748 (2023).[4] Here, Baskin cannot bring claims under § 1983 for

declaratory and injunctive relief against the KDOC Defendants in their individual capacities.

Those claims are effectively official capacity claims and should be dismissed for lack of subject

matter jurisdiction due to Eleventh Amendment immunity as discussed in the previous section.

## III. **Baskin also fails to establish constitutional standing for his claims for injunctive and declaratory relief because of lack of an ongoing injury.**

Article III of the Constitution requires standing to bring a claim. *Steel Co. v. Citizens for

a Better Env't*, 523 U.S. 83, 102 (1998). The "irreducible constitutional minimum of standing"

contains a triad of three requirements: injury in fact, causation, and redressability. *Id.* at 102-03.

This triad "constitutes the core of Article III's case-or-controversy requirement, and the party

---

[4] *But see Idaho v. Couer d'Alene Tribe of Idaho*, 521 U.S. 261, 269 (1997) (in dicta, describing the *Ex Parte Young* exception as applying to "suits seeking declaratory and injunctive relief against state officers in their individual capacities").

invoking federal jurisdiction bears the burden of establishing its existence." *Id.* at 103-04. And "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

### A.   Baskins fails to establish an injury in fact for his claims for injunctive relief.

"The 'injury in fact' requirement differs depending on whether the plaintiff seeks prospective or retrospective relief." *Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1211 (10th Cir. 2014). To recover damages, a form of retroactive relief, it suffices to demonstrate a past harm that is concrete and particularized. *See Tandy v. City of Wichita*, 380 F.3d 1277, 1284, 1290 n.16 (10th Cir. 2004). But "[w]hen prospective relief—such as an injunction—is sought, the plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future." *Colorado Cross*, 765 F.3d at 1211. Here, Baskin only alleges past injuries. So he does not have standing to request injunctive relief.

### B.   Baskin fails to establish redressability for his claims for declaratory relief.

Redressability is established when the relief sought serves to either reimburse the plaintiff for losses or to eliminate lingering effects of losses. *See Steel Co.*, 523 U.S. at 105-06. "Relief that does not remedy the injury suffered" does not count. *Id.* at 107. Accordingly, standing to request declaratory relief requires an ongoing injury. *See Barney v. Pulsipher*, 143 F.3d 1299, 1306 n.3 (10th Cir. 1998) ("A plaintiff cannot maintain a declaratory or injunctive action unless he or she can demonstrate a good chance of being likewise injured in the future."). Here, declaratory relief would not remedy any of the past, completed harms alleged in the complaint, so Baskin lacks standing to request declaratory relief due to lack of redressability.

### C.   Alternatively, Baskin's claim for injunctive and declaratory relief is moot.

In the alternative, Baskin's requested injunctive and declaratory relief is moot due to lack of an ongoing injury. *See Arizonans for Off. Eng. v. Arizona,* 520 U.S. 43, 67 (1997) ("an actual

controversy must be extant at all stages of review, not merely at the time the complaint is filed”);

*Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1224 (10th Cir. 2009) (saying that “a

declaratory or injunctive action” becomes moot when the plaintiff can no longer “demonstrate a

good chance of being likewise injured by the defendant in the future”).

IV.   **Baskin’s Eighth Amendment claim fails because of qualified immunity, no more than de minimis injuries, no serious medical need, and lack of a culpable state of mind.**

A.   **Failing to loosen handcuffs or to switch handcuffs to large-sized handcuffs does not violate clearly established law.**

Defendants are entitled to qualified immunity because there was no clearly established

law within this Circuit, or a robust consensus of cases outside of it, that their alleged actions

violated clearly established law, particularized to the facts of this case. Specifically, Baskin has

not shown any law that put Defendants on notice that failing to loosen handcuffs or failing to

switch an inmate’s handcuffs to large-sized handcuffs violates the Eighth Amendment. Indeed,

“the Tenth Circuit has recently held . . . that a failure to loosen handcuffs or to use regular-sized

handcuffs on an inmate who may need large-sized handcuffs does not violate the Eighth

Amendment.” *Grissom v. Bell*, No. 20-3163-JWB, 2022 WL 4534620, at *8 (D. Kan. Sept. 28,

2022) (citing *Grissom v. Palm*, No. 21-3194, 2022 WL 3571410, at *7 (10th Cir. Aug. 19,

2022)). “[T]he Tenth Circuit has held that while loosening tight handcuffs may be the most

compassionate action, the failure to do so does not rise to a clearly established constitutional

violation.” *Palmer v. Unified Gov’t of Wyandotte Cnty./Kan. City*, 72 F. Supp. 2d 1237, 1248 (D.

Kan. 1999) (quoting *Morreale v. City of Cripple Creek*, 113 F.3d 1246 (table opinion), 1997 WL

290976, *5 n.10 (10th Cir. May 27, 1997)). Therefore, qualified immunity applies and the Court

should grant summary judgment to the KDOC Defendants.

**B. Baskin has not suffered more than a de minimis injury.**

The District of Arizona described the claims remaining in the case as alleging deliberate indifference because of repeated failure to adjust Baskin's restraints. But most cases involving a failure to loosen handcuffs analyze the alleged failure under the framework of excessive force. This may be because most of those cases are brought against the person who applied the restraints – that is, the person who applied the allegedly excessive force. Here, two of the remaining defendants (Diaz and Westbrook) did not apply any force to Baskin at all, so a deliberate indifference framework may possibly be more appropriate for those defendants. Defendant Gaboian, however, applied the handcuffs to Baskin, so excessive force appears to be the appropriate framework to analyze Baskin's claims against at least Gaboian.

The Eighth Amendment protects inmates from "cruel and unusual punishments." U.S. Const. amend. VIII. The primary concern of the drafters was to outlaw torture and other barbarous methods of punishment. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). "After incarceration, only the 'unnecessary and wanton infliction of pain' constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). To prevail on his Eighth Amendment excessive force claim, Baskin must allege and prove both an objective and a subjective element. *Grissom v. Palm*, No. 21-3194, 2022 WL 3571410, at *4 (10th Cir. Aug. 19, 2022) (citing *Redmond v. Crowther*, 882 F.3d 927, 936 (10th Cir. 2018)).

For the objective component, Baskin must show that "the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Id*. Not every allegedly malevolent touch by a prison guard gives rise to a federal cause of action. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id*. at 37-38.

For handcuffing cases where the handcuffing itself is permissible (as is common in the arrest and correctional contexts), "[a]n excessive force claim based on tight handcuffs requires the plaintiff to show some actual injury that is not de minimis." *Watkins v. Wunderlich*, No. 22-1358, 2023 WL 4145904, at *12 (10th Cir. June 23, 2023); *Koch v. City of Del City*, 660 F.3d 1228, 1247-48 (10th Cir. 2011); *see also Wilkins*, 559 U.S. at 37 (saying the extent of injuries is related to the extent and reasonableness of force). The Tenth Circuit has "rejected minor, temporary injuries – like pain, numbness, or swelling – as de minimis in handcuff-related excessive-force cases." *Scott v. City of Albuquerque*, 711 F. App'x 871, 881 (10th Cir. 2017). Indeed, federal courts have found no constitutional violation from minor injuries such as:

- blisters,[5]

- bruises,[6]

- swelling,[7]

- abrasions and scratches,[8]

- redness (or erythema),[9]

- pain,[10]

---

[5] *Booth v. City of Jackson*, No. 3:21-CV-763, 2022 WL 1164414, at *3 (S.D. Miss. April 19, 2022).

[6] *Ellsworth v. City of Broken Arrow*, 850 F. App'x 619, 627 n.9 (10th Cir. 2021) (citing *Donahue v. Wihongi*, 948 F.3d 1177, 1196 (10th Cir. 2020)) (saying a plaintiff "sustained only minor abrasions or bruises, which is insufficient as a matter of law"); *Winter v. Mansfield*, No. 21-3171, 2022 WL 3652464, at *10 to *11 (10th Cir. Aug. 25, 2022); *City of Albuquerque*, 711 F. App'x at 880-81.

[7] *City of Albuquerque*, 711 F. App'x at 880-81.

[8] *Ellsworth*, 850 F. App'x at 627 n.9 (citing *Donahue*, 948 F.3d at 1196) (saying a plaintiff "sustained only minor abrasions or bruises, which is insufficient as a matter of law")

[9] *Folts v. Grady Cnty. Bd. of Cnty. Comm'rs*, 2017 WL 11557929, at *5 (W.D. Okla. Sept. 29, 2017), *report and recommendation adopted*, 2017 WL 11558076 (W.D. Okla. Nov. 22, 2017).

[10] *City of Albuquerque*, 711 F. App'x at 881; *Watkins v. Wunderlich*, No. 22-1358, 2023 WL 4145904, at *8, *12 (10th Cir. June 23, 2023).

- numbness,[11]

- decreased grip strength,[12] and

- bleeding.[13]

This is true even when injuries are still present weeks later[14] or when the alleged tightness of the handcuffs continued for hours.[15]

Missing a single meal is also a de minimis injury, which does not rise to the level of an Eighth Amendment violation. *Watkins v. Rogers*, 525 F. App'x 756, 758-59 (10th Cir. 2013) (holding that an inmate having to forego dinner was "not sufficient to demonstrate an Eighth Amendment violation"); *Lindsey v. O'Connor*, 327 F. App'x 319, 321 (3d Cir. 2009) (holding for purposes of an Eighth Amendment claim that "[t]he purported deprivation of a single meal is not of such a magnitude as to rise to the level of a constitutional violation"); *Romero v. Lann*, 305 F. App'x 242, 243 (5th Cir. 2008) (holding for purposes of an Eighth Amendment claim that "the denial of two meals over an eight month period" was "de minimis").[16]

---

[11] *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011).

[12] *Folts*, 2017 WL 11557929, at *5 (W.D. Okla. 2017), *report and recommendation adopted*, 2017 WL 11558076 (W.D. Okla. 2017).

[13] *Winter*, 2022 WL 3652464, at *10 to *11 (scab); *Ford v. Gruwell*, 961 F.2d 219 (table opinion), 1992 WL 74266, at *1, *3 (10th Cir. Apr. 7, 1992) ("lacerations" or "skin scratch" that drew blood); *Evans v. Heimgartner*, No. 16-3095-DDC, 2018 WL 3055843, at *8 to *9 (D. Kan. June 20, 2018) ("started bleeding from the cuffs"); *Wendt v. City of Kan. City*, No. 89-2463, 1991 WL 49786, at *1, *4 to *5 (D. Kan. Mar. 29, 1991) ("Although two small cuts resulted from application of the handcuff, the extent of injury was minimal.").

[14] *Winter*, 2022 WL 3652464, at *10 to *11 (scab and bruising present two weeks later); *Koch*, 660 F.3d at 1234, 1248 (numbness present a month later and abrasions present four days later); *City of Albuquerque*, 711 F. App'x at 880-81 (swelling, bruising, and pain lasted for a week).

[15] *Watkins v. Wunderlich*, No. 22-1358, 2023 WL 4145904, at *8, *12 (10th Cir. June 23, 2023).

[16] *See also Moore v. Liewert*, No. 22-2056, 2023 WL 8378827, at *3 (6th Cir. Aug. 16, 2023) (collecting cases and finding "the denial of a single meal" to be "a de minimis event" in the context of a First Amendment retaliation claim); *Neal v. McKune*, No. 11-3155-JTM, 2013 WL 1446791, at *5 (D. Kan. Apr. 9, 2013) (finding no constitutional violation under the First Amendment's free exercise clause when an inmate allegedly missed three meals and was hurried

In contrast, courts *have* found violations in more serious situations involving:

- medical diagnosis of (or medical operations on) permanent nerve damage produced by handcuffing,[17]

- serious gunshot wounds being exacerbated,[18]

- punitive cuffing of an inmate to a hitching post in a painful position, causing the inmate to burn shirtless in the sun for seven hours while being refused water and bathroom breaks and being taunted.[19]

Here, the evidence shows nothing more than a *de minimis* injury. Baskin complains only of blisters, redness, swelling, pain, anxiety, and bleeding. (*See* KDOC Defendants' Statement of Facts (KDSF) ¶ 63.) He also complains that he was unable to eat a portion of a single meal. (KDSF ¶¶ 64-65.) His medical records show blisters and bruises on his wrists the day of the incident. (KDSF ¶ 68.) Any pain had apparently resolved the same day as the incident. (KDSF ¶¶ 66-67.) His medical records show that three weeks later he had small, well-healing abrasions on his wrists, 4 cm x 1 cm on the right wrist and 3 cm x 1 cm on the left wrist. (KDSF ¶¶ 69-70.)

---

during six others over the course of two Ramadan months).

[17] *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1208-10 (10th Cir. 2008) ("permanent nerve injury" diagnosed by a neurologist and an orthopedist); *Deville v. Marcantel*, 567 F.3d 156, 168-69 (5th Cir. 2009) (evidence presented "that the handcuffs were applied so tightly as to cause long-term nerve damage that was severe enough to require four surgeries"); *Bamdad v. Gavin*, No. 13-0296, 2014 WL 12852245, at *3, *5 (C.D. Cal. June 6, 2014) (noting that a physician diagnosed "injuries to the median and ulnar nerves of [the plaintiff's] right wrist and hand," plaintiff "underwent surgery for his right median nerve injury; the injury to his ulnar nerve was inoperable," and "Plaintiff still suffers from pain, numbness, and functional limitations").

[18] *Fisher v. City of Las Cruces*, 584 F.3d 888, 899-900 (10th Cir. 2009) (plaintiff alleged two fresh, serious gunshot wounds to his bicep and stomach were exacerbated when officers forced his arms behind his back for handcuffing); *see also Howard v. Dickerson*, 34 F.3d 978, 979, 981 (10th Cir. 1994) (finding a plausible claim for deliberate indifference under the Fourteenth Amendment when handcuffing of a pretrial detainee behind her back exacerbated a known neck fracture).

[19] *Hope v. Pelzer*, 536 U.S. 730, 734-35, 738 & n.8, 745-46 (2002).

Later evaluations showed all issues had resolved. (KDSF ¶¶ 73-77.) Nothing indicates the kind of long-lasting or serious injury that is necessary to state an Eighth Amendment claim for handcuffing. For example, Baskin has not alleged or shown nerve damage, that any conditions such as gunshot wounds were exacerbated, or that he was cuffed in a punitive manner under extreme conditions. Because Baskin fails to show more than a *de minimis* injury as required for the objective prong, the KDOC Defendants are entitled to summary judgment on Baskin's Eighth Amendment claim when analyzed under an excessive force theory.

Additionally, Baskin does not allege that Defendant Diaz applied any force at all, so for this reason too Baskin fails to state a claim for excessive force against Defendant Diaz.

### C. Baskin has not demonstrated a serious medical need.

Baskin's claims also fail when analyzed under a deliberate indifference theory. "[B]ecause the State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities," *Whitley v. Albers*, 475 U.S. 312, 320 (1986), the Eighth Amendment's prohibition on cruel and unusual punishment "include[s] an entitlement to a certain minimum standard of medical care while incarcerated." *Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018) (citing *Estelle v. Gamble*, 429 U.S. 97, 101-05 & n.6 (1976)). "Prison officials violate the Constitution when they act with 'deliberate indifference to an inmate's serious medical needs.'" *Estate of Beauford v. Mesa Cnty.*, 35 F.4th 1248, 1262 (10th Cir. 2022).

Deliberate indifference has both an objective component and a subjective component. *Beauford*, 35 F.4th at 1262 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). For the objective component, the plaintiff must show that the prisoner's medical need was "sufficiently serious." *Id.* (citing *Farmer*, 511 U.S. at 834). "A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that

even a lay person would easily recognize the necessity for a doctor's attention." *Id.* A showing of substantial harm – which may be satisfied by showing "lifelong handicap, permanent loss, or considerable pain" – also meets the objective component. *Id.*

Because Tenth Circuit precedent establishes that *de minimis* injuries from handcuffing are not sufficient to establish an Eighth Amendment claim for excessive force against the persons who actually placed the handcuffs, *de minimis* injuries from handcuffing should not count as "sufficiently serious" medical needs for purposes of the objective prong of the deliberate indifference analysis. To hold otherwise would undermine the rationale of those cases, finding a possible Eighth Amendment violation where those cases have already said none occurred.

Rather, something *additional* must be pled and shown to establish a deliberate indifference claim regarding handcuffing. Specifically, "an allegation of use of excessive force in handcuffing could be based on a claim of deliberate indifference to medical needs when there is a claim that the plaintiff had an injury or medical restriction." *Grissom v. Bell*, No. 20-3163-JWB, 2022 WL 4534620, at *5 (D. Kan. Sept. 28, 2022) (citing *Wells v. Okla. ex rel. Dep't of Pub. Safety*, 97 F.3d 1465 (table opinion), 1996 WL 557722, *2 (10th Cir. 1996)). For example, In *Howard v. Dickerson*, 34 F.3d 978, 979-81 (10th Cir. 1994), the plaintiff had recently undergone neck surgery, was wearing a neck brace, and requested that the officer handcuff her in front rather than behind her back so as to avoid injury to her neck. Despite the plaintiff's request and the officer's knowledge of the injury, the officer handcuffed her behind her back, which exacerbated the still-healing neck injury and caused pain. *Id.* The officer later also refused the plaintiff's request for a doctor. *Id.* Those facts stated a plausible claim. *Id.*

In *Grissom v. Bell*, the Court analyzed an Eighth Amendment claim under the deliberate indifference framework because the plaintiff allegedly "had a medical order for large and double

cuffs" not accommodated by handcuffing policy or in the specific events complained of. *Grissom*, 2022 WL 4534620, at *5. These cases, *Grissom* and *Howard*, show that a "serious medical need" in the handcuffing context involves a known pre-existing injury or a known medical restriction that may affect how handcuffing should be done. However, the Court in *Grissom* did not find a serious medical need that would prevent officers from using regular-sized handcuffs with extra links on the plaintiff despite the medical order saying the plaintiff required larger handcuffs and the officers knowing about the medical order. *Id.* at *7.

Here, Baskin has not alleged or shown any preexisting injury or medical restrictions that may affect handcuffing like those in *Grissom* or *Howard* or that the KDOC Defendants were aware of any such injuries or restrictions. Because Baskin fails to show a serious medical need as required for the objective prong, the KDOC Defendants are entitled to summary judgment on Baskin's Eighth Amendment claim when analyzed under a deliberate indifference theory.

### D. The KDOC Defendants did not have a sufficiently culpable state of mind.

Baskin's claims also fail to meet the subjective components under both frameworks.

#### 1. The subjective component standard for excessive force claims

For excessive force, to establish the subjective component, Baskin must show that the Defendants "acted with a sufficiently culpable state of mind." *Grissom v. Palm*, No. 21-3194, 2022 WL 3571410, at *4 (10th Cir. Aug. 19, 2022) (quoting *Redmond v. Crowther*, 882 F.3d 927, 936 (10th Cir. 2018)). In *Sampley v. Ruettgers*, 704 F.2d 491, 495 (10th Cir. 1983), the Tenth Circuit Court of Appeals provided three elements for excessive force claims: The inmate must show that (1) the guard intended to harm the prisoner; (2) the guard used more force than appeared reasonably necessary at the time to maintain or restore institutional order; and (3) the guard's actions caused severe pain or lasting injury to the prisoner. *See also Scott v. Clune*, No. 17-3024-JAR, 2018 WL 3222612, at *3 (D. Kan. July 2, 2018) (citing the *Sampley* elements

approvingly). The first element, intent to harm, clearly falls under the subjective prong. The second element, reasonableness of force, has both an objective aspect and a subjective aspect, so it spans both prongs. The third element, severe pain or lasting injury, has already been analyzed with regard to *de minimis* injuries under the objective prong above. As both the first and second elements involve the subjective prong, both will be analyzed in this section.

For the first element, intent to harm, the conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Rather, Baskin must show that the Defendants took their actions "maliciously and sadistically for the very purpose of causing harm" and not in a "good faith effort to maintain or restore discipline." *Id*. at 320-21; *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). "The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Whitley*, 475 U.S. at 319.

For the second element, reasonableness of force, the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Kisela v. Hughes*, 584 U.S. 100, 103 (2018). The analysis must consider "the highly-charged prison environment and accord wide-ranging deference to prison officials." *McCoy v. Kan. Dep't of Corr.*, No. 16-3239-SAC, 2018 WL 1726344, at *4 (D. Kan. Apr. 10, 2018) (citing *Hudson*, 503 U.S. at 6, and *Sampley*, 704 F.2d at 495-96). Courts may consider: (1) the need for the application of force; (2) the relationship between that need and the amount of force used; (3) any threat reasonably perceived by the officers; and (4) any efforts made to temper the severity of a forceful response. *Hudson*, 503 U.S. at 7.

2.  *The subjective component standard for deliberate indifference claims*

For deliberate indifference, the subjective component requires showing that the official had a culpable state of mind. *Estate of Beauford v. Mesa Cnty.*, 35 F.4th 1248, 1262 (10th Cir. 2022) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). This is only met if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Even if both the objective and subjective prongs are met for deliberate indifference, "a constitutionally legitimate justification" may still be shown. *Arocho v. Nafziger*, 367 F. App'x 942, 952 (10th Cir. 2010). This should be determined, not with the benefit of hindsight, but based on what the official reasonably knew at the time. *See Strain v. Regalado*, 977 F.3d 984, 996 (10th Cir. 2020) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (saying in the context of the deliberate-indifference standard that "courts do not judge the constitutionality of particular actions 'with the 20/20 vision of hindsight'"). The Supreme Court has described "internal security" as "perhaps the most legitimate of penological goals." *Overton v. Bazzetta*, 539 U.S. 126, 133 (2003); *see also Washington v. Harper*, 494 U.S. 210, 225 (1990)).

3.  *Analysis*

Here, Baskin has failed to establish the subjective component of either an excessive force claim or a deliberate indifference claim. On the day Baskin was transported to Arizona, Gaboian followed his usual procedure of ensuring a one-finger gap when placing handcuffs on each inmate transported that day. (KDOC Defendants' Statement of Facts (KDSF) ¶¶ 7-15.) Baskin complained to Diaz only while on the transport bus. (KDSF ¶¶ 26.) For safety and security reasons, Diaz could not enter the rear cabin where Baskin was. (KDSF ¶¶ 27-30.) The proper officers to adjust handcuffs prior to transport would have been the officers who applied them in

the secure environment of A&D – not Diaz, who was serving as the driver. (KDSF ¶¶ 31, 17.)

When the first leg of the transport was complete and Baskin arrived at EDCF, Baskin entered EDCF and an officer at EDCF adjusted his restraints. (KDSF ¶¶ 35-36.) That officer concluded that the handcuffs were too small even at their loosest setting – not that they were adjusted too tightly. (KDSF ¶ 37.) Medical personnel examined Baskin at EDCF. (KDSF ¶¶ 38-39.) The medical personnel and an EDCF officer concluded there was nothing they could do for Baskin. (KDSF ¶ 39.) Adjusting his restraints would not have helped.

On the second leg of the transport, from HCF to EDCF, Baskin again complained to Diaz only while on the transport bus when Diaz could not enter the rear cabin. (KDSF ¶¶ 40-43.) At the airport in Salina, TCA officials checked and adjusted the inmates' restraints. (KDSF ¶ 47.) So Baskin's restraints were checked and adjusted at HCF, at EDCF, and at the airport in Salina.

Under an excessive force framework, these facts do not show that the KDOC Defendants intended to harm Baskin, as required for the first element under *Sampley*. Rather, at every point where safety and security concerns allowed, Baskin's restraints were checked and adjusted. Baskin even received medical attention at EDCF. As an officer at EDCF concluded, no looser setting for Baskin's handcuffs was possible. Regarding the second element under *Sampley*, these facts do not show that the amount of force applied was more than appeared reasonably necessary at the time. Baskin's own statement says that the handcuffs were too tight even at their loosest setting, and that EDCF personnel concluded that there was nothing they could do for him. Loosening the handcuffs was not possible. For safety and security reasons, the approximately 120 convicted felons being transported across state lines needed to be in restraints while being

transported.[20] Baskin does not suggest any reasonable alternative to being handcuffed.

Under a deliberate indifference standard, even if *de minimis* injuries like swelling counted as a "serious medical need" for purposes of a deliberate indifference claim, Baskin has not alleged or shown that the KDOC Defendants at any time observed any such injuries. Baskin does not allege that any swelling occurred until he was away from Gaboian and on the transport bus. (*See* Doc. 1 at ¶ 24.) If Baskin had requested medical treatment, Gaboian would have referred him to medical immediately. (KDSF ¶ 16.) And Baskin does not allege or show that Diaz at any point stopped and observed Baskin's symptoms. Rather, Baskin complains that Diaz did not do so. Diaz, the bus driver, did not need to do so because at HCF, at EDCF, and at the airport at Salina, the appropriate personnel checked and adjusted Baskin's restraints.

Therefore, Baskin fails to establish both the subjective and objective prongs for both excessive force and deliberate indifference. Alternatively, Diaz was justified by legitimate safety and security concerns for not entering into the rear cabin of the transport bus. The KDOC Defendants are entitled to summary judgment on Baskin's Eighth Amendment claims.

## V.   The KDOC Defendants are entitled to summary judgment on Baskin's § 1983 complaint because he failed to exhaust his administrative remedies under the PLRA.

The KDOC Defendants' relevant actions occurred on or around October 23, 2019, when the KDOC Defendants facilitated the transfer of Baskin to the airport. (KDOC Defendants' Statement of Facts (KDSF) ¶¶ 2-43.) Baskin sought informal resolution of his concerns from October 23, 2019 through November 16, 2019. (KDSF ¶ 92.) He filed a grievance with KDOC on November 14, 2019 and resubmitted it on December 3, 2019. (KDSF ¶ 93-96.) Baskin also

---

[20] Baskin was incarcerated for violent felonies, including kidnapping and rape. *See Baskin v. State*, 520 P.3d 293 (table opinion), 2022 WL 17172021, at *1 (Nov. 23, 2022).

filed an unrelated grievance on November 16, 2019, with the Saguaro Correctional Center regarding the "denial of Medical Treatment for Plaintiff Baskin" by "CoreCivic Health Care Provider(s)." (KDSF ¶ 97.)

Baskin had previous experience with the grievance process, including appealing grievances to the highest administrative level. (KDSF ¶ 102.) But Baskin admits he did not finish appealing any of his grievances to the highest administrative level here. (KDSF ¶¶ 83, 99-101.) "Upon expiration of the answer/appeal time period" for the KDOC grievance, Baskin "conversed with Kansas Contract Monitor Mr. Moore" on December 30, 2019. (KDSF ¶ 103.) Baskin asserts as potential excuses that an SCC official would not give him a copy of his unrelated Arizona grievance on December 11, 2019, that the same SCC official did not drop what he was doing to immediately talk to Baskin after Baskin made a general request to talk on December 23, 2019, and that the Arizona warden threatened Baskin with retaliation with regard to Baskin's unrelated Arizona grievance on December 30, 2019. (KDSF ¶¶ 104-106.)

**A. Exhaustion of administrative remedies is mandatory under the PLRA.**

The PLRA requires an inmate to exhaust all available administrative remedies before bringing a § 1983 claim about prison conditions. 42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516, 520 (2002). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). "[T]he PLRA exhaustion requirement requires proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "An inmate properly exhausts a claim by utilizing each step the prison holds out for resolving the claim internally and by abiding 'with an agency's deadlines and other critical procedural rules.'" *Gray v. Sorrels*, 818 F. App'x 787, 789 (10th Cir. 2020) (quoting *Woodford*, 548 U.S. at 90). "In other words, a prisoner must comply with procedural 'rules that are defined not by the PLRA, but by the prison grievance process itself.'" *Williams v. Hill*, 422 F. App'x

682, 684 (10th Cir. 2011) (quoting *Bock*, 549 U.S. at 218). In a suit governed by the PLRA, failure to exhaust is an affirmative defense, and the defendant has the burden of proof regarding the defense. *Roberts v. Barreras*, 484 F.3d 1236, 1240-41 (10th Cir. 2007).

As this Court has stated regarding interstate transfers of inmates, "an interstate transfer does not by itself render administrative remedies unavailable." *Sims v. Kan. Dep't of Corr.*, No. 18-1259-EFM, 2020 WL 707989, at *5 (D. Kan. Feb. 12, 2020) (citing *Lynn v. Simmons*, 32 Kan. App. 2d 974, 977-78 (2003) (rejecting inmate's argument that an interstate transfer "effectively 'slammed the door shut' to KDOC's administrative grievance procedure")). Grievances involving responsibilities of the sending state should be filed with the sending state.[21]

The KDOC Grievance Procedure for Inmates is set forth in K.A.R. § 44-15-101 *et seq*., and applies "to a broad range of matters that directly affect the inmate, including . . . [c]omplaints by inmates regarding policies and conditions within the jurisdiction of the facility or the department of corrections; and . . . actions by employees and inmates, and incidents occurring within the facility." K.A.R. § 44-15-101a(d)(1). Here, this regulation applies to Baskin's § 1983 claim because his Complaint involves the alleged actions of HCF employees. *See Lindsey v. Cook*, No. 19-3094-HLT, 2021 WL 483855, at *2 (D. Kan. Feb. 4, 2021).

Here, any grievances involving the responsibilities of Kansas, the sending state, should be filed with the state of Kansas. So an unrelated grievance filed with the Arizona facility that was not meant to be sent on to KDOC did not exhaust administrative remedies for purposes of the claims against the KDOC Defendants. (*See* KDSF ¶ 97.) (This is especially so when, as here,

---

[21] *See id*; *Lynn*, 32 Kan. App. 2d at 978; *Trujillo v. Williams*, No. CIV-04-0635, 2010 WL 11505952, at *4 (D.N.M. Oct. 5, 2010); *Baltas v. Maiga*, No. 3:20cv1177, 2022 WL 3646199, at *11 (D. Conn. Aug. 24, 2022).

that grievance involved actions by defendants other than the KDOC Defendants.) In Kansas, an inmate must take four steps to complete the grievance process: (1) attempt an informal resolution with unit team members; (2) submit a grievance to an appropriate unit team member; (3) appeal to the warden of the facility; and (4) appeal to the Secretary of Corrections. *Lindsey*, 2021 WL 483855, at *2; K.A.R. §§ 44-15-101(b), (d), 44-15-102(a)-(c). Step two must occur within 15 days of discovery of the issue, not counting weekends or holidays. *See* K.A.R. § 44-15-101b. If the inmate does not receive a response at steps two or three within ten days, the inmate can move to the next step in the process but must do so within three days of that deadline. *Lindsey*, 2021 WL 483855, at *3; K.A.R. § 44-15-102(a)(2), (b), (b)(3)(A)(ii), (G), (c)(1).

## B. Remedies were available to Baskin at SCC.

The District of Arizona declined to dismiss the case for failure to exhaust administrative remedies because it believed it was unclear from face of the Complaint whether administrative remedies were available to Baskin. (Doc. 50 at 4-6.) The District of Arizona did so without prejudice to raising the argument on summary judgment, saying "following transfer, [the] KDOC Defendants will have the opportunity to litigate this issue on summary judgment, and the District of Kansas, which has personal jurisdiction over Defendants, is an appropriate forum to consider their arguments." (Doc. 50 at 6.) Now on summary judgment the undisputed facts demonstrate what the District of Arizona previously found unclear from the pleadings.

Inmates housed in SCC "had access to KDOC's administrative remedy process . . . while housed in [the] out-of-state facility." (KDSF ¶ 84; *see also* Doc. 50 at 5.) Baskin "had access to . . . applicable instructions/regulations concerning how to utilize that process while housed in an out-of-state facility—including the timeframes for submitting grievances and appeals and, more specifically, what to do if he did not receive a response." (*See* Doc. 50 at 5.) Specifically, as part of KDOC's arrangement with SCC, inmates housed in SCC had access to Kansas regulations –

including KDOC's grievance policy – as well as KDOC's grievance forms while housed in SCC, in both electronic and paper forms. (KDSF ¶ 85.) KDOC inmates housed at SCC had a computer kiosk for regular access to KDOC's Internal Management Policies and Procedures (IMPP's) as well as the Kansas Administrative Regulations. (KDSF ¶ 86.) Inmates housed in SCC also had access to a KDOC rulebook which covered the grievance timeframes and the next action to take if no response was made to a grievance at any step of the process. (KDSF ¶ 97.) Those grievance timelines have not changed since 2007. K.A.R. 44-15-101 to -102 (amendment history at the bottom of each section shows last amended date). So it also "clear . . . what KDOC policy stated at the relevant time." (*See* Doc. 50 at 6.) The above facts show that Baskin "had access to written [*and*] electronic versions of [KDOC] policy while at SCC." (*See* Doc. 50 at 6.)

Baskin's "grievance documents were . . . forwarded to KDOC." (*See* Doc. 50 at 5.) As part of KDOC's arrangement with SCC, all KDOC grievance forms received by SCC were to be electronically sent to KDOC. (KDSF ¶ 88.) That happened here. (KDSF ¶ 94.) The grievance was sent to HCF (KDSF ¶ 94), which was Baskin's home facility (KDSF ¶¶ 61-62) and which had the relevant personnel (KDSF ¶¶ 2, 17). For the 15-day deadline to file a KDOC grievance, KDOC gave more leeway to inmates housed at SCC (although Baskin filed his initial grievance within 15 days here, as discussed below). (KDSF ¶ 89.) KDOC even monitored how SCC handled SCC grievances filed by KDOC inmates. (KDSF ¶ 90.)

Alternatively, KDOC sent contract monitors who were available to reliably inform Baskin about how to pursue the grievance process if needed. (KDSF ¶¶ 46, 78-82, 96; *see also* Doc. 50 at 6.) Even when Moore allegedly said nothing further could happen with the grievance process (Doc. 1 at ¶ 93), that would have been accurate because the time to appeal had expired.

**C.   Baskin did not complete the KDOC grievance process prior to filing his § 1983 claim.**

"An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim under [the] PLRA for failure to exhaust his administrative remedies." *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002). Baskin began the grievance process on November 14, 2021, and he did not complete it. Prior to filing his lawsuit, Brown sought informal resolution and filed a grievance, completing the first two steps of the KDOC grievance process. (KDSF ¶¶ 92-96.) Baskin did not receive a response to his grievance, and the time for the KDOC unit team to respond expired. (KDSF ¶ 98.) But Baskin admits that the time to appeal also expired. (KDSF ¶ 99.) And he did not appeal as required. (KDSF ¶¶ 99-101.) Instead, he simply "conversed with Kansas Contract Monitor Mr. Moore" on December 30, 2019. (KDSF ¶ 103.) So he did not complete steps three or four of the KDOC grievance process.

Baskin alleges that SCC officials impeded his ability to exhaust, but, as the District of Arizona held earlier in this case, Baskin "fails to allege facts to support that he was denied access to the grievance process." (Doc. 14 at 11:1-2.) Baskin's first KDOC grievance on November 14, 2019, met the 15-day time limit (not counting weekends or holidays) for step two of the KDOC grievance process. Even if the deadline for step three was tolled until the second KDOC grievance was filed on December 3, 2019, Baskin's deadline to have appealed to the HCF warden from that second KDOC grievance was December 16, 2019. *See* Kan. Admin. Regs. (K.A.R.) § 44-15-102(a)(2), (b). Baskin did not do so. The failure of an SCC official to provide a copy of Baskin's unrelated Arizona grievance on December 11, 2019, would not reasonably have impeded any attempts by Baskin to appeal his KDOC grievance to the HCF warden. And any alleged actions by SCC officials after the deadline of December 16, 2019, could not retroactively have affected any earlier attempts by Baskin to appeal to the warden prior to the deadline.

Even if Baskin's statement that the HCF warden did not respond to his initial grievance (Doc. 1 at ¶¶ 90, 110) is interpreted to mean that Baskin did actually file an appeal to the HCF warden by December 16, 2019, the latest possible deadline for Baskin to appeal to the Secretary would have been December 29, 2019. *See* K.A.R. § 44-15-102(b)(3)(A)(ii), (G), (c)(1). An SCC official not immediately dropping what he was doing to talk to Baskin after Baskin made a general request to talk on December 23, 2019, would not reasonably have impeded any attempts by Baskin to appeal his KDOC grievance to the Secretary. And the alleged threats on December 30, 2019, could not have impeded the KDOC grievance process as they occurred after all relevant deadlines had passed and were unrelated to Baskin's KDOC grievance.

Steps three and four are required steps for exhaustion under the PLRA, *see* K.A.R. §§ 44-15-101(d), 44-15-102(a)-(c), and Baskin did not complete them before pursuing his § 1983 claim. Based on the undisputed evidence, Baskin failed to exhaust his administrative remedies regarding the allegations in his lawsuit. So summary judgment for Defendants is appropriate.

### D.  KDOC did not interfere with the grievance process.

The District of Arizona stated remedies may have been rendered unavailable to Baskin by KDOC in the following ways: because HCF staff failed to respond to Baskin's grievances; because contract monitor Moore told Baskin on December 30, 2019, that "Administration seemingly did not care to entertain or answer the Grievance"; and because Moore told Baskin, also on December 30, 2019, that he did not need to continue the administrative grievance process before pursuing legal action. (Doc. 40 at 19 (quoting Doc. 1 at ¶ 93).) The court said that these matters raised questions of fact about whether the KDOC administrative remedy process was available to Baskin. (Doc. 40 at 19; *see also* Doc. 50 at 4-6.) The court further said that Moore's statements to Baskin on December 30, 2019, raised factual issues about whether Baskin was misinformed by a corrections official about what he needed to do to exhaust. (Doc. 40 at 19.)

If a policy does not instruct a prisoner on what he is to do when a corrections official fails to respond to his grievance, then the remedy may be considered unavailable when that unaddressed circumstance occurs. *See Brengettcy v. Horton*, 423 F.3d 674, 682 (7th Cir. 2005). But when the regulation explicitly provides for an appeal after a failure to respond (like in K.A.R. 44-15-102(a)(2), (b), (b)(3)(A)(ii), (G), and (c)(1)) remedies *are* considered available:

> While we agree that the failure to respond to a grievance within the time limits contained in the grievance policy renders an administrative remedy unavailable, [citations omitted] that is not what happened here. . . . [T]he grievance policy contains time limits on responses, and also provides that if an inmate does not receive a response from the warden within thirty days after submission of the grievance, the inmate may send the grievance with evidence of its prior submission to an administrative review authority.
>
> [The inmate] may not successfully argue that he had exhausted his administrative remedies by, in essence, failing to employ them and since he may now be time barred from pursuing them, they are exhausted by default. This would trivialize the Supreme Court's holdings in *Booth* and *Porter* that exhaustion is now mandatory.

*Jernigan v. Stuchell*, 304 F.3d 1030, 1032-33 (10th Cir. 2002) (citing *Booth v. Churner*, 532 U.S. 731, 740 (2001) and *Porter v. Nussle*, 534 U.S. 516, 532 (2002)); *see also Lindsey v. Cook*, No. 19-3094-HLT, 2021 WL 483855, at *3 (D. Kan. Feb. 4, 2021) (discussing the remedy available to KDOC inmates when prison officials do not timely respond). Based on this binding Tenth Circuit precedent, summary judgment for the KDOC Defendants is appropriate.

Moore's statements on December 30, 2019, occurred *after* "expiration of the answer/appeal time period" for the grievance. (KDSF ¶ 103.) So Moore's statements could not have affected Baskin's failure to exhaust, as they came after Baskin had already failed to exhaust. Further, Moore allegedly stated that Baskin did not need to continue the administrative grievance process *because* "the time limit to answer and appeal the Grievance had expired." (Doc. 1 at ¶ 93.) Plaintiff *could not* continue the administrative grievance process at that point.

*See Woodford v. Ngo*, 548 U.S. 81, 90 (2006) ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules").

Any confusion that Plaintiff may have had before that point about the grievance process is legally irrelevant. *See Beals v. Jay*, 730 F. App'x 633, 637 (10th Cir. 2018) (holding that a plaintiff cannot "rely on his purported confusion about the grievance process" because "ignorance of the law, even for an incarcerated pro se petitioner, generally does not excuse prompt filing"); *see also Ross v. Blake*, 578 U.S. 632, 637, 639, 644, 648-49 (2016) (holding that "reasonable mistake" cannot excuse a prisoner's failure to exhaust but that the sole exception involves only whether administrative remedies were actually available to the inmate); *Fields v. Okla. State Penitentiary*, 511 F.3d 1109, 1112 (10th Cir. 2007) ("To exhaust administrative remedies an inmate must properly comply with grievance procedures; substantial compliance is insufficient."); *Little v. Jones*, 607 F.3d 1245, 1249 (10th Cir. 2010) ("An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim.").

KDOC did not interfere with the grievance process. It remained available to Baskin, who failed to exhaust administrative remedies. So summary judgment for Defendants is appropriate.

## VI. **Alternatively, Baskin is not entitled to punitive damages when he cannot show any conduct was motivated by evil intent or was undertaken with reckless or callous indifference to his constitutional rights.**

Federal Rule of Civil Procedure 56 allows for "partial summary judgment," not necessarily on whole claims, but on a "part of each claim or defense." Here, even if Baskin's claims otherwise survive summary judgment, he is not entitled to punitive damages under § 1983 because he has not alleged or provided any evidence that any defendants acted with the required maliciousness, evil motive, or with reckless indifference to Baskin's civil rights, or that they subjectively knew their actions were unconstitutional under clearly established law. *See Jolivet v.*

*Deland*, 966 F.2d 573, 577 (10th Cir. 1992); *Searles v. Van Bebber,* 251 F.3d 869, 879 (10th Cir. 2001) (citing *Smith v. Wade,* 461 U.S. 30, 56 (1983)). Therefore, in the alternative, partial summary judgment for Defendants is appropriate on Baskin's punitive damages claims.

## CONCLUSION

For the reasons above, the KDOC Defendants request that the Court grant summary judgment in favor of the KDOC Defendants.

Respectfully submitted,

Kris W. Kobach
Attorney General of Kansas

*/s/ Matthew L. Shoger*
Matthew L. Shoger, KS No. 28151
Assistant Attorney General
Office of the Attorney General
120 SW 10th Ave., 2nd Floor
Topeka, Kansas 66612-1597
matt.shoger@ag.ks.gov
(785) 296-2215
Fax: (785) 291-3767
*Attorney for the KDOC Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this _____ day of March, 2024, the foregoing document was filed with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to the following:

Thomas A. Rottinghaus
Wagstaff & Cartmell, LLP
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
*Attorney for Defendant Westbrook*

I also certify that a copy of the above will be served by means of first-class mail, postage prepaid, addressed to:

Benton Gene Baskin #52888
Hutchinson Correctional Facility
P.O. Box 1568
Hutchinson, KS  67504
*Plaintiff, pro se*

_____
Matthew L. Shoger
Assistant Attorney General



**Exhibit A**

# Locating a resident

by Nancy Burghart — last modified May 25, 2023 11:07 AM
**How do I know where a resident is housed?**

You may check a resident's location and status on the Kansas Adult Supervised Population Electronic Repository (KASPER) located on the KDOC's website. Information is updated daily, excluding weekends.

KASPER is a database which contains information about offenders sentenced to the custody of the Secretary of Corrections since 1980. KASPER contains information regarding those who are: currently incarcerated; under post-incarceration supervision; and, who have been discharged from a sentence. KASPER does not have information available about inmates sent to Kansas under the provisions of the interstate compact agreement.

The information contained in KASPER is public information under provisions of Kansas statute and is made available to the public and law enforcement in the interest of public safety. No names are removed from the database unless a conviction is removed from the public record by one of three ways: one, if the conviction is overturned by means of an appeal; two, if the conviction is expunged; or three, if an offender is granted executive clemency.

Through KASPER you can find:

- Name and KDOC Registration Number;
- Physical description (date of birth, height, weight, hair and eye color, body markings, including photograph);
- Conviction description (crime(s) of conviction, county, case number);
- Anticipated release date;
- Inmate housing location (current location and facility movements, including movement dates, location of parole office maintaining supervision);
- Custody or supervision level (Whether an offender has been released to post-incarceration supervision (parole, conditional release, post-release supervision, compact probation or parole); and,
- Institutional disciplinary record (violations for which offender was found guilty).

Please note that release dates may change and are contingent upon good time and program credit earnings and forfeitures.

Specific questions regarding an inmate's release date should be directed to the KDOC's sentence computation unit at (785) 296-3317 or by e-mail.

_____

# Names

| Name Type | Name |
|---|---|
| Conviction | BASKIN, BENTON G |
| True | BASKIN, BENTON GENE |
| Alias | SCOTT, GEORGE |
| Alias | DUKE, BENTON |
| Alias | BENTON, ANTHONY |
| Alias | DUKE, ANTHONY BASKIN |
| Alias | HUNTER, MARCUS |
| Alias | DUKE, TONY |
| Alias | BASKIN, BENTON |
| Alias | BASKIN, JOHN |
| Alias | DUKE, ANTHONY K |
| Alias | DUKES, ANTHONY |



(/kasper/search/image?
kdocNumber=0052888&imageNumber=1)

**BASKIN, BENTON G**

**Approx Picture Date**

2022-03-02

# Birthdates

| Birthdate Type | Birthdate | Age |
|---|---|---|
| True | Jan 14, 1970 | 54 |

# Demographics

| Eye Color | Hair Color | Height | Weight | Gender | Race |
|---|---|---|---|---|---|
| Black | Gray or Partially Gray | 5'-9" | 214 | Male | Black |

# Current Status reported by Dept. of Corrections

Work or Program Participation  Private Industry

Earliest Possible Release Date (1)  Jul 06, 2049

3/14/24, 11:36 AM          Kansas Department of Corrections

**Current Status**   Incarcerated

**Admission Date**   Nov 16, 2015

**Current Location (2)**   **Hutchinson CF-East** (http://www.doc.ks.gov/facilities/hcf)
**Custody Level**   LMD Low Medium

**(1) This date could be affected by a parole board decision or good time and/or program credit.**
**(2) Click on Location for the Facility web site.**

# Convictions

| County | Case Number (I) | Offense Date | Sentencing Date | ACS | Criminal Conviction Description | Counts | Crime Severity Level | Case Status (II) | State |
|---|---|---|---|---|---|---|---|---|---|
| Sedgwick | 94CR669 | Apr 04, 1994 | Aug 08, 1994 | N/A | Driving While Suspended - 1st conviction | 1 | Unknown | Inactive | KS |
| Sedgwick | 94CR669 | Apr 04, 1994 | Aug 08, 1994 | N/A | Opiates,Opium or Narcotic Drugs;Possession 1st Off | 1 | Drug-grid Severity Level 4 | Inactive | KS |
| Sedgwick | 89CR62 | Dec 18, 1988 | Feb 05, 1991 | N/A | Burglary | 1 | Class D Felony | Inactive | KS |
| Sedgwick | 89CR2438 | Dec 22, 1988 | Feb 05, 1991 | N/A | Burglary | 3 | Class D Felony | Inactive | KS |
| Sedgwick | 89CR2438 | Dec 22, 1988 | Feb 05, 1991 | N/A | Theft ($500 thru $50,000) | 1 | Class E Felony | Inactive | KS |
| Sedgwick | 89CR484 | Feb 01, 1989 | Feb 05, 1991 | N/A | Burglary | 1 | Class D Felony | Inactive | KS |
| Sedgwick | 89CR484 | Feb 01, 1989 | Feb 05, 1991 | N/A | Theft ($500 thru $50,000) | 1 | Class E Felony | Inactive | KS |
| Sedgwick | 97CR1001 | Feb 25, 1997 | Nov 25, 1997 | N/A | Opiates,Opium or Narcotic Drugs;Possession;2nd Off | 1 | Drug-grid Severity Level 2 | Inactive | KS |
| Sedgwick | 97CR1001 | Feb 25, 1997 | Nov 25, 1997 | N/A | Taxation; Drugs; Evidence of Tax Payment | 1 | Non Drug-Grid Severity Level 10 | Inactive | KS |

| County | Case Number (I) | Offense Date | Sentencing Date | ACS | Criminal Conviction Description | Counts | Crime Severity Level | Case Status (II) | State |
|---|---|---|---|---|---|---|---|---|---|
| Sedgwick | 14CR1677 | Jun 13, 2014 | Oct 23, 2015 | N/A | Kidnapping | 1 | Non Drug- Grid Severity Level 3 | Active | KS |
| Sedgwick | 14CR1677 | Jun 13, 2014 | Oct 23, 2015 | N/A | Agg Criminal Sodomy; Noncon Vic forcefear | 1 | Non Drug- Grid Severity Level 1 | Active | KS |
| Sedgwick | 14CR1677 | Jun 13, 2014 | Oct 23, 2015 | N/A | Rape; Sex Intercourse w/Out Consent | 1 | Non Drug- Grid Severity Level 1 | Active | KS |
| Sedgwick | 14CR1677 | Jun 13, 2014 | Oct 23, 2015 | N/A | Aggravated Sex Battery;Intentional Touching GE16 | 1 | Non Drug- Grid Severity Level 5 | Active | KS |
| Rooks | 89CR501 | Mar 15, 1989 | Feb 05, 1991 | N/A | Burglary | 1 | Class D Felony | Inactive | KS |

(I) If Number includes  JV  : Extended juvenile jurisdiction adjudications with adult prison sentences stayed, then imposed.
(II) If Status includes * : Denotes Active for Post Release Supervision Only.

# KDOC Physical Location History(s)

| Location | Movement Date | Movement Reason |
|---|---|---|
| Hutchinson CF-East | Jul 05, 2023 | Inter-Facility Movement |
| Hutchinson CF-Central | Jul 16, 2021 | Returned From Court Appearance |
| Sedgwick County | Jun 15, 2021 | Released For Court Appearance |
| Hutchinson CF-Central | Jan 05, 2021 | Inter-Facility Movement |
| Lansing CF-Central | Dec 15, 2020 | Inter-Facility Movement |
| Arizona State | Oct 23, 2019 | Contract Jail-KDOC Placement |
| Hutchinson CF-Central | Feb 13, 2018 | Inter-Facility Movement |

Kansas Department of Corrections

| Location | Movement Date | Movement Reason |
|----------|---------------|-----------------|
| Lansing CF-Central | Dec 16, 2015 | Inter-Facility Movement |
| El Dorado CF-RDU | Nov 16, 2015 | New Court Commitment |
| Unknown or N/A | Jan 28, 2005 | Expiration Of Sentence |
| US (Federal) | Jan 02, 2004 | Paroled To Detainer |
| Norton CF-Central | Dec 22, 2003 | Inter-Facility Movement |
| Norton CF-East | Oct 21, 2003 | Inter-Facility Movement |
| Norton CF-Central | Oct 07, 2003 | Parole Viol. No New Sentence |
| Sedgwick County | Sep 29, 2003 | DOC Warrant Issued |
| Sedgwick County | Sep 25, 2003 | DOC Warrant Issued |
| Unknown or N/A | Sep 22, 2003 | Absconded |
| Sedgwick County | Jul 21, 2003 | DOC War. Wthdrwn Supervsn I/S |
| Sedgwick County | Jul 21, 2003 | Intra-parole/CR |
| Sedgwick County | Jul 11, 2003 | DOC Warrant Issued |
| Unknown or N/A | Jun 16, 2003 | Absconded |
| Sedgwick County | Feb 11, 2003 | Det. Par/CR Rtnd KS Supervsn |
| Sedgwick County | Feb 07, 2003 | Paroled To Detainer |
| Norton CF-Central | Nov 19, 2002 | Inter-Facility Movement |
| El Dorado CF-Central | Nov 13, 2002 | Parole Viol. No New Sentence |
| Sedgwick County | Nov 06, 2002 | DOC Warrant Issued |
| Sedgwick County | Nov 06, 2002 | DOC Warrant Issued |
| Sedgwick County | Nov 06, 2002 | DOC Warrant Issued |
| Sedgwick County | Aug 16, 2002 | In-State Post Release |
| Ellsworth CF | Jun 04, 2002 | Parole Viol. No New Sentence |
| Sedgwick County | May 16, 2002 | DOC Warrant Issued |
| Unknown or N/A | May 02, 2002 | Absconded |
| Sedgwick County | Jan 28, 2002 | Intra-parole/CR |
| Reno County | Jan 28, 2002 | Intra-parole/CR |
| Sedgwick County | Jan 28, 2002 | Intra-parole/CR |

3/14/24, 11:36 AM                                    Kansas Department of Corrections

| Location | Movement Date | Movement Reason |
|---|---|---|
| Sedgwick County | Jan 18, 2002 | Paroled To Detainer |
| Sedgwick County | Jan 18, 2002 | Det. Par/CR Rtnd KS Supervsn |
| Sedgwick County | Jan 18, 2002 | Intra-parole/CR |
| Hutchinson CF-Central | Oct 26, 2001 | Parole Viol. No New Sentence |
| Rice County | Oct 23, 2001 | DOC Warrant Issued |
| Sedgwick County | Oct 10, 2001 | DOC Warrant Issued |
| Unknown or N/A | Sep 28, 2001 | Absconded |
| Sedgwick County | Sep 22, 2001 | DOC Warrant Issued |
| Sedgwick County | May 11, 2001 | In-State Post Release |
| Hutchinson CF-Central | Feb 24, 2001 | Inter-Facility Movement |
| Hutchinson CF-Central | Aug 31, 2000 | Inter-Facility Movement |
| HutchinsonCF-Work Release | Aug 31, 2000 | Inter-Facility Movement |
| El Dorado CF-North | Feb 08, 2000 | Inter-Facility Movement |
| El Dorado CF-Central | Jan 18, 2000 | Inter-Facility Movement |
| El Dorado CF-North | Jan 13, 2000 | Inter-Facility Movement |
| El Dorado CF-East | Dec 23, 1998 | Inter-Facility Movement |
| El Dorado CF-Central | Oct 23, 1998 | Inter-Facility Movement |
| Lansing CF-Central | Dec 31, 1997 | Inter-Facility Movement |
| Topeka CF-RDU | Dec 11, 1997 | New Court Commitment |
| Unknown or N/A | Apr 17, 1997 | Expiration Of Sentence |
| Ellsworth CF | Mar 19, 1997 | Parole Viol. No New Sentence |
| Sedgwick County | Feb 25, 1997 | DOC Warrant Issued |
| Unknown or N/A | Jun 17, 1996 | Absconded |
| Sedgwick County | Mar 05, 1996 | In-State Post Release |
| Ellsworth CF | Nov 22, 1995 | Parole Viol. No New Sentence |
| Sedgwick County | Nov 09, 1995 | DOC Warrant Issued |
| Unknown or N/A | Aug 04, 1995 | Absconded |
| Sedgwick County | Apr 14, 1995 | In-State Post Release |

Kansas Department of Corrections

| Location | Movement Date | Movement Reason |
|---|---|---|
| Hutchinson CF-Central | Apr 13, 1995 | Inter-Facility Movement |
| Hutchinson CF-East | Jan 19, 1995 | Inter-Facility Movement |
| Hutchinson CF-Central | Nov 01, 1994 | Inter-Facility Movement |
| Winfield CF | Sep 07, 1994 | Inter-Facility Movement |
| Hutchinson CF-Central | Sep 06, 1994 | Inter-Facility Movement |
| Topeka CF-RDU | Aug 23, 1994 | Parole Viol. New Sentence |
| Sedgwick County | May 05, 1994 | DOC Warrant Issued |
| Sedgwick County | May 02, 1994 | DOC Warrant Issued |
| Unknown or N/A | Apr 19, 1994 | Absconded |
| Illinois State | May 01, 1993 | Out-of-State Parole |
| Sedgwick County | Sep 21, 1992 | Rel. In Lieu Of Revoc-Par/CR |
| Osawatomie CF | Jun 25, 1992 | Adm. In Lieu Of Revoc-Par/CR |
| Sedgwick County | Jun 15, 1992 | Intra-parole/CR |
| Sedgwick County | Jun 12, 1992 | Intra-parole/CR |
| Sedgwick County | Jun 09, 1992 | Intra-parole/CR |
| Sedgwick County | Apr 12, 1992 | DOC War. Wthdrwn Supervsn I/S |
| Sedgwick County | Apr 12, 1992 | Intra-parole/CR |
| Sedgwick County | Mar 31, 1992 | DOC Warrant Issued |
| Unknown or N/A | Feb 04, 1992 | Absconded |
| Sedgwick County | Aug 08, 1991 | Paroled In-State |
| Wichita-Work Release Center | May 01, 1991 | Inter-Facility Movement |
| Hutchinson CF-Central | Apr 30, 1991 | Inter-Facility Movement |
| Ellsworth CF | Mar 12, 1991 | Inter-Facility Movement |
| Topeka CF-RDU | Feb 19, 1991 | New Court Commitment |

Kansas Department of Corrections

# KDOC Disciplinary Report(s) since January 1996

| Date | Class | Location | Type of report |
|------|-------|----------|----------------|
| Mar 31, 2020 | 1 | Hutchinson Correctional Fac. - Central | Disobeying Orders |
| Mar 31, 2020 | 1 | Hutchinson Correctional Fac. - Central | Interfering W/Official Duties |
| Nov 17, 2003 | 3 | Norton Correctional Facility - East | Violation of Published Orders |
| Oct 13, 2003 | 3 | Norton Correctional Facility - Central | Answering Calls or Passes |
| Jan 07, 2003 | 2 | Norton Correctional Facility - Central | Unauthorized Dealing or Trade |
| Feb 24, 2001 | 1 | Hutchinson Corr. Fac. - Work Release | Responsibility for Counts |
| Mar 23, 1998 | 3 | Lansing Correctional Facility - Central | Rest Area/Unauth Presence |
| Mar 12, 1998 | 2 | Lansing Correctional Facility - Central | Restr Area/Unauth Presence |
| Dec 15, 1997 | 2 | Topeka Correctional Facility - RDU | Insub/Disrespect Officer/Other |

**Exhibit B**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

BENTON GENE BASKIN,         )
                              )
        Plaintiff,         )
                              )
v.                          )     **Case. No. 23-3212-JAR-ADM**
                              )
TODD THOMAS, *et al.*,        )
                              )
        Defendants.      )
                              )

## <u>DECLARATION OF ARMEN GABOIAN</u>

I, Armen Gaboian, being of lawful age, make the following declaration pursuant to 28 U.S.C. § 1746 relating to the captioned matter based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment.

1.  I served as a Corrections Officer at Hutchinson Correctional Facility (HCF) from May 2011 to June 2020, when I retired.

2.  I worked for the Kansas Department of Corrections (KDOC) for nine years. During this time I was assigned to the Special Security Team. My responsibilities included preparing inmates for transportation in and out of the facility.

3.  As part of my duties as a corrections officer on the Special Security Team, I routinely placed belly irons and leg irons on inmates in their preparation for transport.

4.  I never put belly irons on an inmate too tightly. I made sure they were properly secured for the individual and created a routine to check their security to ensure they

are done correctly every time.  My experience in the military required safety checks and procedures for every task.

5. My safety check and procedure included: putting one of my fingers between the handcuffs and the inmate's wrist while putting the handcuffs on the inmate. After tightening the handcuffs, a sufficient gap would remain for me to slip my finger out. This gap ensured that the handcuffs would not be too tight. This allowed about a one inch of mobility for the inmate to use their hands for proper transportation.  Once completed I would double lock the cuff so it would not tighten.

6. If the handcuffs were too small to accomplish this, I would use leg irons instead, which are larger.

7. If the inmate requested that I adjust the handcuffs, I would redo the handcuffs.

8. If the inmate requested that I adjust the handcuffs again, I would tell the inmate to check with another corrections officer, and that officer can redo the cuffs if the inmate felt they were improperly applied.

9. I would only place handcuffs on an inmate tightly if circumstances demanded it, such as when I needed to quickly get someone out of a fight or when an inmate became violent or belligerent.

10. On or around October 23, 2019, I helped prepare inmates at HCF to travel to a private prison facility in Arizona.

11. I assisted in the Admissions and Discharge section of HCF, where other officers and I placed restraints on the inmates being transported to the Arizona facility from HCF.

12. I had placed many restraints on inmates that day and I do not recall whether I placed restraints on inmate Benton Baskin (#52888), what I can say with confidence is, I have never applied belly or leg irons on too tightly for inmates being transported in or out of the facility.

13. If an inmate had acted violently or belligerently prior to transport, we would not have transported them. We would have instead moved the inmate to a higher security setting, such as administrative segregation (also known as restrictive housing). Because that kind of situation did not arise, I am confident that I followed my usual procedure of ensuring a one-finger gap when placing handcuffs on each inmate transported that day.

14. If an inmate had requested medical treatment, I would have referred the inmate to medical immediately.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 27__, 2024.

Armen Gaboian
Former Corrections Officer, HCF
Kansas Department of Corrections

**Exhibit C**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| BENTON GENE BASKIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case. No. 23-3212-JAR-ADM |
| | ) |
| TODD THOMAS, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF JAVIER DIAZ

I, Javier Diaz, being of lawful age, make the following declaration pursuant to 28 U.S.C. § 1746 relating to the captioned matter based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment.

1. I currently serve as a Corrections Supervisor at the Wichita Work Release Facility (WWRF) operated by the Kansas Department of Corrections (KDOC).

2. I previously served as a Corrections Officer at Hutchinson Correctional Facility (HCF) from at least December 2018 to October 2021. Then I served as a Corrections Supervisor at HCF until I moved to my current position at WWRF in June 2023.

3. As Corrections Officer and Corrections Supervisor, my duties have included enforcing policies and rules in a fair, firm, and consistent manner to preserve the safety and security of the facility, the staff, the inmates, and the public. Some specific duties have included supervising and maintaining discipline and control of inmates, detecting and preventing contraband, applying mechanical restraints when necessary,

performing counts of residents, observing and reporting problematic behavior, and responding to emergency situations.

4. I have worked for KDOC for twelve years.

5. Over the years, I have conducted many inmate transports, taking inmates from one facility to another.

6. On or around October 23, 2019, I was part of a group responsible for transporting inmates from HCF to an airport, where they would then be transported to a private prison facility in Arizona.

7. At HCF, the inmates being transported were first processed by other officers who placed restraints on the inmates in the Admissions and Discharge (A&D) section of HCF.

8. The inmates were then escorted to a bus where I was waiting as the driver.

9. The front cabin of the bus was separated from the rear cabin of the bus by a partition with a window in it.

10. In the front cabin of the bus, I sat in the driver's seat and another officer sat in the passenger seat of the bus as my partner.

11. The inmates sat in the rear cabin of the bus behind the partition.

12. The other officer and myself could communicate with the inmates in the rear cabin through the window between the cabins.

13. Once inmates were on the bus, at least one of the two of us would have stayed with the bus at all times.

14. We often provided sack lunches to inmates when transporting them between facilities if they would otherwise miss a meal.

15. I do not recall providing sack lunches to inmates on that particular day.

16. I was not aware of any complaints by the inmates until the bus started pulling away from HCF. At that point, inmate Benton Baskin (#52888) started to complain about his handcuffs being too tight.

17. Under strict KDOC policy, which I had been trained on, once the bus has started moving, the officers conducting the transport are not permitted to enter the rear cabin. This policy exists to ensure safety and security. For example, a complaint about tight restraints could be a ploy to set up an ambush on officers, which could then potentially allow inmates to escape.

18. For security reasons, the inmates being transported did not know for a long time in advance, if at all in advance, that they were heading to Arizona. I know from training and experience that inmates often do not like the change of moving to a different facility, especially when it is unexpected or sudden. For these reasons, I believed some inmates were likely upset about being moved to Arizona.

19. In addition to the strict KDOC policies prohibiting entering the rear cabin, knowing that inmates were likely upset about the transport gave me an additional reason to believe, in light of my training and experience, that entering the rear cabin was inadvisable.

20. The proper officers to adjust handcuffs prior to transport would have been the team of officers who applied them in the secure environment of A&D, so I asked Baskin why he had not raised the handcuffs issue earlier while he was in A&D.

3

21. I did not hear Baskin give any response.

22. I do not recall taking the inmates to El Dorado Correctional Facility (EDCF) that day.

23. We transported the inmates to the airport in Salina.

24. I remained in the bus as other KDOC officers escorted the inmates from the bus.

25. Personnel from a third-party private security firm escorted the inmates on board a plane.

26. My partner and I were instructed to keep the bus at the Salina airport until the plane had been in the air for some time. I think it was about forty-five minutes. This ensured that if something happened and the plane needed to turn around and land, we would be available to assist on the ground if necessary.

27. After the required time had passed, my partner and I returned in the bus to HCF.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 26, 2024.

Javier Diaz
Corrections Supervisor, WWRF
Kansas Department of Corrections

4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **BENTON GENE BASKIN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No. 23-3212-JAR-ADM** |
| | ) |
| **TODD THOMAS,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## DECLARATION OF PATRICK DOUGLAS

I, Patrick Douglas, being of lawful age, make the following declaration pursuant to 28

U.S.C. § 1746 relating to the captioned matter based upon my personal knowledge and

information made known to me from official records reasonably relied upon by me in the course

of my employment.

1.  I have served as the Security and Emergency Manager for the Kansas Department of

    Corrections (KDOC) since June 2016.

2.  My duties include overseeing KDOC's operations regarding security and emergency

    preparedness. I oversee audits and reviews of those operations and participate in

    reviewing any serious incidents.

3.  I report to the Deputy Secretary of Facilities Management.

4.  I have worked for KDOC for thirty-six years.

### *Flight to Arizona*

5.  On or around October 23, 2019, KDOC transferred a group of inmates to Saguaro

    Correctional Center (SCC), a private prison facility in Arizona.

6. I was the coordinator for KDOC's operations and logistics for transportation to the airport, site security, and inmate movement to the airplane.

7. Once the airplane was loaded, I observed the airplane transport by TransCor America (TCA). TCA was the third-party private security firm conducting the air transport. I was on the flight as a "contract monitor" on behalf of KDOC to monitor the transport, to talk with the inmates, and to ensure that inmates had answers to their questions.

8. TCA checked all restraints prior to boarding, changed some, and handled all restraint and movement on the trip.

9. I did not have a key to the inmates' restraints.

10. The restraints included belly chains and a pair of handcuffs attached at the front of the belly chain.

11. A rigid "black box" handcuff cover was placed in the middle of the handcuffs to prevent lock-picking.

12. The image below fairly and accurately depicts a black box placed over a pair of handcuffs.



13. For the flight, the inmates were secured in groups of three by TCA, with chains connecting the restraints of each trio in a line.

2

14. The photograph below fairly and accurately shows the restraints TCA placed on the inmates for the flight prior to boarding.



15. The seating on the plane was in rows of six, divided by a central aisle into half-rows of three. Each trio of connected inmates sat in a half-row with the other inmates in that trio and were connected to each other at the sides with a plastic restraint by TCA.

3

16. I took the photograph below, which fairly and accurately shows the layout of seats on the plane. It also fairly and accurately shows a "black box" on the handcuffs worn by the inmate on the right in the foreground.



17. The armrests on the plane happened to pull on the restraint between inmates, causing the restraint to restrict movement more.

18. TCA adjusted some restraints during the flight.

19. I received some complaints from inmates near me on the flight regarding the tightness of their restraints. I personally asked TCA staff to check those inmates' restraints.

20. I remember that several inmates who had come in on one particular bus (not from the Hutchinson or El Dorado Correctional Facilities) had their restraints placed incorrectly, and TCA staff had to adjust those restraints.

21. I do not recall anyone on the flight being given larger handcuffs, also known as "big brutus" handcuffs.

4

22. Zip ties were not used on inmates' hands or feet. Zip ties, if used, would have been used to link belly chains together.

23. After the plane landed in Arizona, the inmates were escorted by TCA staff from the plane to buses.

24. Because the seating on the buses was in groups of two, the TCA staff no longer connected the inmates' belly chains in trios but rather in pairs for the drive.

25. When we arrived at SCC, all inmates received a medical intake check and I recall I personally took at least two inmates to medical due to skin indentations or swelling of their wrists from tight restraints. The next morning I returned to the facility and checked for any further issues, referring at least two inmates back to medical for follow-up examination.

26. As part of my job duties, I am familiar with inmate Benton Baskin (#52888). I do not specifically recall if I observed his handcuffs being too tight on the flight to Arizona or at any other time that day. I did not personally check all of the inmates' restraints.

### *Contract Monitors*

27. From October 23, 2019 to December 2020, KDOC housed about 120 inmates, including Baskin, out of state in SCC.

28. While inmates were housed in SCC, KDOC sent contract monitors to SCC to meet with inmates housed there.

29. The KDOC staff members who served as contract monitors volunteered to do so.

30. One or two contract monitors would be sent at a time.

5

31. The contract monitors were responsible for talking with KDOC residents and ensuring that residents had answers to their questions.

32. I served as a KDOC contract monitor four times.

33. The first time, on or around October 23, 2019, I was on the flight from Kansas to Arizona with the inmates.

34. The second time was from September 28 to October 1, 2020. I spent at least part of the first and last day in transit, but I was able to spend at least two days available to inmates at the facility.

35. The third time was from December 8 to December 10, 2020, along with Deputy Secretary Joel Hrabe. We spent at least part of the first and last day in transit, but we were able to spend at least one and a half days available to inmates at the facility. During this trip, we discussed with the inmates the planned move back to Kansas that would occur the following week.

36. The fourth time, on or around December 15, 2020, I was on the flight back to Kansas with the inmates. For this return flight, I personally checked all of the inmates' restraints before the flight.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 27, 2024.

Patrick Douglas
Security and Emergency Manager
Kansas Department of Corrections

**Exhibit E**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

BENTON GENE BASKIN,          )
                             )
       Plaintiff,        )
                             )
v.                           )    Case No. 23-3212-JAR-ADM
                             )
TODD THOMAS, *et al.*,       )
                             )
       Defendants.       )
_____)

### DECLARATION OF JOEL HRABE

I, Joel Hrabe, being of lawful age, make the following declaration pursuant to 28 U.S.C. § 1746 relating to the captioned matter based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment.

1. I served as the Deputy Secretary of Facilities Management for the Kansas Department of Corrections (KDOC) from August 2019 until I retired in July 1, 2023.

2. As Deputy Secretary, my duties included overseeing the operations and services of all adult correctional facilities within KDOC, including security, sentence computation, case management, day-to-day operations, emergency response, special operations, and  operational schedules. I also oversaw transfers to and from temporary housing outside KDOC facilities.

3. As Deputy Secretary, I reported directly to the Secretary of Corrections.

4. I worked for KDOC for thirty one years.

***Saguaro Correctional Center***

5. From October 23, 2019 to December 2020, KDOC housed about 120 inmates, including Benton Gene Baskin (#52888), out of state in Saguaro Correctional Center (SCC), a private prison facility in Arizona.

6. Although these inmates were housed temporarily in SCC, their home facility remained the facility they were at prior to being transferred to SCC. For examples, these inmates had some of their property kept at their respective home facilities.

7. Although inmate Benton Baskin (#52888) was housed in SCC, his home facility remained as Hutchinson Correctional Facility (HCF).

8. As part of KDOC's arrangement with SCC, all KDOC grievance forms received by SCC were to be electronically sent to KDOC.

***Contract Monitors***

9. While inmates were housed in SCC, KDOC frequently sent representatives called "contract monitors" to SCC to meet with inmates housed there. From October 23, 2019, to the end of 2020, this occurred about once a week.

10. The KDOC staff members who served as contract monitors volunteered to do so.

11. One or two contract monitors would be sent at a time.

12. The contract monitors were responsible for talking with KDOC residents and addressed questions that residents had.

13. I served as a KDOC contract monitor at SCC on two separate occasions, once in November 2019 and once in December 2020. Each time, it was a three-day trip. I

2

spent at least part of the first and last day in transit, but each time the goal was to I was able to spend at least one day available to meet with inmates at the facility.

14. On the December 2020 trip, which was from December 8 to December 10, 2020, I went with Pat Douglas. We discussed with the inmates the process for returning back to Kansas which was to occur the following week.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March _12_, 2024.

Joel Hrabe
Former Deputy Secretary of Facilities Management
Kansas Department of Corrections

3

**Exhibit F**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **BENTON GENE BASKIN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case. No. 23-3212-JAR-ADM** |
| ) | |
| **TODD THOMAS,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## DECLARATION OF DOUG BURRIS

I, Doug Burris, being of lawful age, make the following declaration pursuant to 28 U.S.C.

§ 1746 relating to the captioned matter based upon my personal knowledge and information

made known to me from official records reasonably relied upon by me in the course of my

employment.

1. I served as a Corrections Manager for the Kansas Department of Corrections (KDOC)

   from November 2011 until I retired in January 2021.

2. My duties included handling on behalf of the Secretary of Corrections appeals to the

   Secretary regarding grievances, property claims, and censorship of incoming mail

   items. I occasionally handled appeals to the Secretary regarding disciplinary reports

   as well. I oversaw compacts with other states regarding transfers of inmates between

   states.

3. I reported to the Deputy Secretary of Facilities Management.

4. I worked for KDOC for eighteen years.

5. From October 23, 2019 to December 2020, KDOC housed about 120 inmates, including Benton Gene Baskin (#52888), out of state in Saguaro Correctional Center (SCC), a private prison facility in Arizona.

6. As part of my duties, I made sure that KDOC inmates housed at SCC had access to the Kansas Administrative Regulations, including the regulations regarding the grievance process. KDOC inmates housed at SCC had a computer kiosk for regular access to KDOC's Internal Management Policies and Procedures (IMPP's) as well as the Kansas Administrative Regulations.

7. With regard to the 15-day deadline to file a grievance regarding KDOC or KDOC personnel, KDOC gave more leeway to inmates housed at SCC than to other inmates.

8. KDOC even actively reviewed how SCC handled grievances regarding SCC or SCC personnel filed by KDOC inmates housed at SCC.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 13, 2024.

 

 

_____
Doug Burris
Former Corrections Manager
Kansas Department of Corrections

**Exhibit G**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **BENTON GENE BASKIN,** )<br>)<br>**Plaintiff,** )<br>)<br>**v.** )<br>)<br>**TODD THOMAS,** *et al.*, )<br>)<br>**Defendants.** )<br>———————————————————— ) | **Case No. 23-3212-JAR-ADM** |

## <u>DECLARATION OF MELISSA WALDOCK</u>

I, Melissa Waldock, being of lawful age, make the following declaration pursuant to 28 U.S.C. § 1746 relating to the captioned matter based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment.

1. I have served as a Classification Director for the Kansas Department of Corrections (KDOC) since July 2018.

2. My duties include serving as a subject-matter expert regarding custody classification, overseeing the facility classification administrators, overseeing sentence computation (including ensuring the accuracy of time spent in custody, good-time credits, and all technical aspects of the computation), and overseeing population management.

3. Population management means tracking and assigning bed space at the appropriate classification levels and in appropriate facilities for all inmates in the custody of KDOC.

4. I report to the Deputy Secretary of Facilities Management.

5. I have worked for KDOC for nineteen years.

### Grievance Process

6. From October 23, 2019 to December 2020, KDOC housed about 120 inmates, including Benton Gene Baskin (#52888), out of state in Saguaro Correctional Center (SCC), a private prison facility in Arizona.

7. Inmates housed in SCC had access to KDOC's administrative remedy process while housed in SCC.

8. As part of KDOC's arrangement with SCC, inmates housed in SCC had access to Kansas regulations – including KDOC's grievance policy – as well as KDOC's grievance forms while housed in SCC, in both electronic and paper forms.

9. Inmates housed in SCC also had access to a KDOC rulebook which covered the grievance timeframes and the next action to take if no response was made to a grievance at any step of the process.

10. The rulebook that was in effect in October 2019 is attached as Exhibit 1. SCC inmates would have had a copy of this version of the rulebook.

11. As part of KDOC's arrangement with SCC, all KDOC grievance forms received were to be electronically sent to KDOC.

### Contract Monitors

12. While inmates were housed in SCC, KDOC frequently sent representatives called "contract monitors" to SCC to meet with inmates housed there. From October 23, 2019, to the end of 2019, this occurred about once a week.

13. The KDOC staff members who served as contract monitors volunteered to do so.

14. One or two contract monitors would be sent at a time.

15. The contract monitors were responsible for talking with KDOC residents and ensuring that residents had answers to their questions.

16. I served as a KDOC contract monitor at SCC from November 12 to November 15, 2019, along with one other KDOC staff member. We spent at least part of the first and last day in transit, but we were able to spend at least two days available to inmates at the facility.

### Baskin's Past Grievances

17. As part of my job duties, I have access to inmate grievance records.

18. In 2016, inmate Benton Baskin (#52888) appealed grievance AA20160406 to the Secretary of Corrections.

19. Fair and accurate copies of that grievance appeal and the Secretary of Corrections' response to it are attached as Exhibit 2.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 11, 2024.

Melissa Waldock
Classification Director
Kansas Department of Corrections

**Exhibit 1**

**Department of Corrections**

# REGULATIONS

INMATE CONDUCT, PENALTIES, DISCIPLINE PROCEDURE, DISCIPLINARY
AND ADMINISTRATIVE SEGREGATION, GRIEVANCE PROCEDURE, AND
REPORTING AND CLAIMS PROCEDURE.

ARTICLE 44-12 Through 44-16 of Kansas Administrative Regulations

## Office of the SECRETARY OF CORRECTIONS

## EFFECTIVE: June 10, 2019

*This book does not include the orders of any warden of any correctional
facility.*

Inmates and Employees, please turn in this book to Unit Team, or your
supervisor, when you no longer live or work here.

*THANK YOU*

## INSTRUCTIONS FOR USE OF THIS BOOK

1       You should read well this entire book and should keep it available
for quick reference.

2       From time to time changes may be made. If this happens you will
be notified of the change by publication on the bulletin board in each
cellhouse or residence facility.

3       Any suggestion you have for changing this book is welcome and
may be submitted to the institution director or his legal advisor for review
and transmittal to the office of the Secretary. Suggestion should be in
writing.

4       When you are released or transferred from this facility please turn
in this book before leaving.

The copyright to certain material herein reprinted from the Kansas
Administrative Regulations is retained by the Revisor of Statutes for the use
and benefit of the State of Kansas.

2

## TABLE OF CONTENTS
# Inmate Rule Book

### 44-12.CONDUCT AND PENALTIES

**Clothing, Hygiene, Safety, Appearance and Living Quarters**

44-12-101. Inmate clothing.
44-12-102. Personal cleanliness.
44-12-103. Tattoos, body piercing, and body markings.
44-12-104. Care of living quarters.
44-12-105. Unsanitary practices.
44-12-106. Hair standards and appearance.
44-12-107. Use of safety devices.

**Property and Money, Ownership, Possession, Registration, Care and Use**

44-12-201. Registration and use of personal property.
44-12-202. Radios, televisions, musical instruments, and other sound equipment.
44-12-203. Theft.
44-12-204. Taking without permission.
44-12-205. Unauthorized dealing and trading.
44-12-206. Debt adjustment or collection prohibited.
44-12-207. Gambling and bookmaking.
44-12-208. Misuse of state property.
44-12-209. Entering into contracts, incurring financial obligations.
44-12-210. Accounts.
44-12-211. Telephones or other communication devices.
44-12-212. Accessing unauthorized computer-based information.

**Deportment, Violence, Disruptive Behavior and Riot.**

44-12-301. Fighting.
44-12-302. Noise.
44-12-303. Lying.
44-12-304. Disobeying orders.
44-12-305. Insubordination or disrespect to officers or other employees.
44-12-306. Threatening or intimidating any person

44-12-307. Avoiding an officer44-12-309. Kitchen utensils and shop tools.

44-12-308. Improper use of prepared or served food.

44-12-309. Kitchen utensils and shop tools.

44-12-310. Misconduct in dining room.

44-12-311. Being in a condition of drunken ness, intoxication, state of altered consciousness.

44-12-312. Use of stimulants, sedatives, unauthorized drugs, or narcotics, or the misuse, or hoarding of authorized or prescribed medication.

44-12-313. Sexually explicit materials.

44-12-314. Sexual activity; aggravated sexual activity; sodomy; aggravated sodomy.

44-12-315. Lewd acts.

44-12-316. Revoked

44-12-317. Falsifying documents.

44-12-318. Disruptive behavior.

44-12-319. Riot or incitement to riot.

44-12-320. Revoked

44-12-320a. Interfering with official duties.

44-12-321. Conduct regarding visitors or the public.

44-12-322. Arson.

44-12-323. Assault.

44-12-324. Battery.

44-12-325. Security threat groups: inmate activity; limitations.

44-12-326. Revoked

44-12-327. Interference with restraints.

44-12-328. Undue familiarity.

## Assignments To and Performance of Work, Education, Training, or Other Duty

44-12-401. Work performance.

## Being Present and Accounted For

44-12-501. Answering calls or passes.

44-12-502. Responsibility for counts.

44-12-503. Restricted area and unauthorized presence or out-of-place in assigned domicile.

44-12-504. Interference with cell operation and visibility.

44-12-505. Restriction.

44-12-505b. Medical restriction.

44-12-506. Change of name as it appears on journal entry of sentence, convictions.

4

### Inmate Writing and Other Inmate Communications or Publications

44-12-601. Mail.
44-12-602. Posting notices.

### Legal Work, Law Library, Legal Assistance

44-12-701. Revoked
44-12-702. Legal assistance by inmates.

### Administration Publications and Postings

44-12-801. Bulletin boards.

### Contraband

44-12-901. Dangerous contraband.
44-12-902. Contraband.
44-12-903. Tobacco contraband

### Violation of Statutes, Regulations and Orders

44-12-1001. Violation of statutes, other regulations, or orders.
44-12-1002. Violation of published orders.

### Attempt, Conspiracy and Accessory to Commission of Offense

44-12-1101. Attempt, conspiracy, accessory, solicitation; liability for offenses of another.

### Increased Penalties

44-12-1201. Increased penalty for involving or victimizing an inmate under 18.
44-12-1202. Conviction of four offenses in six months.

### Classification of Offenses and Penalties

44-12-1301. Class I offenses.
44-12-1302. Class II offenses.
44-12-1303. Class III offenses.
44-12-1304. Revoked
44-12-1305. Use of fines.
44-12-1306. Use of restitution.
44-12-1307. Fines and restitution, imposition and collection; limits.
44-12-1308. Disciplinary segregation; limits.

5

## 44-13. DISCIPLINARY PROCEDURE

### Procedure Generally

44-13-101. Disciplinary procedure established, general description of system.
44-13-101a. Waiver of rights.
44-13-102. Revoked.
44-13-103. Prosecution by outside agency.
44-13-104. Revoked
44-13-105. The disciplinary administrator.
44-13-106. Administration of oaths; designation of persons authorized.
44-13-107. Reserved.
44-13-108. Reserved.
44-13-109. Reserved.
44-13-110. Reserved.
44-13-111. Reserved.
44-13-112. Reserved.
44-13-113. Reserved.
44-13-114. Reserved.
44-13-115. Revoked.

### Commencement of Proceedings

44-13-201. Disciplinary report and written notice.
44-13-201a. Diversion procedure.
44-13-201b. Summary judgment procedure.
44-13-202. Amendment of the charge.
44-13-203. State prosecution and disciplinary hearing.

### Nature of Proceedings

44-13-301. Revoked.
44-13-302. Revoked.
44-13-302a. Revoked.
44-13-303. Revoked.
44-13-304. Revoked.
44-13-305. Revoked.
44-13-306. Inmate responsibilities.
44-13-307. Administrative review of requests for witnesses; denial of requests;
issuance of summons; voluntary nature of witness appearance.

### Hearings Generally

44-13-401. Hearing within certain time.
44-13-401a Notice to inmate; time & place of hearing

44-13-402. Continuing the hearing; recesses; time limits;
extensions.
    44-13-403. Conducting the disciplinary hearing.
    44-13-404. Presence of inmate, and presence of charging officer at
disciplinary hearings;
    officer statements in lieu of testimony.
    44-13-405. Revoked.
    44-13-405a. Calling witnesses.
    44-13-406. Disposition.
    44-13-407. Revoked
    44-13-408. Assistance from staff.
    44-13-409. Standard of proof.

## Reports and Records

    44-13-501. Preservation of all reports.
    44-13-502. Revoked.
    44-13-502a. Hearing record.
    44-13-503. Revoked.
    44-13-504. Revoked.
    44-13-505. Copy to the inmate.
    44-13-506. Preparation of the record in seven days.
    44-13-507. Docket.
    44-13-508. Disciplinary reports in file.
    44-13-509. Disciplinary case log.

## Sentences

    44-13-601. Serving sentence.
    44-13-602. Time not credited for administrative segregation.
    44-13-603. Absence from facility.
    44-13-604. Reserved
    44-13-605. Reserved
    44-13-606. Reserved
    44-13-607. Reserved
    44-13-608. Reserved
    44-13-609. Reserved
    44-13-610. Collection of fines.

## Appeals

    44-13-701. Administrative review.
    44-13-702. Appeal on the record to the principal administrator of the
                        institution or
    facility in class III offense cases.
    44-13-703. Appeal on the record to secretary of corrections in class I and
                        II offense

7

cases only.
44-13-704. Secretary of corrections' final review on appeal.

## 44-14. ADMINISTRATIVE AND DISCIPLINARY SEGREGATION

### Segregation Generally

44-14-101. Revoked.
44-14-102. Revoked.

### Disciplinary Segregation

44-14-201. Revoked.
44-14-202. Revoked.

### Administrative Segregation

44-14-301. Revoked.
44-14-302. Revoked.
44-14-303. Revoked.
44-14-304. Revoked.
44-14-305. Revoked.
44-14-305a. Revoked.
44-14-306. Revoked.
44-14-307. Revoked.
44-14-308. Revoked.
44-14-309. Revoked.
44-14-310. Revoked.
44-14-311. Revoked.
44-14-312. Revoked.
44-14-313. Revoked.
44-14-314. Revoked.
44-14-315. Revoked.
44-14-316. Revoked.
44-14-317. Revoked.
44-14-318. Revoked.

## 44-15. GRIEVANCE PROCEDURE FOR INMATES AND PAROLEES

### Procedures Generally

44-15-101. Inmate or parolee grievance procedure; informal resolution;
           formal levels.
44-15-101a. Grievance procedure distribution; orientation; applicability;
            remedies;
advisory committee; investigation.
44-15-101b. Time limit for filing grievance.

44-15-102. Procedure.
44-15-103. Reserved.
44-15-104. Reprisals prohibited.
44-15-105. Records.
44-15-105a. Annual review.
44-15-106. Emergency procedure.

**Special Procedures**

44-15-201. Special kinds of problems.
44-15-202. Revoked.
44-15-203. Ombudsman.
44-15-204. Special procedure for sexual abuse grievances; sexual harassment
Grievances and grievances alleging retaliation for filing same; reports of sexual
Abuse or sexual harassment submitted by third parties.
44-16-101. Reserved
44-16-102. Reporting loss or damage to property.
44-16-103. Revoked.
44-16-104. Revoked.

## 44-16. REPORTING AND CLAIMS PROCEDURE FOR LOST OR DAMAGED PROPERTY OR FOR PERSONAL INJURY

44-16-104a. Inmate claims for personal injury.
44-16-105. Property at own risk.
44-16-106. Revoked.
44-16-107. Revoked.
44-16-108. Revoked.

## Article 12.—CONDUCT AND PENALTIES

### CLOTHING, HYGIENE, SAFETY, APPEARANCE AND LIVING QUARTERS

**44-12-101. Inmate clothing.** (a) Turn-in and issuance. Inmates shall turn in all personal clothing upon admission to a facility. Clothing furnished by the state facility shall be worn by all inmates unless exception is granted by the principal administrator with the approval of the secretary of corrections. Inmates shall not wear or have in their possession any other clothing, or clothing in excess of the authorized issue, unless specifically authorized by principal administrator's orders.

(b) Principal administrator's orders. Inmates shall follow the principal administrator's orders in regard to the clothing, care, and handling procedure.

(c) No inmate clothing will be given special treatment at the laundry, clothing distribution room, or elsewhere. Exchange of clothing shall be made according to established schedules and procedures. Inmates shall keep their clothing as neat and clean as conditions permit. Violation of this rule shall be a class III offense. (Authorized by and implementing

K.S.A. 1991 Supp. 75-5210; effective May 1, 1980; amended April 20, 1992.)

**44-12-102. Personal cleanliness.** Inmates shall shower or bathe a minimum of once a week. Inmates shall brush their teeth a minimum of once a day. Violation of this rule shall be a class III offense. (Authorized by and implementing K.S.A. 1991 Supp. 75-5210; effective May 1, 1980; amended April 20, 1992.)

**44-12-103. Tattoos, body piercing, and body markings.** (a) Inmates shall not place on or remove from or allow to be placed on or removed from their body any tattoo or body marking, nor shall they place on or remove from the body of another inmate any tattoo or body marking. Removal or alteration of tattoos or body markings shall be performed by a medical officer after written approval has been given by the warden.

(b) Inmates shall not pierce their own bodies or the body of another inmate. Inmates shall not allow their bodies to be pierced by another inmate. Any cosmetic piercing of an inmate's body shall be performed by a physician, dentist, or other medical personnel exempted from licensure requirements according to K.S.A. 65-1941 and amendment thereto, after written approval has been given by the warden. Cosmetic piercing shall be permitted only upon a showing of medical necessity certified by a physician or dentist.

(c) Inmates shall not maintain an existing body piercing hole or opening.

(d) Violation of this regulation shall be a class II offense. (Authorized by and implementing K.S.A. 2005 Supp. 75-5210; effective May 1, 1980; amended Feb.15, 2002; amended July 13, 2007.)

10

**44-12-104. Care of living quarters.** Every inmate shall keep his or her living quarters in a neat, clean and sanitary condition. Clothing shall be neatly hung or stored in designated places. Beds shall be made at all times when not in use. Linens shall be exchanged in accordance with the established facility procedures. Wash basins and toilet bowls shall be kept clean. No alteration, painting of, or addition to any assigned quarters or its equipment shall be made without approval according to the orders of the institution or facility. Violation of this rule shall be a class III offense. (Authorized by and implementing K.S.A. 1991 Supp. 75-5210; effective May 1, 1980; amended April 20, 1992.)

**44-12-105. Unsanitary practices.** (a) No inmate shall throw trash of any kind upon the floors, sidewalks, or grounds of any facility. All rubbish shall be placed in the containers provided for that purpose. No inmate shall spit upon the floors, sidewalks, and grounds or within any facility building. Violation of this subsection shall be a class III offense.
(b) No inmate shall collect, smear, or throw body wastes. No inmate shall urinate or defecate upon the floors, sidewalks, or grounds of any facility. Violation of this subsection shall be a class I offense.
(c) Alternatively, violation of this regulation may be handled according to the summary disposition procedure set forth in K.A.R. 44-13-201b.
(Authorized by and implementing K.S.A. 2006 Supp. 75-5210; effective May 1, 1980; amended April 20, 1992; amended Feb. 15, 2002; amended July 13, 2007.)

**44-12-106. Hair standards and appearance.** (a) Each inmate shall keep the inmate's hair neat and clean and follow reasonable health and safety standards. When working in food services, each inmate shall wear a cook's hat, or net, or both for sanitary purposes. Inmates working in food services shall not have facial hair in excess of one inch in length or shall wear beard nets, and shall keep this hair neat and clean.
(b) Violation of this regulation shall be a class III offense. (Authorized by and implementing K.S.A. 2006 Supp. 75-5210; effective May 1, 1980; amended May 1, 1987; amended Feb. 15, 2002; amended July 13, 2007.)

**44-12-107. Use of safety devices.** Each inmate shall use safety devices provided in accordance with the orders of the warden. Violation of this regulation shall be a class II offense. Alternatively, violation of this regulation may be handled according to the summary disposition procedure set forth in K.A.R. 44-13-201b. (Authorized by and implementing K.S.A. 2006 Supp. 75-5210; effective May 1, 1980; amended Feb. 15, 2002; amended July 13, 2007.)

**PROPERTY AND MONEY: OWNERSHIP, POSSESSION, REGISTRATION, CARE AND USE**

**44-12-201**. **Registration and use of personal property.** (a) It shall be the

11

responsibility of each inmate to make certain that any items of personal property in the inmate's possession as designated by department of corrections internal management policy and procedure or orders of the warden are properly registered. Each inmate shall be required, upon demand, to produce any personal property registered in the inmate's name or issued to the inmate, unless previously reported lost according to proper procedure.

(b) Violation of this regulation shall be a class II offense.

This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210; effective May 1, 1980; amended May 1, 1981; amended April 20, 1992; amended February 15, 2002.)

**44-12-202**. **Radios, televisions, musical instruments, and other sound equipment.** (a) All personal radios, televisions, and other electronic sound equipment shall be played only in accordance with the orders of the warden. The size, type, and capacity of this equipment shall be limited by internal management policies and procedures issued by the secretary of corrections. All such equipment, including all musical instruments, shall be possessed and used in accordance with the orders of the warden.

(b) Violation of this regulation shall be a class III offense.

This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing 75-5210; effective May 1, 1980; amended May 1, 1981; amended May 1, 1985; amended April 20, 1992; amended February 15, 2002.)

**44-12-203**. **Theft.** (a) Theft shall include any of the following acts done with intent to deprive the owner permanently of the possession, use, or benefit of the owner's property or services:

(1) Obtaining or exerting unauthorized control over property or services;

(2) obtaining, by deception, control over property or services;

(3) obtaining, by threat, control over property or services; or

(4) obtaining control over stolen property or services and knowing the property or services to have been stolen by another.

(b) Violation of this regulation shall be a class I offense.

This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210; effective May 1, 1980; amended February 15, 2002.)

**44-12-204**. **Taking without permission.** (a) No inmate shall take without permission, regardless of the intent, articles of any kind from any other person or place, nor shall the inmate obtain these articles by fraud or dishonesty.

(b) Violation of this regulation shall be a class II offense. Alternatively, violation of this regulation may be handled according to the summary disposition procedure set forth in K.A.R. 44-13-201b.

This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210; effective May 1, 1980; amended April 20, 1992; amended February 15, 2002.)

**44-12-205**. **Unauthorized dealing and trading.** (a) Trading, borrowing, loaning, giving, receiving, selling, and buying goods, services, or any item with economic value between or among inmates without written permission of the warden or designee shall be prohibited.

(b) Violation of this regulation shall be a class II offense. Alternatively, violation of this regulation may be handled according to the summary disposition procedure set forth in K.A.R. 44-13-201b.

This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210; effective May 1, 1980; amended May 1, 1988; amended April 20, 1992; amended February 15, 2002.)

**44-12-206. Debt adjustment or collection prohibited.** All debt adjustment or collection among inmates is strictly prohibited. Violation of this rule shall be a class II offense. (Authorized by and implementing K.S.A. 1979 Supp. 75-5210(f); effective May 1, 1980.)

**44-12-207. Gambling and bookmaking.** An inmate shall not make any bet, operate or bank any gambling pool or game, keep book, or engage in any form of gambling. An inmate shall not possess, transfer, sell, distribute, nor obtain dice or other gambling paraphernalia. An inmate shall not receive, possess, distribute, sell, nor transfer lottery tickets. Violation of this rule shall be a class II offense. (Authorized by and implementing K.S.A. 75-5210; effective May 1, 1980; amended May 1, 1988.)

**44-12-208. Misuse of state property.** No inmate shall destroy, damage, deface, alter, misuse, or fail to return when due any article of property owned by the state, whether issued by the department of corrections or another state agency, including clothing and shoes. Normal wear and tear to clothing and shoes shall be excepted from this regulation. Violation of this regulation shall be a class II offense. (Authorized by and implementing K.S.A. 2005 Supp. 755210; effective May 1, 1980; amended April 20, 1992; amended July 13, 2007.)

**44-12-209.Entering into contracts, incurring financial obligations.** No inmate shall enter into a contract, or incur any financial obligation, including orders by mail, without the principal administrator's approval. Violation of this rule shall be a class III offense. (Authorized by and implementing K.S.A. 1991 Supp. 75-5210; effective May 1, 1980; amended May 1, 1981; amended April 20, 1992.)

**44-12-210. Accounts.** No inmate shall establish or have access to any

checking or savings account outside the trust fund while confined in a correctional facility. Violation of this regulation shall be a class II offense. (Authorized by K.S.A. 2005 Supp. 75-5210; implementing K.S.A. 2006 Supp. 75-5210, K.S.A.75-5251; effective May 1, 1980; amended May 1, 1981; amended February 15, 2002; amended July 13, 2007.)

**44-12-211. Telephones or other communication devices.** (a) When using any authorized inmate telephone, no inmate shall perform or engage in any of the following:

(1) Use another inmate's personalized identification number (PIN) or permit another inmate to use the inmate's PIN;

(2) be a party to call forwarding;

(3) call any telephone number not listed on the inmate's authorized calling list;

(4) participate in any call involving a party at a phone number other than that originally called, including receiving information relayed by an intermediary, and either relaying or receiving information over any telephone service other than that authorized by the secretary of corrections for inmate usage;

(5) initiate any call to a party on the inmate's authorized calling list and then permit the telephone to be used by another inmate, whether in speaking to the authorized party or to another party;

(6) use the telephone in furtherance of any illegal activity; or

(7) use the telephone to communicate or attempt to communicate with a minor, unless correspondence with the minor is authorized by K.A.R. 44-12-601.

(b) Except as specified in subsection (a), the use or possession of any telephone or any communication device by an inmate without the permission of the warden or warden's designee shall be prohibited.

(c) For purposes of this regulation, "minor" shall mean a person under the age of 18.

(d) Violation of this regulation shall be a class I offense. (Authorized by and implementing K.S.A. 2013 Supp. 75-5210; effective July 13, 2007; amended June 20, 2014.)

**44-12-212. Accessing unauthorized computer-based information.** (a) No inmate shall perform any of the following:

(1) Access, or attempt to access, any information, data, images, or other material residing on or stored in any computer or available through any computer network, unless the information, data, images, or other material has been authorized for inmate access by the secretary of corrections and established and maintained by the information technology division of the department of corrections for that purpose;

(2) communicate or attempt to communicate with a minor through any computer or computer network, unless correspondence with the minor is authorized by K.A.R. 44-12-601; or

14

(3) communicate or attempt to communicate with any person through use of another inmate's authorized electronic mail account.

(b) For purposes of this regulation, "minor" shall mean a person under the age of 18.

(c) Violation of this regulation shall be a class I offense. (Authorized by and implementing K.S.A. 2013 Supp. 75-5210; effective July 13, 2007; amended June 20, 2014.)

### DEPORTMENT, VIOLENCE, DISRUPTIVE BEHAVIOR AND RIOT

**44-12-301. Fighting.** (a) Fighting or any other activity that constitutes violence or is likely to lead to violence shall be prohibited.

(b) It shall be an affirmative defense, for which the offender shall bear the sole burden of proof, if the offender is engaged in self-defense.

(c) Violation of this regulation shall be a class I offense. (Authorized by and implementing K.S.A. 2015 Supp. 75-5210; effective May 1, 1980; amended April 20, 1992; amended, T-44-8-16-16, Aug. 16, 2016; amended Nov. 4, 2016.)

**44-12-302. Noise.** Inappropriate booing, whistling, shouting, or other loud and disturbing noises are not permitted. Violation of this rule shall be a class III offense. (Authorized by K.S.A. 1979 Supp. 75-5210, 75-5210(f); effective May 1, 1980.)

**44-12-303**. **Lying.** (a) Every inmate shall speak the truth. No inmate shall lie, misrepresent the facts, mislead, or give false or misleading information to an officer, employee, or any other person assigned to supervise inmates or others having a right to know. No inmate shall make any false allegations against any officer, employee, inmate, or other person.

(b) Violation of this regulation shall be a class II offense. Alternatively, violation of this regulation may be handled according to the summary disposition procedure set forth in K.A.R. 44-13-201b.

This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210; effective May 1, 1980; amended February 15, 2002.)

**44-12-304. Disobeying orders.** (a) Each inmate shall promptly and respectfully obey any order, directive, or instruction given to the inmate by any employee of the facility, or by an employee of any other agency or of an organization or firm in charge of the inmate. In case of conflicting orders, the last order shall be obeyed.

(b) If an order is violated, the specific circumstances surrounding the violation charge shall be included in the following:

(1) The disciplinary report bringing the charge;

(2) the investigation report, if any; and

(3) if used, the report writer's written statement in lieu of testimony.

15

(c) Violation of this regulation shall be a class I offense. (Authorized by and implementing K.S.A. 2005 Supp. 75-5210; effective, May 1, 1980; amended, T-83-23, Aug. 11, 1982; amended, T-84-1, Jan. 5, 1983; amended May 1, 1984; amended May 1, 1987; amended July 13, 2007.)

**44-12-305**. **Insubordination or disrespect to officers or other employees.** (a) Each inmate shall be attentive and respectful towards employees, visitors, and officials. The showing of disrespect, directly or indirectly, or being argumentative in any manner shall be considered insubordination. This regulation shall exclude an initial exchange or discussion in a civilized tone for the purpose of clarification of the order if the exchange or discussion is not disrespectful or argumentative.
(b) Violation of this regulation shall be a class II offense. Alternatively, violation of this regulation may be handled according to the summary disposition procedure set forth in K.A.R. 44-13-201b.
This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210; effective May 1, 1980; amended February 15, 2002.)

**44-12-306. Threatening or intimidating any person.** (a) An inmate shall not threaten or intimidate, either directly or indirectly, any person or organization. This regulation shall specifically prohibit conditional threats or intimidation. Violation of this subsection shall be a class I offense.
(b) A civilized warning by the inmate that the inmate may properly use legal process to enforce rights or redress wrongs, including use of the inmate grievance procedure, shall not be considered a violation of this regulation.
(c) The subjective impression of the target of the alleged threat or intimidation shall not be a factor in proving a violation of subsection (a). (Authorized by and implementing K.S.A. 2006 Supp. 75-5210; effective May 1, 1980; amended May 1, 1984; amended May 1, 1986; amended Feb. 15, 2002; amended July 13, 2007.)

**44-12-307**. **Avoiding an officer.** No inmate shall run from or deliberately avoid any officer, supervisor, or employee if required, ordered, or requested to be present to talk with, be accounted for, be searched, or be questioned by the officer, supervisor, or employee. Violation of this regulation shall be a class I offense.
This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210; effective May 1, 1980; amended April 20, 1992; amended February 15, 2002.)

**44-12-308. Improper use of prepared or served food.** No inmate shall accept more prepared or served food or drink than the inmate will

16

consume. No inmate shall wastefully and deliberately destroy prepared or served food. Inmates shall not carry any prepared or served food or drink from the dining area, except as allowed under the facility orders. Violation of this regulation shall be a class III offense.

(Authorized by and implementing K.S.A. 2006 Supp. 75-5210; effective May 1, 1980; amended April 20, 1992; amended July 13, 2007.)

**44-12-309**.**Kitchen utensils and shop tools.** (a) No inmate shall remove or have in possession any eating or cooking utensils or tools without proper authorization.

(b) Violation of this regulation shall be a class II offense. However, possession of utensils or tools may be considered possession of dangerous contraband and punishable as a class I offense. Alternatively, violation of this regulation may be handled according to the summary disposition procedure set forth in K.A.R. 44-13-201b. This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210; effective May 1, 1980; amended April 20, 1992; amended February 15, 2002.)

**44-12-310**. **Misconduct in dining room.** (a) All inmates shall enter and leave the dining room in accordance with the established procedure at each facility and shall conduct themselves in an orderly manner while in the dining room.

(b) Violation of this regulation shall be a class II offense. Alternatively, violation of this regulation may be handled according to the summary disposition procedure set forth in K.A.R. 44-13-201b.

This amendment shall be effective on and after February 15, 2002. (Authorized by K.S.A. 75-5210; implementing K.S.A. 75-5210, 75-5251; effective May 1, 1980; amended February 15, 2002.)

**44-12-311. Being in a condition of drunkenness, intoxication, state of altered consciousness.** No inmate shall at any time be drunk, intoxicated, or be in a chemically induced state of altered consciousness. Violation of this rule shall be a class I offense. (Authorized by K.S.A. 1979 Supp. 755210, 75-5210(f); effective May 1, 1980.)

**44-12-312. Use of stimulants, sedatives, unauthorized drugs, or narcotics, or the misuse or hoarding of authorized or prescribed medication.** (a) No inmate shall take into the bodily system any kind of substance that is capable of producing intoxication, hallucination, stimulation, depression, dizziness, or other alteration of the inmate's state of consciousness or feeling, except approved foods, including coffee and tea, and legal drugs, including medication properly and legally prescribed or authorized for a specific inmate by an authorized licensed physician. Alcohol in any form shall be specifically declared not to be an approved food or drink unless it is a component of authorized or prescribed medication.

(b) Misusing, hoarding, tampering with, or defacing any authorized or

17

prescribed medication shall be prohibited.

(1) "Misusing" medication shall mean using any medication for a purpose other than that for which the medication was specifically authorized or prescribed. This shall include either of the following:

(A) Keeping the medication beyond the stop date, as designated by the health care provider; or

(B) dealing and trading prescribed medications within the meaning of K.A.R. 44-12-205.

(2) "Hoarding" medication shall mean having possession or control of or holding any quantity of authorized or prescribed medication greater than an amount or dosage that has been issued to the inmate by medical staff, or greater than the amount that should be remaining if the inmate has taken the medication in accordance with the prescription and instructions from medical staff. Approved over-the-counter medications shall be purchased and possessed only in reasonably consumable quantities.

(3) "Tampering with or defacing" shall mean altering or disfiguring the original packaging of a medication, or removing the medication from the original packaging to any other bottle or container.

(c) No inmate shall leave the infirmary or any area where medication is issued while in possession or control of any medication unless removal of the medication from this area has been authorized by medical staff.

(d) Each of the following by an inmate shall create a presumption that the inmate has used a substance prohibited for consumption by this regulation and shall constitute a violation of this regulation:

(1) Refusal to provide a urine sample or other sample of bodily fluid or tissue pursuant to an authorized alternate substance abuse testing method;

(2) failure to provide a urine sample or other sample of bodily fluid or tissue of sufficient quantity; or

(3) failure to provide any sample of urine, bodily fluid, or tissue within two and one-half hours. A bona fide medical or psychological condition verified by a duly licensed practitioner that prevents or hampers the provision of any sample within a period of two and one-half hours shall constitute a defense to this charge.

(e) Violation of this regulation shall be a class I offense. (Authorized by and implementing K.S.A. 2006 Supp. 75-5210; effective May 1, 1980; amended April 20, 1992; amended Feb. 15, 2002; amended July 13, 2007.)

**44-12-313**. **Sexually explicit materials**. (a) No inmate shall have in possession or under control any sexually explicit materials, including drawings, paintings, writing, pictures, items, and devices.

(b) The material shall be considered sexually explicit if the purpose of the material is sexual arousal or gratification and the material meets either of the following conditions:

(1) Contains nudity, which shall be defined as the depiction or display of any state of undress in which the human genitals, pubic region, buttock, or female breast at a point below the top of the areola is less than completely and opaquely

18

covered; or

(2) contains any display, actual or simulated, or description of any of the following:

(A) Sexual intercourse or sodomy, including genital-genital, oral-genital, anal-genital, and anal-oral contact, whether between persons of the same or differing gender;

(B) masturbation;

(C) bestiality; or

(D) sadomasochistic abuse.

(c) Each violation of this regulation by inmates classified as sex offenders shall be a class I violation.

(d) Each violation of this regulation by inmates not classified as sex offenders shall be a class II violation.

(e) Each violation of this regulation by any inmate if the sexually explicit material depicts, describes, or exploits any child under the age of 18 years shall be a class I offense. (Authorized by and implementing K.S.A. 2003 Supp. 75-5210; effective May 1, 1980; amended April 20, 1992; amended Feb. 15, 2002; amended, T-443-19-04, March 19, 2004; amended July 2, 2004.)

### 44-12-314. **Sexual activity; aggravated sexual activity; sodomy; aggravated sodomy.** (a) No inmate shall commit or induce others to commit an act of sexual intercourse or sodomy even with the consent of both parties. Participation in such an act shall be prohibited.

(b) No inmate shall force or intimidate another person to engage in sexual intercourse or sodomy. No inmate shall solicitor arrange for the application of force or intimidation by another person in order to engage in sexual intercourse or sodomy with another person. No inmate shall participate in any scheme or arrangement to force or intimidate another person to engage in sexual intercourse or sodomy.

(c) (1) Sexual intercourse shall mean any penetration of the female sex organ by a finger, the male sex organ, or any object. Any penetration, however slight, shall be deemed sufficient to constitute sexual intercourse.

(2) Sodomy shall be defined as any of the following:

(A) Oral contact with or oral penetration of the female genitalia or oral contact with the male genitalia;

(B) anal penetration, however slight, of a male or female by any body part or object; or

(C) oral or anal copulation or sexual intercourse between a person and an animal.

(d) Violation of this regulation shall be a class I offense.

This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210,75-5251; effective May 1, 1980; amended May 1, 1984; amended April 20, 1992; amended February 15, 2002.)

**44-12-315. Lewd acts.** (a) No inmate shall engage in a lewd or lascivious

19

manner in any act of kissing, fondling, touching, or embracing, whether with a person of the same or opposite sex.

(b) An inmate shall not intentionally expose or manipulate a sex organ with the knowledge or reasonable anticipation that the inmate will be viewed by others or with the intent to arouse or gratify the sexual desires of the inmate or another. A violation of this regulation shall be a class I offense. (Authorized by and implementing

K.S.A. 2006 Supp. 75-5210; effective May 1, 1980; amended May1, 1981; amended April 20, 1992; amended July 13, 2007.)

**44-12-316.** (Authorized by and implementing K.S.A. 1982 Supp. 75-5210; effective May 1, 1980; amended May 1, 1984; revoked April 20, 1992.)

**44-12-317. Falsifying documents.** No inmate shall falsify any document. Violation of this rule shall be a class II offense. (Authorized by and implementing K.S.A. 1991 Supp. 75-5210; effective May 1, 1980; amended April 20, 1992.)

### 44-12-318. **Disruptive behavior.**

(a) No inmate shall start or get others to start, or perform or participate in, or help others to perform or participate in any disruptive behavior.

(b) Violation of this regulation shall be a class II offense. Alternatively, violation of this regulation may be handled according to the summary disposition procedure set forth in K.A.R. 4413-201b.

This amendment shall be effective on and after February 15, 2002. (Authorized by K.S.A. 75-5210; implementing K.S.A. 75-5210, 75-5251; effective May 1, 1980; amended February 15, 2002.)

**44-12-319. Riot or incitement to riot.** (a) Riot is any use of force or violence by three or more persons acting together and without the authority of law which produces a breach of the peace on the premises of a correctional facility whether within or without the security perimeter itself, or any threat to use such force or violence against any person or property, if accompanied by power or apparent power of immediate execution.

(b) Incitement to riot is urging others by words or conduct to engage in riot under circumstances which produce a clear and present danger of injury to persons or property, or a breach of the peace. Violation of this rule shall be a class I offense. (Authorized by and implementing K.S.A. 1991 Supp. 75-5210; effective May 1, 1980; amended April 20, 1992.)

**44-12-320a. Interfering with official duties.** No inmate shall intentionally disrupt, sabotage, impede, or interfere with the performance of official duties by any officer, employee, or contract employee. Violation of this regulation shall be a class I offense*.*

(Authorized by a implementing K.S.A. 2006 Supp. 75-5210; effective July 13, 2007.)

20

**44-12-321**. **Conduct regarding visitors or the public.** (a) Each inmate shall treat visitors and members of the public in a respectful and helpful manner. Each inmate shall comply with the orders of the warden regarding contact with visitors and the public and shall maintain a dignified and respectful demeanor while in the presence of these individuals.

(b) Violation of this regulation shall be a class II offense.

This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210; effective May 1, 1980; amended April 20, 1992; amended February 15, 2002.)

**44-12-322. Arson.** Arson is knowingly, by means of fire or explosive, damaging any property. Violation of this rule shall be a class I offense. (Authorized by K.S.A. 1979 Supp. 75-5210, 75-5210(f); effective May 1, 1980.)

**44-12-323. Assault.** An assault is an intentional threat or attempt to do bodily harm to another, coupled with apparent or recognizable ability to carry out the threat or attempt, and resulting in immediate apprehension or fear of bodily harm. No bodily contact is necessary. Violation shall be a class I offense. (Authorized by and implementing K.S.A. 1991 Supp. 75-5210; effective May 1, 1980; amended April 20, 1992.)

**44-12-324. Battery.** Battery is the unlawful or unauthorized, intentional touching or application of force to the person of another, when done in a rude, insolent, or angry manner. Violation of this rule shall be a class I offense. (Authorized by and implementing K.S.A. 1991 Supp. 75-5210; effective May 1, 1980; amended April 20, 1992.)

**44-12-325. Security threat groups; inmate activity; limitations.**
(a) No proselytizing of religious faiths or beliefs shall be allowed in the facilities. "Proselytizing" shall be defined as an active effort to persuade a person to convert to a religious belief without the person's prior consent. However, nothing in this regulation shall prohibit one-to-one conversation about religious matters. Violation of this subsection shall be a class III offense.

(b) Inmates shall not serve in the capacity of clergy or religious instructors at any time except for purposes of K.A.R. 44-7-113, on recommendation of chaplain and the approval of the warden. Violation of this subsection shall be a class III offense.

(c) Inmates shall not develop, organize, promote, or assist any security threat group and shall not engage in any activity calculated to incite a demonstration by any security threat group. Inmates shall not possess any item, whether in its original condition or in an altered state, associated or identified with any security threat group. "Security threat group" shall mean any ongoing formal or informal organization, association, or group of three or more persons with a common name or identifying sign or symbol,

21

but without specific approval by the warden. Violation of this subsection shall be a class I offense. (Authorized by and implementing K.S.A. 2005 Supp. 75-5210; effective May 1, 1980; amended May 1, 1981; amended April 20, 1992; amended Feb. 15, 2002; amended July 13, 2007.)

**44-12-326**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 1990 Supp. 75-5210; effective, T-84-32, Nov. 23, 1983; effective May 1, 1984; amended April 20, 1992; revoked February 15, 2002.)

**44-12-327**. **Interference with restraints.** (a) No inmate shall interfere with or assist other inmates in interfering in any way with handcuffs or other restraints that have been, or are being, applied to the inmate by an officer or employee. An inmate shall not remove or attempt to remove that inmate or another inmate from handcuffs or other restraints without approval of an officer or employee.
(b) Violation of this regulation shall be a class I offense. This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210; effective May 1, 1988; amended February 15, 2002.)

**44-12-328**. **Undue familiarity.** (a) No inmate shall solicit, encourage, establish, or participate in any type of personal relationship with any staff member, contract personnel, volunteer, or employee of any other organization in charge of the inmate. A personal relationship shall be defined as any relationship involving unnecessary familiarity by the inmate toward any such individual. Any contact between an inmate and staff member other than a polite exchange of remarks or casual conversation shall be limited to that contact necessary to allow any such individual to carry out official duties and provide authorized assistance to the inmate in a professional manner.
(b) Violation of this regulation shall be a class I offense. This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210; effective April 20, 1992; amended February 15, 2002.)

### ASSIGNMENTS TO AND PERFORMANCE OF WORK, EDUCATION, TRAINING, OR OTHER DUTY

**44-12-401**. **Work performance.** (a) No inmate shall intentionally interfere with, delay, or disrupt work in progress, or sabotage the work, machinery, systems, or products, nor shall any inmate assist or participate in these actions. Violation of this subsection shall be a class I offense.
(b) Each inmate shall perform work assigned in the manner prescribed and according to the directives of the inmate's supervisor or other authorized official. Intentional failure to report to or depart from work at the

22

prescribed time and without unnecessary delay en route shall be prohibited. Violation of this subsection shall be a class II offense. Alternatively, violation of this subsection may be handled according to the summary disposition procedure set forth in K.A.R. 44-13-201b.

(c) No inmate shall slow the work progress through carelessness or neglect. Violation of this subsection shall be a class II offense. Alternatively, violation of this subsection may be handled according to the summary disposition procedure set forth in K.A.R. 44-13-201b.

(d) No inmate shall be tardy for work. Violation of this subsection shall be a class III offense.

(e) "Work," as used in this regulation, shall include any work assignment, educational, vocational, treatment, or training program to which an inmate has been assigned. This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210; effective May 1, 1980; amended May 1, 1988; amended April 20, 1992; amended February 15, 2002.)

## BEING PRESENT AND ACCOUNTED FOR

**44-12-501**. Answering calls or passes.

(a) Each inmate shall respond promptly to all calls made for the inmate and shall move from place to place as required by the orders of the facility. No inmate shall destroy a pass issued to that inmate. Each inmate shall present a pass to the proper person at the time and place indicated on the pass.

(b) Violation of this regulation shall be a class III offense.

This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210; effective May 1, 1980; amended April 20, 1992; amended February 15, 2002.)

**44-12-502. Responsibility for counts.** Every inmate shall be present at the proper time and place of counts, in accordance with the orders of the principal administrator. Causing a delay that renders the count inaccurate or more difficult, or failure to be present during the count process shall be considered as fouling count. Violation of this rule shall be a class I offense. (Authorized by and implementing K.S.A. 1991 Supp. 75-5210; effective May 1, 1980; amended April 20, 1992.)

**44-12-503**. **Restricted area and unauthorized presence or out-of-place in assigned domicile.** (a) Restricted area. Each inmate shall be aware of all restricted areas. No inmate shall enter a restricted area without a direct order by a correctional employee authorized to render this order or unless expressly permitted in writing by the warden, Violation of this subsection shall be a class II offense. Alternatively, violation of this subsection may be

23

handled according to the summary disposition procedure set forth in K.A.R. 44-13-201b.

(b) Unauthorized presence. No inmate shall be present in any area without authorization. If a pass is required, the inmate shall show the pass when required to do so. Specific permission or authorization, whether verbal or written, shall be required for an inmate to be present at any location at any time. Violation of this subsection shall be a class III offense.

(c) Out-of-place in assigned domicile. An inmate shall not roam about in the housing unit and shall not be any place in the housing unit without permission of the unit team. This subsection shall apply to conditions where the inmate's presence generally in the living unit itself is otherwise authorized. Violation of this subsection shall be a class III offense. This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210; effective May 1, 1980; amended April 20, 1992; amended February 15, 2002.)

**44-12-504**. **Interference with cell operation and visibility.** (a) No inmate shall block or otherwise interfere with the operation of the cell opening and closing mechanism in any way including food passage ports or slots. No inmate shall cover the inmate's cell, including food passage ports or slots, so as to block visibility into the cell, except as allowed by the warden's orders.

(b) Violation of this regulation shall be a class I offense.

This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210; effective May 1, 1980; amended May 1, 1987; amended February 15, 2002.)

**44-12-505. Restriction.** No inmate shall avoid, break or violate the terms of a restriction which has been imposed upon him or her. Violation of this rule shall be a class II offense. (Authorized by K.S.A. 1979 Supp. 75-5210, 75-5210(f); effective May 1, 1980.)

**44-12-505b**. **Medical restriction.** In order not to aggravate any injury, illness, or other medical condition, no inmate shall participate in any work or recreational activities, or partake of food items, in violation of a documented medical restriction that the inmate has received. Violation of this regulation shall be a class III offense.

This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210; effective April 20, 1992; amended February 15, 2002.)

**44-12-506. Change of name as it appears on journal entry of sentence, convictions.** In all matters an inmate shall respond to officials when addressed by the name under which he or she was committed to the custody of the secretary of corrections until discharged from sentence. An inmate shall be referred to in all official transactions, and all correspondence to and

24

from the inmate, under the name used in the journal entry of convictions and commitment throughout his or her period of incarceration. In the event of a legal name change, the records may reflect the new name as an alias and the inmate may use the alias name in parentheses after the conviction name. All directives to, references to, or orders to an inmate by his or her convicted name shall be complied with regardless of the fact that he or she may have changed his or her name. No charge shall be made against any inmate under this rule because the inmate is the addressee of any mail, phone call, document or other communication under the non-conviction name unless it is alleged and proven that the inmate was knowing and willing conspirator or instigator of such use of non-conviction name. Violation of this rule shall be a class II offense. (Authorized by K.S.A. 1979 Supp. 75-5210, 75-5210(f); effective May 1, 1980.)

## INMATE WRITING AND OTHER INMATE COMMUNICATIONS OR PUBLICATIONS

**44-12-601. Mail.** (a) Definitions.

(1)(A) "Legal mail" means mail affecting the inmate's right of access to the courts or legal counsel. This term shall be limited to letters between the inmate and any lawyer, a judge, a clerk of a court, or any intern or employee of a lawyer or law firm, legal clinic, or legal services organization, including legal services for prisoners.

(B) "Official mail" means any mail between an inmate and an official of the state or federal government who has authority to control, or to obtain or conduct an investigation of, the custody or conditions of confinement of the inmate.

(C) "Privileged mail" means any mail between the inmate and the inmate's physician, psychiatrist, psychologist, or other licensed mental health therapist.

(2)(A) "Censor" means to remove or change any part or all of the correspondence or literature.

(B) "Inspect" means to open, shake out, look through, feel, or otherwise check for contraband without reading or censoring. This term shall include any cursory reading necessary to verify that mail is legal or official in nature as permitted by paragraph (f)(3).

(C) "Read" means to read the contents of correspondence or literature to ascertain the content.

(3) "Minor" means a person under the age of 18.

(4) "Bodily substance" means blood, fecal matter, nasal or sinus mucous or secretions, perspiration, saliva, semen, skin or other tissue, sputum, tears, urine, or vaginal secretions.

(b) General provisions.

(1) Each inmate shall comply with the mail procedures and restrictions established by the order of the warden of the facility. Failure to comply with mail procedures or restrictions, or circumventing or attempting to

25

circumvent mail procedures or restrictions by any means, shall be prohibited. The delivery of mail through an employee, volunteer, teacher, or any other person who is not authorized to perform functions related to the established mail-handling system shall be prohibited.

(2) Contraband. Items identified as contraband shall be dealt with as provided in subsection (d) and then either returned to the sender at the inmate's expense or destroyed, at the inmate's option. Items illegal under Kansas or U.S. federal law shall be seized and held as evidence for other law enforcement officers.

(3) All incoming mail shall identify the inmate recipient by name and inmate identification number.

(4) Violation of mail regulations of the department of corrections, orders of the warden, or the laws of Kansas or the United States may result in additional mail restrictions upon the offender that are sufficient to prevent the continuation or reoccurrence of the violation.

(5) All funds sent for deposit to an inmate's trust account shall be in the form of an electronic funds transfer sent through an entity under contract with the department of corrections to conduct those transactions. These funds shall be sent to the centralized banking location or individual work release location designated by the secretary. All other funds sent for deposit to an inmate's trust account, other than governmental checks, warrants, and worker's compensation benefit checks, shall be returned immediately to the sender, and the intended inmate recipient shall be so notified in writing, without need of formal censorship. Except for correspondence qualifying as legal mail in which funds are enclosed in an envelope clearly marked as such, correspondence or other material sent with funds shall not be forwarded and shall be discarded.

(6) Any incoming or outgoing mail other than legal, official, or privileged mail may be inspected or read at any time.

(7) Incoming mail addressed solely to a specific inmate and not otherwise subject to censorship shall be delivered regardless of whether the mail is sent free of charge or at a reduced rate. All incoming mail shall nonetheless bear the sender's name and address on the envelope, or this mail shall not be delivered and shall be immediately destroyed.

(8) Any outgoing first-class letters may be sent to as many people and to whomever the inmate chooses, subject to the restrictions in this regulation.

(9) Outgoing inmate mail shall bear the full conviction name, inmate number, and address of the sender, and the name and address of the intended recipient. No other words, drawings, or messages shall be placed on the outside of the envelope or package by an inmate except words describing the mail as being legal, official, privileged, or intended to aid postal officials in delivery of the item. Outgoing inmate mail shall be stamped by the facility to indicate that it was mailed from a facility operated by the department of corrections and that it has not been censored.

(10) Inmates shall not correspond with any person, either directly or through third parties, who has filed a written objection to the correspondence with

26

the director of victim services in the department of corrections central office. The director of victim services in the department of corrections central office shall notify the warden of the facility where the offender is incarcerated of any written objections to correspondence sent by the offender within three business days of its receipt.

(A) The inmate shall be notified of the objection in writing when it is received, but shall not be required to be informed of the exact contents of the objection.

(B) Orders shall be developed by the warden of each facility to prevent further correspondence from being sent to those who have filed an objection.

(C) This regulation shall not prevent an inmate from writing to the inmate's natural or adoptive child, unless the child was the victim of the crime for which the inmate is incarcerated, the person having legal custody of the child files a written objection with the director of victim services in the department of corrections central office, and the inmate has not obtained a court order permitting this written communication with the child. The director of victim services in the department of corrections shall inform the warden of the facility where the inmate is assigned of any objection from the person having legal custody of the child within three business days of its receipt.

(11)(A) No inmate shall correspond with a minor, either directly or through any third party, unless one of the following conditions is met:

(i) A parent or legal guardian of the minor has filed written authorization for the correspondence between the inmate and the minor with the director of victim services in the department of corrections central office.

(ii) If the minor is the inmate's natural or adoptive child, the correspondence is authorized pursuant to paragraph (b)(10)(C), and the inmate has registered the child by providing the name, date of birth, and address of the natural or adoptive child to the director of victim services.

(B) The director of victim services shall notify the warden of the facility where the inmate is incarcerated of any written authorization for correspondence with a minor who is not the natural or adoptive child of the inmate, as well as the registration information of the inmate's natural or adoptive child.

(12) An inmate shall not mail or attempt to mail any of the following:

(A) Any bodily substance;

(B) a substance represented by the inmate as being a bodily substance; or

(C) a substance that a reasonable person would conclude is a bodily substance.

(c) Legal, official, and privileged mail.

(1) Subject to the provisions of paragraph (f)(3), outgoing privileged, official, or legal mail sent by any inmate shall be opened and read only upon authorization of the warden for good cause shown. However, if any inmate threatens or terrorizes any person through this mail, any subsequent mail, including official or legal mail, from the inmate to the person threatened or terrorized may, at the request of that person, be read and censored for a time

27

period and to the extent necessary to remedy the abuse.

(2) Incoming mail clearly identified as legal, official, or privileged mail shall be opened only in the inmate's presence. This mail shall be inspected for contraband but shall not be read or censored, unless authorized by the warden based upon a documented previous abuse of the right or other good cause.

(3) All legal mail and official mail shall be indefinitely forwarded to the inmate's last known address. If any mail is returned to a facility as undeliverable when sent to the inmate's last known address, the mail shall be returned to the sender with a notice that the mail was forwarded unsuccessfully and is now returned to the sender for further disposition.

(d) Censorship grounds and procedures.

(1) Incoming or outgoing mail, other than legal, official, or privileged mail, may be censored only when there is reasonable belief in any of the following:

(A) There is a threat to institutional safety, order, or security.

(B) There is a threat to the safety and security of public officials or the general public.

(C) The mail is being used in furtherance of illegal activities.

(D) The mail is correspondence between offenders, including any former inmate regardless of current custodial status, that has not been authorized according to subsection (e). Correspondence between offenders may be inspected or read at any time.

(E) The mail contains sexually explicit material, as defined and proscribed by K.A.R. 44-12-313.

(2) If any communication to or from an inmate is censored, all of the following requirements shall be met:

(A) Each inmate shall be given a written notice of the censorship and the reason for the censorship, without disclosing the censored material.

(B) Each inmate shall be given the name and address of the sender of incoming mail, if known, or the addressee of outgoing mail and the date the item was received in the mail room. Notice of the censorship of correspondence by the facility shall be provided to the sender, if known, by staff in the facility's mail room within three business days of the decision to censor.

(C) The author or addressee of the censored correspondence shall have 15 business days from the date of the notice of censorship to protest that decision.

(D) All protests shall be forwarded to the secretary of corrections or the secretary's designee for final review and disposition.

(E) Each inmate shall have the option of having censored correspondence or other materials in their entirety either mailed out at the expense of the inmate or discarded.

(e) Offender correspondence with other offenders.

Offenders sentenced to the custody of the Kansas department of corrections shall not correspond with any person who is in the custody of or under the supervision of any state, federal, county, community corrections, or

28

municipal law enforcement agency, or with any former inmate regardless of current custodial status, unless either of the following conditions is met:

(1) The proposed correspondents are members of the same immediate family or are parties in the same legal action, or one of the persons is a party and the other person is a witness in the same legal action.

(2) Permission for correspondence is granted due to exceptional circumstances. Verification and approval of offender correspondence shall be conducted pursuant to the internal policies and procedures of the department of corrections.

(f) Writing supplies and postage.

(1) Stationery and stamps shall be available for purchase from the inmate canteen.

(2) Indigent inmates, as defined by the internal management policies and procedures of the department of corrections, shall receive reasonable amounts of free writing paper, envelopes, and postage for first-class domestic mail weighing one ounce or less, not to exceed four letters per month.

(3) All postage for legal and official mail shall be paid by the inmate, unless the inmate is indigent, as defined by the internal management policies and procedures of the department of corrections. The cost of postage for legal or official mail paid by the facility on behalf of an indigent inmate shall be deducted from the inmate's funds, if available. Credit for postage for legal and official mail shall be extended to indigent inmates under the terms and conditions of the internal management policies and procedures of the department of corrections. Outgoing legal or official mail sent with postage provided on credit shall be subject to inspection and a cursory reading in the presence of the inmate for the purpose of ascertaining that the mail is indeed legal or official mail, and the inmate shall then be permitted to seal the envelope containing the mail.

(4) The facility shall not pay postage for inmate groups or organizations.

(5) The mailing of postage stamps by an offender shall be prohibited.

(g) Publications.

(1) Inmates may receive books, newspapers, and periodicals as permitted by the internal management policies and procedures of the department of corrections. All books, newspapers, and periodicals shall be purchased through account withdrawal requests. Only books, newspapers, and periodicals received directly from a publisher or a vendor shall be accepted. However, an inmate shall be permitted to receive printed material, including newspaper and magazine clippings, if the material is included as part of a first-class letter that does not exceed one ounce in total weight.

(2) The procedures for censorship of mail listed in subsection (d) shall be used for censorship of publications.

(3) No publication that meets either of the following conditions shall be allowed into the facility:

(A) Contains sexually explicit material, as described in K.A.R. 44-12-313, or is otherwise illegal, in whole or in part; or

29

(B) meets, in whole or in part, the test for censorship of mail in subsection (d).

(4) Inmates shall have the option of having censored publications in their entirety either mailed out of the facility at their own expense or discarded.

(5) Before transferring between facilities, the inmate shall arrange for a change of address for the inmate's mail, including newspapers and periodicals. Mail, with the exception of legal mail or official mail, shall not be forwarded for more than 30 days after the date of transfer.

(h) Regulation violation. Each violation of this regulation shall be a class I offense. (Authorized by K.S.A. 2013 Supp. 75-5210, K.S.A. 2013 Supp. 75-5251; implementing K.S.A. 2013 Supp. 75-5210, K.S.A. 2013 Supp. 75-5251, and K.S.A. 75-5256; effective May 1, 1980; amended May 1, 1981; amended May 1, 1984; amended May 1, 1986; amended May 1, 1988; amended April 20, 1992; amended Jan. 3, 1995; amended April 17, 1998; amended Feb. 15, 2002; amended, T-44-3-19-04, March 19, 2004; amended July 2, 2004; amended July 13, 2007; amended June 20, 2014.)

**44-12-602**. **Posting notices.** No inmate may post or distribute any written communications without the written approval of the warden or designee. Violation of this regulation shall be a class II offense. This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210; effective May 1, 1980; amended April 20, 1992; amended February 15, 2002.)

### LEGAL WORK; LAW LIBRARY, LEGAL ASSISTANCE

**44-12-701.** (Authorized by K.S.A. 1979 Supp. 75-5210, 75-5210(f); effective May 1, 1980; revoked April 20, 1992.)

**44-12-702**. **Legal assistance by inmates.** In accordance with applicable rules of the facility, an inmate may give, but shall not charge for, assistance in legal matters to another inmate if the assistance is requested by the other inmate. Violation of this regulation shall be a class II offense. This amendment shall be effective on and after February 15, 2002. (Authorized by K.S.A. 75-5210; implementing K.S.A. 75-5210, 75-5251; effective May 1, 1980; amended February 15, 2002.)

### ADMINISTRATION PUBLICATIONS AND POSTINGS

**44-12-801**. **Bulletin boards.** (a) No inmate shall remove any item from any bulletin board. Each inmate shall be held responsible for compliance with orders published by posting on the bulletin boards. Bulletin boards shall be used by and shall be under the exclusive control of the warden or designee. (b) Violation of this regulation shall be a class II offense.

This amendment shall be effective on and after February 15, 2002.

(Authorized by K.S.A. 75-5210; implementing K.S.A. 75-5210, 75-5251; effective May 1, 1980; amended February 15, 2002.)

### CONTRABAND

**44-12-901. Dangerous contraband.** (a) Dangerous contraband shall be defined as any of the following:

(1) Any item, or any ingredient or part of or instructions on the creation of an item, that is inherently capable of causing damage or injury to persons or property, or is capable or likely to produce or precipitate dangerous situations or conflict, and that is not issued by the department of corrections or the facilities, sold through the canteen, or specifically authorized or permitted by order of the secretary of corrections or warden for use or possession in designated areas of the facility;

(2) any item that can be the basis for a charge of felony for its possession under the laws of Kansas or the United States; or

(3) any item that, although authorized, is misused if the item in its misused form has the characteristics of being able to cause damage or injury to persons or property or being likely to precipitate dangerous situations or conflicts.

(b) All contraband shall be confiscated and shall be ordered forfeited by the inmate.

(c) No inmate shall possess, hold, sell, transfer, receive, control, or distribute any dangerous contraband.

Violation of this regulation shall be a class I offense. (Authorized by and implementing K.S.A. 2006 Supp. 75-5210; effective May 1, 1980; amended May 1, 1981; amended April 20, 1992; amended July 13, 2007.)

**44-12-902. Contraband.** (a) Contraband shall be defined as either of the following:

(1) Any item, or any ingredient or part of or instructions for the creation of the item, that is not issued by the department of corrections, sold through the facility canteen, or specifically authorized or permitted by order of the secretary of corrections or warden for use or possession in designated areas of the facility; or

(2) any item that, although authorized, is misused in a way that causes some danger or injury to persons or property.

(b) All contraband shall be confiscated and shall be ordered forfeited by the inmate.

(c) No inmate shall possess, hold, sell, transfer, receive, control, or distribute any type of contraband. Violation of this subsection shall be a class II offense.

(d) No inmate shall possess papers, bottles, containers, trash, or any other items in excess of those limits established by regulation, internal management policies and procedures, and facility general orders. The possession of excess items described in this subsection shall be considered

31

nuisance contraband and shall be a class III offense.

(e) Alternatively, violation of this regulation may be handled according to the summary disposition procedure set forth in K.A.R. 44-13-201b. (Authorized by and implementing K.S.A. 2006 Supp. 75-5210, K.S.A. 75-5251; effective May 1, 1980; amended April 20, 1992; amended Feb. 15, 2002; amended July 13, 2007.)

**44-12-903. Tobacco contraband.** (a) For the purposes of this regulation, each of the following terms shall have the meaning specified in this subsection:

(1) "Tobacco products" means cigarettes, cigars, pipe tobacco, loose-leaf tobacco, chewing tobacco, and smokeless tobacco. This term shall not include pharmacological aids for smoking cessation approved by the food and drug administration.

(2) "Tobacco substitutes" means any substance ingested by smoking, and any herbal or leaf-based replacements for chewing tobacco. This term shall not include any controlled substance, as defined by K.S.A. 65-4101(e) and amendments thereto.

(3) "Smoking paraphernalia" means pipes, lighters, matches, altered batteries, cigarette papers, rolling machines, and all other items fabricated, developed, or processed for the primary purpose of facilitating the use or possession of tobacco products or tobacco substitutes.

(b) No inmate shall possess, hold, sell, transfer, receive, control, or distribute tobacco products, tobacco substitutes, or smoking paraphernalia, except as specified in subsection (d).

(c) No inmate shall possess, hold, sell, transfer, receive, or control tobacco products, tobacco substitutes, or smoking paraphernalia that is intended to be introduced or distributed upon the grounds of a correctional facility.

(d) Inmates may engage in bona fide religious activities sanctioned by the warden of the facility involving the use and possession of tobacco products, tobacco substitutes, and smoking paraphernalia as permitted by and in accordance with the terms of internal management policies and procedures of the secretary.

(e) Violation of this regulation shall be a class I offense. (Authorized by and implementing K.S.A. 2006 Supp. 75-5210; effective July 13, 2007.)

## VIOLATION OF STATUTES, REGULATIONS AND ORDERS

**44-12-1001. Violation of statutes, other regulations, or orders.** (a) Unless otherwise designated in this rule book, violation of state or federal statutes shall be a class I offense if the statute is a felony crime. A violation shall be a class II offense if the statute designates a misdemeanor criminal offense.

(b) Unless otherwise designated in this rule book, violation of any civil penalty statute or any regulation shall be a class III offense. (Authorized by and implementing K.S.A. 1991 Supp. 75-5210; effective May 1, 1980;

32

amended May 1, 1981; amended April 20, 1992.)

**44-12-1002**. **Violation of published internal management policies and procedures or of published orders.** Each violation of any published internal management policies and procedures of the secretary of corrections or any published orders of the warden of the facility shall be an offense of the class stated in the internal management policy and procedure or in the order itself. If no class is stated, the violation shall be a class III offense. Each violation of any internal management policy and procedure shall be subject to the penalties that are prescribed in the internal management policy and procedure. If no penalty is prescribed, then the violation shall be subject to the penalties provided in this article of regulations.

(Authorized by and implementing K.S.A. 2002 Supp. 755210, K.S.A. 75-5251; effective May 1, 1980; amended May 1, 1981; effective April 20, 1992; amended July 11, 1994; amended February 15, 2002; amended T-44-3-11-03, March 11, 2003; amended July 25, 2003.)

## ATTEMPT, CONSPIRACY AND ACCESSORY TO COMMISSION OF OFFENSE

**44-12-1101. Attempt, conspiracy, accessory, solicitation; liability for offenses of another.** Each attempt or conspiracy to violate any regulation, or acting as an accessory for any offense, or soliciting another or other persons to commit any offense, shall carry the same penalty as that for the offense itself. The specific regulation that is the basis of the attempt, conspiracy, accessory, or solicitation shall be stated and described in the disciplinary report.

(a) Attempt.

(1) An attempt shall mean any overt, or clearly evident, act toward the perpetration of an offense by an inmate who intends to commit the offense but fails in the perpetration of the offense or is prevented from or intercepted in executing that offense.

(2) It shall not be a defense to a charge of attempt that the circumstances under which the act was performed, the means employed, or the act itself was such that the commission of the offense was not possible.

(b) Conspiracy.

(1) A conspiracy shall mean an agreement with another person to commit an offense or to assist in committing an offense. No inmate may be convicted of a conspiracy unless an overt act furthering that conspiracy is alleged and proved to have been committed by the inmate or by a coconspirator.

(2) It shall be a defense to a charge of conspiracy that the accused voluntarily and in good faith withdrew from the conspiracy and

33

communicated the fact of this withdrawal to one or more of the accused conspirators, before any overt act furthering the conspiracy was committed by the accused or by a coconspirator.

(c) Accessory to an offense. Aiding an offender or one charged with an offense shall mean knowingly harboring, concealing, or aiding any inmate who has committed an offense, or one who has been charged with an offense, with intent that the inmate will avoid or escape from apprehension, disciplinary hearing conviction, or punishment for the offense.

(d) Solicitation. Solicitation shall mean commanding, encouraging, or requesting another person to commit an offense, attempt to commit an offense, or aid and abet in the commission or attempted commission of an offense for the purpose of promoting or facilitating the offense. It shall not be a defense to a charge of solicitation that the inmate failed to communicate with the person solicited to commit the offense if the inmate's conduct was designed to effect a communication. It shall be a defense to a charge of solicitation that the inmate, after soliciting another person to commit an offense, persuaded that person not to do so or otherwise prevented the commission of the offense, under circumstances manifesting a complete and voluntary renunciation of the inmate's prohibited purposes.

(e) Liability for the offenses of another. An inmate shall be responsible for an offense committed by another if the inmate intentionally aids, abets, advises, hires, counsels, or procures the other to commit the offense. The specific underlying regulation violation committed by the other inmate that is the subject of the activity of aiding, abetting, advising, hiring, counseling, or procuring shall be stated and described in the disciplinary report. (Authorized by and implementing K.S.A. 2006 Supp. 75-5210; effective, E-79-37, Jan. 1, 1979; effective May 1, 1980; amended, T-83-23, Aug. 11, 1982; amended, T-846, May 1, 1983; amended May 1, 1984; amended April 20, 1992; amended July 13, 2007.)

## INCREASED PENALTIES

**44-12-1201. Increased penalty for involving or victimizing an inmate under 18.** (a) If any inmate who is 18 years of age or older involves, induces, or solicits an inmate who is less than 18 to commit an offense, or if the victim of an offense committed by the older inmate is an inmate who is less than 18, the older inmate may be subject to a penalty that is double the penalty established for the offense under these regulations. One of the following findings shall be necessary to invoke this increased penalty:

(1) The older inmate is guilty of the same offense as that committed by the younger inmate.

(2) The older inmate is guilty of a violation of K.A.R. 44-121101 with respect to that offense.

(3) The older inmate is guilty of an offense involving the victimization of the younger inmate.

34

(b) The limitations of K.A.R. 44-12-1308 regarding sentences of disciplinary segregation shall be construed, within the context of K.A.R. 44-12-1201, to mean that the total length of a sentence of disciplinary segregation for all charges arising from a single incident shall not exceed 120 days. (Authorized by and implementing

K.S.A. 2005 Supp. 75-5210; effective May 1, 1980; amended May 1, 1981; amended May 1, 1984; amended April 20, 1992; amended Jan. 3, 1995; amended July 13, 2007.)

**44-12-1202. Conviction of four offenses in six months.** Subject to the limitations contained in K.A.R. 44-12-1308, upon conviction of the fourth offense of the same class within the immediate prior six month period, the hearing officer may impose a sentence for such fourth offense not greater than twice the maximum that can be imposed for an offense of that class. (Authorized by and implementing K.S.A. 1991 Supp. 75-5210; effective May 1, 1980; amended April 20, 1992.)

## CLASSIFICATION OF OFFENSES AND PENALTIES

**44-12-1301. Class I offenses.** (a) Class I offenses shall be any of the following:

(1) Those violations of a very serious nature that are designated in this article as class I offenses, whether or not the offense is also a violation of law;

(2) those violations of law designated by the laws of the state of Kansas as felonies; or

(3) those violations of law designated by the laws of the United States as felonies.

(b) The penalty for a class I offense may be any one or all, or any combination of the following, unless prohibited in this subsection:

(1) Disciplinary segregation, not to exceed 45 days;

(2) loss of "good time credits," not to exceed six months;

(3) extra work without incentive pay for not more than two hours each day, not to exceed 30 days;

(4) work without incentive pay, not to exceed five days. This penalty shall not include a fine and shall apply only to ordinary inmate work assignments;

(5) restriction to inmate's own cell, not to exceed 10 days;

(6) restriction from privileges, not to exceed 60 days;

(7) a fine of not more than $20.00, unless prohibited by paragraph (b)(4);

(8) restitution of at least $3.00; or

(9) an oral or written reprimand. (Authorized by and implementing

K.S.A. 2006 Supp. 75-5210; effective May 1, 1980; amended May 1, 1981; amended, T-83-23, Aug. 11, 1982; amended, T-84-6, May 1, 1983; amended May 1, 1984; amended May 1, 1985; amended April 20, 1992; amended July 13, 2007.)

35

**44-12-1302. Class II offenses.** (a) Class II offenses shall be any of the following:

(1) Those offenses of moderate seriousness that are designated in this article as class II offenses, whether or not the offenses are also violations of the law;

(2) those violations of law designated by the laws of the state of Kansas as misdemeanors; or

(3) those violations of law designated by the laws of the United States as misdemeanors.

(b) The penalty for a class II offense may be any one or any combination of the following, unless prohibited in this subsection:

(1) Disciplinary segregation, not to exceed 15 days;

(2) loss of good time credits, not to exceed three months;

(3) extra work without incentive pay for not more than two hours each day, not to exceed 20 days;

(4) work without incentive pay, not to exceed five days. This penalty shall not include a fine and shall apply only to ordinary inmate work assignments;

(5) restriction to inmate's own cell for a period, not to exceed seven days;

(6) restriction from privileges, not to exceed 30 days;

(7) a fine not more than $15.00, unless prohibited by paragraph (b)(4);

(8) restitution of at least $3.00; or

(9) an oral or written reprimand. (Authorized by and implementing K.S.A. 2006 Supp. 75-5210; effective May 1, 1980; amended May 1, 1981; amended, T-83-23, Aug. 11, 1982; amended, T-84-6, May 1, 1983; amended May 1, 1984; amended April 20, 1992; amended July 13, 2007.)

**44-12-1303. Class III offenses.** (a) Class III offenses shall be those offenses of a less serious nature that are designated in this article as class III offenses, whether or not the offense is also a violation of law. Each violation of any published secretary of corrections' regulation or order of the warden that is not otherwise designated in these regulations or warden's orders as a class I or class II offense shall be a class III offense.

(b) The penalty for a class III offense may be any one or any combination of the following, unless prohibited in this subsection:

(1) Restriction to inmate's own cell for not more than three days;

(2) restriction from privileges for not more than 20 days;

(3) extra work without incentive pay for not more than two hours each day for a period not to exceed 10 days;

(4) work without incentive pay, not to exceed five days. This penalty shall not include a fine and shall apply only to ordinary inmate work assignments;

(5) a fine of not more than $10.00, unless prohibited by paragraph (b)(4);

(6) restitution of at least $3.00; or

(7) an oral or written reprimand. (Authorized by and implementing K.S.A 2006 Supp. 75-5210; effective May 1, 1980; amended May 1, 1981;

amended, T-83-23, Aug. 11, 1982; amended, T-84-6, May 1, 1983; amended May 1, 1984; amended May 1, 1985; amended April 20, 1992; amended July 13, 2007.)

**44-12-1304.** (Authorized by and implementing K.S.A. 1983 Supp. 75-5210; effective May 1, 1980; amended May, 1 1981; amended, T-83-23, Aug. 11, 1982; amended, T-84-6, May 1, 1983; amended May 1, 1984; revoked April 20, 1992.)

**44-12-1305. Use of fines.** Fines shall be deposited in the inmate benefit fund. (Authorized by K.S.A. 1979 Supp. 75-5210, 75-5210(f); effective May 1, 1980.)

**44-12-1306**. **Use of restitution.** (a) When restitution is used in the disciplinary process, the following requirements and limitations shall apply:
(1) The amount of and manner of payment of restitution imposed may be appealed in the same manner and to the same extent as those for any other appeal of sentence in the disciplinary process.
(2) The appropriateness and amount of restitution ordered shall be determined by consideration of the factors set forth in K.A.R. 44-12-1307.
(3) No inmate shall be required to continue payment on any restitution imposed under these regulations while released from incarceration. Upon any subsequent readmission of the inmate to a facility, any restitution owed may be collected. No portion of the inmate's gate money gratuity as authorized by K.S.A. 75-5211, and amendments thereto, shall be used toward the payment of this restitution.
(4) Restitution shall continue to be paid out of money earned by the inmate in the work release program, the private non-prison employment program, or any other gainful employment industries program. Restitution payment shall be limited to a reasonable amount and, if appropriate, shall be made in installments.
(5) The inmate shall be given notice in the disciplinary report or, if necessary, in an amended disciplinary report served upon the inmate no later than 24 hours before the hearing of the amount and basis for seeking restitution. The inmate shall be given an opportunity at the sentencing phase of the hearing to present evidence regarding the appropriate amount of restitution. The hearing officer shall limit the evidence to a reasonable amount and extent that is appropriate to the nature of the administrative hearing, the level of the offense, and the extent of possible impact on the inmate's resources.
(b) If restitution is to be made to an entity, whether or not the entity is a governmental agency or unit, then the money satisfying the order of restitution shall be delivered to that entity. If restitution is paid to an inmate, the money shall be transferred by the clerk from the account of the inmate payer to the account of the inmate payee after the conclusion of the entire disciplinary process, including any appeal. If restitution is paid to any

other person, the hearing officer shall determine how payment is to be made, and the warden, or designee shall review the payment arrangements for approval, conferring with the facility business manager if appropriate. (Authorized by and implementing K.S.A. 2005 Supp. 75-5210, K.S.A. 75-5251; effective May 1, 1981; amended May 1, 1987; amended April 20, 1992; amended Feb. 15, 2002; amended July 13, 2007.)

**44-12-1307**. **Fines and restitution, imposition and collection; limits.** Fines shall be fairly and appropriately used. Fines shall not be used in a way that disrupts family support payments, tax payments, or court-ordered restitution payments. This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210, 755251; effective May 1, 1984; amended May 1, 1985; amended April 20, 1992; amended February 15, 2002.)

**44-12-1308. Disciplinary segregation; limits.** (a) The maximum sentence of disciplinary segregation for all violations arising out of one incident shall not exceed 60 days.
(b) Continuous confinement in disciplinary segregation for more than 30 days shall require the review and approval of the warden. (Authorized by and implementing K.S.A. 2006 Supp.75-5210; effective May 1, 1985; amended Jan. 3, 1995; amended July 13, 2007.)

## Article 13.—DISCIPLINARY PROCEDURE PROCEDURE GENERALLY

**44-13-101**. **Disciplinary procedure established, general description of system.** (a) A disciplinary procedure in accordance with these regulations shall be implemented by the warden of each facility. The term "warden," as used throughout this article, shall include the warden's designee.
(b) Prosecution by criminal justice agencies in the community shall be deemed a separate process from this disciplinary procedure, and both prosecution and disciplinary procedures may be conducted on matters relating to the same factual situations.
(c) Subject to the limitations and guidelines set out in these regulations and subject to the control of the hearing officer exercised within the parameters of the law and these regulations, the inmate shall be entitled to the following:
(1) To receive advance written notice of the charge and a fair hearing by an impartial hearing officer;
(2) to be present at the hearing;
(3) to present documentary evidence;
(4) to testify on the inmate's own behalf;

38

(5) to have witnesses called to testify on the inmate's behalf;

(6) to confront and cross-examine witnesses against the inmate; and

(7) to be furnished with staff assistance according to K.A.R. 44-13-408.

(d) The charge may be amended according to the provisions of these regulations.

(e) If an inmate allegedly commits an act covered by criminal law, the case shall be referred to the appropriate law enforcement or prosecutorial agency as provided in K.A.R. 44-13 103.

(f) There shall be three classes of offenses, which shall be processed according to the provisions of these regulations.

(g) The disciplinary hearing process shall be structured as specified in K.A.R. 44-13-403, 44-13-404, and 44-13-405a.

(h) All stages of the disciplinary hearing shall be conducted by a hearing officer appointed by the warden according to K.A.R. 44-13-105.

(i) A complete log of the disciplinary process shall be maintained as specified in K.A.R. 44-13-509.

(j) The disciplinary hearing shall be conducted within a certain time following notice of the charge as established by these regulations. Continuances and recesses of the hearing may be granted. Generally, the inmate shall be permitted to be present at all stages of the hearing, except as provided by these regulations.

(k) Staff assistance, shall be permitted only under limited conditions established in K.A.R. 44-13-408.

(1) A summary record shall be made of all stages of the hearing.

(m) In class I and II offense cases, following an administrative review of the record and any needed adjustments of the disposition by the warden, the inmate may appeal the case to the secretary of corrections on the record. In class III offense cases, an appeal may be made to the warden on the record following an initial review of the record by some person within the facility other than the warden. No appeal to the secretary of corrections shall be permitted.

(n) Nothing in these regulations shall prohibit the assignment or delegation of the disciplinary hearing and review process or any portion of it to the warden of another Kansas state correctional facility if good cause is shown and if justice and fairness will not thereby be infringed. An assignment or delegation shall not be made except by the secretary of corrections or designee, or by the warden with the secretary of corrections' written approval. This restriction shall not prohibit the holding of hearings at a receiving facility following a transfer based on a classification decision in the sending facility where the offense occurred in the sending facility.

(o) This regulation shall summarize the disciplinary procedure and shall not be construed or interpreted as establishing any rights or procedures that are not specifically set forth in article 13.

This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210, 75-5251; effective May 1, 1980; amended, T-83-23, Aug. 11, 1982; amended, T-84-6, May 1, 1983;

amended May 1, 1984; amended, T-85-37, Dec. 19, 1984; amended May 1, 1985; amended May 1, 1987; amended April 20, 1992; amended February 15, 2002.)

**44-13-101a. Waiver of rights.** (a) Each inmate shall be permitted to voluntarily waive the right to any time limit or process afforded by the disciplinary procedure regulations in this article. The waiver shall be in writing and shall state with specificity the particular time limit or process being waived. The waiver shall be made in the form and manner approved or prescribed by the secretary of corrections. The waiver shall be signed by the inmate and the hearing officer unless the inmate is waiving the right to the disciplinary hearing process by accepting a summary judgment citation as defined in K.A.R. 44-13-201b.

(b) The inmate shall be informed of the nature of the time limit or process being waived and of the impact and consequence of the waiver.

(c) Unless the inmate is waiving the right to the disciplinary hearing process by accepting a summary judgment citation as defined in K.A.R. 44-13-201b, the inmate shall be questioned by the hearing officer before accepting the waiver to determine if it is knowingly and voluntarily made. (Authorized by and implementing K.S.A. 2006 Supp. 75-5210; effective May 1, 1984; amended May 1, 1985; amended April 20, 1992; amended July 13, 2007.)

**44-13-102.** (Authorized by K.S.A. 1980 Supp. 75-5210; effective, May 1, 1980; amended, May 1, 1981; revoked, T83-23, Aug. 11, 1982; revoked, T-84-6, May 1, 1983; revoked, May 1, 1984.)

**44-13-103. Prosecution by outside agency.** (a) When an inmate allegedly commits an act covered by criminal law, the case shall be referred to the appropriate law enforcement or prosecutorial agency for consideration for prosecution unless the prosecutor provides a written statement requesting that certain types or classes of crimes not be reported, or requesting that no report be made.

(b) Notification for prosecution by outside agency shall not preclude a disciplinary charge and proceeding by the correctional facility for the rule infraction arising from the same facts. The hearing officer may proceed or continue the case to await the outcome of the prosecution by the law enforcement agency. (Authorized by and implementing K.S.A. 1991 Supp. 75-5210; effective May 1, 1980; amended May 1, 1984; amended April 20, 1992.)

**44-13-104**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 1990 Supp. 75-5210; effective May 1, 1980; amended May 1, 1981; amended May 1, 1984; amended April 20, 1992; revoked February 15, 2002.)

**44-13-105. The disciplinary administrator and hearing officers.**

(a) A disciplinary administrator shall be appointed by the warden of each facility to manage the disciplinary process for the entire facility. Any suitable employee may be designated by the warden to carry out this task on a continuing basis.

(b) One or more impartial hearing officers shall be appointed by the warden to conduct disciplinary hearings at each department-operated facility.

(1) The minimum qualification for hearing officers shall be satisfactory completion of required training.

(2) A person who is the reporting officer, investigator, or a witness in a case shall not be the hearing officer in that case.

This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210, 75-5251; effective, T-83-23, Aug. 11, 1982; effective, T-846, May 1, 1983; effective May 1, 1984; amended February 15, 2002.)

**44-13-106. Administration of oaths; designation of persons authorized.** (a) The warden, a deputy warden, the disciplinary administrator appointed pursuant to K.A.R. 44-13-105, and those persons serving as hearing officers at the facility disciplinary hearings shall be authorized to administer oaths to witnesses in those proceedings.

(b) Oaths shall be administered in a form and a manner that are in accordance with K.S.A. 54-101 et seq., and amendments thereto.

(Authorized by and implementing K.S.A. 2006 Supp. 75-5210,

K.S.A. 75-5251; effective, T-85-37, Dec. 19, 1984; effective May 1, 1985; amended April 20, 1992; amended Feb. 15, 2002; amended July 13, 2007.)

**44-13-107 through 114 inclusive. Reserved.**

**44-13-115.** (Authorized by and implementing K.S.A. 1990 Supp. 75-5210; effective May 1, 1984; amended May 1, 1987; revoked April 20, 1992.)

### COMMENCEMENT OF PROCEEDINGS

**44-13-201. Disciplinary report and written notice.** (a) A disciplinary proceeding shall be commenced upon the making of a charge by a disciplinary report.

(1) The inmate shall be notified in writing by personal service of a copy of the report upon the inmate within 48 hours after the issuance of the disciplinary report, excluding Saturdays, Sundays, and holidays.

(2) The report shall be served upon the inmate by an officer or unit team manager. The report shall not be served upon the inmate by the same person who brought the charge against the inmate.

(3) The officer serving the report shall inform the inmate that the inmate may enter a plea of guilty or no contest to the charge at the time of service of the report.

41

(A) If the officer serving the report has been appointed as a hearing officer by the warden according to K.A.R. 44-13-105, that officer may immediately, or as soon as possible, accept the inmate's plea of guilty or no contest, conduct a sentencing hearing, and

(B) If the officer serving the report has not been appointed as a hearing officer by the warden according to K.A.R. 44-13-105, or wishes to refer the case to another hearing officer, then the inmate desiring to plead guilty or no contest to the charge at the time of service of the report shall be brought immediately, or as soon as possible, before a hearing officer, who shall accept the inmate's plea of guilty or no contest, conduct a sentencing hearing, and impose sentence by following the procedures established in K.A.R. 44-13 403.

(4) If necessary, the hearing officer may accept the inmate's plea of guilty or no contest immediately, or as soon as possible, after service of the report, but may delay the sentencing hearing and imposition of sentence for not more than six working days.

(5) When the unit team manager serves the report, or at any time before the scheduled hearing, the unit team manager may implement one of the following options:

(A) Offer the inmate diversion of the charge or charges in accordance with K.A.R. 44-13-201a;

(B) offer the inmate summary judgment in accordance with K.A.R. 44-13-201b; or

(C) inform the inmate that the inmate may enter a plea of guilty or no contest to the charge at the time of service of the report and, acting as a hearing officer, accept the inmate's plea of guilty or no contest, conduct a sentencing hearing, and impose sentence by following the procedures established in K.A.R. 44-13-403. If the inmate accepts this option, the unit team manager shall forward to the disciplinary administrator the guilty or no contest plea waiver form and disposition and hearing record.

(b) If the inmate is transferred to another facility before the arrival of the disciplinary report at the receiving facility, service of the report upon the inmate shall be made within 48 hours after arrival of the report, excluding Saturdays, Sundays, and holidays, in the same manner as that specified in subsection (a).

(c) The disciplinary report shall be written within 48 hours of the offense, the discovery of the offense, or the determination following an investigation that the inmate is the suspect in the case and is to be named as defendant.

(1) If an alleged violation is based upon uncertain facts, an appropriate investigation shall be initiated within 24 hours of the time the allegation is made and shall be completed without unreasonable delay. The investigation shall determine if a disciplinary action should be initiated or continued by determining whether the allegation is soundly based on reasonably reliable facts. The investigator shall be a staff member, and, if practical, shall be a staff member other than the person making the allegation. If an inmate is making the allegation, the officer who is receiving the allegation and is in a

42

position to write the report may also be the investigator.

(2) The investigation report may be adopted by the charging officer both as the charge itself, and as the officer's sworn statement in lieu of testimony in any case, in accordance with the regulations. If necessary, pending completion of the investigation, the inmate may be held in administrative segregation for a certain period according to K.A.R. 44-14-302(b).

(3) The report shall be reviewed and either approved or disapproved by the shift supervisor or unit team manager based on whether or not the report is sound and adequate and is made in proper manner and form.

(4) The shift supervisor or unit team manager shall assure that all necessary elements of the alleged violation are contained in the written report of the facts of the incident and that the report does not represent an abuse of the disciplinary process. The shift supervisor or unit team manager shall also make or direct appropriate amendments to the report, including use of the summary judgment procedure under K.A.R. 44-13-201b.

(5) If the charge is dismissed or the report is otherwise rejected by the shift supervisor or unit team manager, a written explanation shall be made in the record and filed with the report, with a copy given to the officer. The report shall not be destroyed.

(d) The disciplinary report shall constitute a formal statement of the charge, shall be in a form prescribed by the secretary, and shall include the following:

(1) The name and number of the inmate;

(2) the institution;

(3) the signature and title of the writing officer;

(4) the date and time of the alleged offense;

(5) the date and time the report is written;

(6) the nature of the alleged offense;

(7) the class, title, and number of the rule or regulation violated, including citation to any underlying statute, regulation, internal management policy and procedure, or published order allegedly violated;

(8) the specific regulation that is the basis of an attempt, conspiracy, accessory, solicitation, or liability for the offenses of another under K.A.R. 44-12-1101;

(9) the names of known staff witnesses;

(10) a brief description of the circumstances and facts of the violation if, in cases in which the violation is based upon information supplied by a confidential witness or informant, the identity of the witness or informant is not disclosed, nor is any reference or factual detail likely to reveal the identity of the witness or informant;

(11) any unusual inmate behavior;

(12) the disposition of any physical evidence;

(13) any immediate action taken, including the use of force; and

(14) the factual basis for and the amount of any restitution sought for any injury, damage, or other loss caused by or resulting from the violation charged.

(e) An inmate shall not be charged unless the regulation or law has been made in writing and published.

(f) The officer may orally warn or reprimand the inmate instead of writing a report or otherwise documenting the incident. (Authorized by and implementing K.S.A. 2006 Supp. 75-5210, K.S.A. 75-5251; effective May 1, 1980; amended, T-83-23, Aug. 11, 1982; amended, T-84-6, May 1, 1983; amended May 1, 1984; amended May 1, 1987; amended April 20, 1992; amended July 11, 1994; amended Feb. 15, 2002; amended July 13, 2007.)

**44-13-201a. Diversion procedure.** (a) In any case involving one or more alleged class I or class II offenses, the charged inmate's unit team manager may initiate, or a member of the inmate's unit team in the inmate's assigned housing unit may request, consideration of diversion of the pending charges from prosecution, in connection with the formation and implementation of an intervention plan intended to address each behavioral issue presented in the incident in question. If a request is made by a unit team member other than the unit team manager, the request shall be submitted in writing and addressed to the unit team manager, who may decline further action or who may proceed further with the request. The unit team manager's decision about the request shall be final and shall not be subject to hearing or appeal under these regulations or to review pursuant to the inmate grievance procedure or any other administrative remedial procedure.

(b) The unit team manager may formulate the intervention plan or may assign the diversion request to the inmate's assigned correctional counselor for review and recommendation as to the nature and components of the intervention plan. The unit team manager shall apply for a continuance of the case pursuant to K.A.R. 44-13-402 if necessary, in order to complete consideration and formulation of the intervention plan.

(c) Upon formulation of the intervention plan, the unit team manager shall confer with the reporting officer or supervisor and the inmate. If both parties consent to the diversion, the unit team manager shall present to the inmate for the inmate's execution a written request for continuance of the disciplinary case for the length of time required to carry out the plan, which shall not exceed 180 days, and shall also present the written intervention plan to the inmate and the reporting officer or supervisor. This plan shall be in the form of an agreement to be signed by both parties and the unit team manager. If either party fails to consent, then the case shall proceed for prosecution. If a continuance has been secured by the unit team manager, then the unit team manager shall notify the disciplinary administrator in writing of the failure to agree to diversion.

(d) As a condition of the agreement specified in subsection (c), the inmate shall waive any right or claim to have the disciplinary case heard and determined within ordinary time limits. The inmate shall also agree and acknowledge that the determination as to whether the inmate has successfully completed the plan is that of the unit team manager, whose

44

decision in that regard shall not be subject to hearing or appeal under these regulations or to review under the inmate grievance procedure or any other administrative remedial procedure.

(e) The request for continuance specified in subsection (c) shall then be forwarded to the facility disciplinary administrator, who shall proceed to grant the continuance, duly note the length of the continuance specified in the request on the case continuance log, and further note the diversion of prosecution of the charge or charges under the assigned case number.

(f) If the inmate fails to successfully complete the intervention plan or receives another disciplinary report for any class of offense during the term of the plan, the diversion of the charge or charges from prosecution shall immediately terminate. Upon receipt of written notification of the termination from the inmate's unit team manager, the disciplinary administrator shall proceed to docket the case for hearing, notify the parties, and process the case according to the ordinary procedures set forth in these regulations.

(g) If the inmate successfully completes the intervention plan, the reporting officer or supervisor or, in that person's absence, the unit team manager shall submit a written request for dismissal of the case to the disciplinary administrator, who shall cause the case to be shown as dismissed in the records of the administrator's office. The existence of the case and its charge or charges shall not be part of the inmate's master file or any other file subject to review by the Kansas parole board or to disclosure to the public. (Authorized by and implementing K.S.A. 2006 Supp. 75-5210; effective July 13, 2007.)

**44-13-201b. Summary judgment procedure.** (a) In any case involving one or more alleged class II or class III offenses, the reporting officer may offer the inmate the option of resolving the matter through the summary judgment procedure as an alternative to writing a disciplinary report that leads to initiation of the formal disciplinary hearing process.

(b) Officers shall carry with them or have immediate access to summary judgment citation forms.

(c) If an officer observes an inmate in the act of committing one or more offenses designated as eligible for summary judgment procedures that the officer believes require more than an undocumented, on-the-spot verbal reprimand, the officer may file a formal disciplinary report against the inmate or offer the inmate summary judgment by issuing a summary judgment citation. If summary judgment is offered to the inmate by the officer, the offer shall not be withdrawn without the commission of additional alleged disciplinary offenses by the inmate.

(1) The summary judgment citation shall be written, verified pursuant to K.S.A. 53-601 and amendments thereto, and served on the inmate by the reporting officer within 24 hours of the alleged incident, or within 48 hours if directed by the shift supervisor or unit team manager under paragraph (c)(3)(B), and shall include the following:

45

(A) The date and time of each alleged offense;

(B) the date and time the citation is written;

(C) the name and rule number of each alleged offense;

(D) a statement of the facts of the alleged incident, including names of witnesses;

(E) the date and time that the citation is served on the inmate;

(F) the summary judgment sanction; and

(G) the signature of the inmate indicating acceptance or refusal of the summary judgment.

(2) The officer may impose only one of the following summary judgment sanctions regardless of the number of offenses cited:

(A) Restriction from privileges for not more than 10 days;

(B) a fine not to exceed $10.00;

(C) extra work without incentive pay for not more than two hours each day, not to exceed five days;

(D) work without incentive pay not to exceed five days, which shall apply only to ordinary inmate work assignments; or

(E) restitution of not less than $3.00 and not more than $10.00.

(3) The inmate may choose whether to accept the summary judgment or to reject it in favor of the formal disciplinary hearing process. This decision shall be made within one hour of the inmate's receipt of the citation, or it shall be assumed that the inmate refused the summary judgment. The officer may choose to impose a different summary judgment sanction after discussion of the incident with the inmate, and this fact shall be documented on the summary judgment citation if the inmate then accepts the summary judgment.

(A) If the inmate accepts the summary judgment offered, this acceptance shall constitute a waiver of the inmate's right to the benefits of the formal disciplinary hearing process. The waiver of rights established according to K.A.R. 44-13-101a shall be executed by the inmate. Upon the inmate's acceptance of the summary judgment, the sanction shall be immediately imposed, and the shift supervisor or unit team manager shall be notified.

(B) If the inmate refuses the summary judgment offered, the inmate shall receive the applicable hearing process. The summary judgment citation shall be marked and signed by the officer and the inmate to indicate the inmate's refusal. The citation may then be used in lieu of the more formal disciplinary report to initiate the formal disciplinary hearing process. The citation shall then be submitted to the shift supervisor or unit team manager for review and appropriate disposition, including any amendments that the reviewer may direct, pursuant to K.A.R. 44-13-201(c)(3) and (4). The citation shall subsequently be served upon the inmate in the manner and using procedures that apply to ordinary disciplinary reports.

(C) If an inmate refuses the summary judgment offered, the inmate shall not be charged with a more serious offense or combination of offenses than was alleged in the summary judgment citation.

46

(D) All evidence shall be confiscated or seized in connection with the issuance of a summary judgment citation and shall be disposed of in accordance with K.A.R. 44-5-111.

(4) All summary judgment citations accepted by the inmate shall be documented in the inmate's file. (Authorized by and implementing K.S.A. 2006 Supp. 75-5210, K.S.A. 75-5251; effective April 20, 1992; amended July 11, 1994; amended Feb. 15, 2002; amended, T-44-3-11-03, March 11, 2003; amended July 25, 2003; amended July 13, 2007.)

**44-13-202. Amendment of the charge.** (a) If, in the judgment of the disciplinary administrator, hearing officer, or warden during administrative review, the charge is incorrect or a language change would change the substance of the charge or adversely affect the defense, the charge shall be amended and notice given to the inmate. After this notice is given, the inmate shall have the same period of time between notice and hearing to prepare a defense as would have been permitted when the charge was originally made.

(b) The same charge shall not be brought twice on same facts under any circumstance if a factual finding of guilt or innocence has been made. If a case has been dismissed without a factual finding of guilt or innocence, upon administrative review pursuant to K.A.R. 44-13-701, the reviewing authority may either reinstate the charge or amend the charge as deemed appropriate, and remand the case for hearing.

(c) After the hearing officer has begun to hear evidence in the case, the hearing officer may permit amendment at any time before a factual finding of guilt or innocence has been made if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced.

(d) The hearing officer shall ask the inmate which option the inmate chooses:

(1) Continue the case for hearing on a different date to prepare a defense to the additional or different offense resulting from amendment of the original charge or charges; or

(2) waive any time period allowed to prepare to defend against any additional or different offense resulting from amendment of the original charge or charges and hold the hearing on the charges at the time of amendment of the disciplinary charge.

(Authorized by and implementing K.S.A. 2006 Supp. 75-5210, K.S.A. 75-5251; effective May 1, 1980, amended April 20, 1992, amended July 11, 1994; amended February 15, 2002; amended July 13, 2007.)

**44-13-203. State prosecution and disciplinary hearing.** (a) If the inmate has been charged, convicted, or acquitted in a criminal court of a charge or for a crime arising from the same facts, the disciplinary hearing may be conducted or continued at the hearing officer's discretion.

(b) Where the inmate has been convicted or acquitted in criminal court for a crime arising from the same facts, the hearing officer may rely on the

47

finding made by the jury or judge in conducting or dismissing the disciplinary hearing.

(c) If the disciplinary hearing is conducted while the criminal court case is pending, and the court later renders a decision different from the decision of the hearing officer, the decision of the hearing officer shall remain unaffected unless upon motion to the hearing officer there is a showing that the hearing officer's decision is based on an obviously erroneous fact which affects the substantial rights of the inmate, in which case the hearing officer shall correct its decision on the record. The hearing officer may not change his or her decision in order to convict an inmate following a conviction by the court if the hearing officer acquitted the inmate before the court made its finding, or otherwise change his or her decision to adversely affect the inmate. (Authorized by and implementing K.S.A. 1991 Supp. 75-5210; effective May 1, 1980; amended April 20, 1992.)

## NATURE OF PROCEEDINGS

**44-13-301.** (Authorized by and implementing K.S.A. 1983 Supp. 75-5210; effective May 1, 1980; amended May 1, 1981; amended, T-83-23, Aug 11, 1982; amended, T-84-6, May 1, 1983; amended May 1, 1984; amended May 1, 1985; revoked April 20, 1992.)

**44-13-302.** (Authorized by and implementing K.S.A. 1983 Supp. 75-5210; effective May 1, 1980; amended T-83-23, Aug 11, 1982 amended, T-84-6, May 1, 1983; amended May 1, 1984; amended May 1, 1985; revoked April 20, 1992.)

**44-13-302a**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing
K.S.A. 1990 Supp. 75-5210; effective April 20, 1992; revoked February 15, 2002.)

**44-13-303.** (Authorized by and implementing K.S.A. 755210; effective May 1, 1980; amended May 1, 1981; amended T-83-23, Aug 11, 1982; amended, T-84-6, May 1, 1983; amended May 1, 1984; amended May 1, 1986; revoked April 20, 1992.)

**44-13-304**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 1990 Supp. 75-5210; effective May 1, 1980; amended, T-8323, Aug. 11, 1982; amended, T-84-6, May 1, 1983; amended May 1, 1984; amended April 20, 1992; revoked February 15, 2002.)

**44-13-305.** (Authorized by K.S.A. 1979 Supp. 75-5210; effective May 1, 1980; revoked, May 1, 1984.)

**44-13-306**. **Inmate responsibilities.** It shall be the responsibility of

48

each inmate being served to read the disciplinary report and any associated documentation, or to notify the serving staff that the inmate is illiterate or otherwise unable to read and understand the documents presented and request that the notice and associated documents be read to the inmate. Within 48 hours of service of the report, the inmate shall complete and submit the authorized form for witnesses to the disciplinary administrator. If one or more witnesses are requested, the inmate shall indicate on the form the testimony expected from each witness. The inmate may use the form to waive the inmate's right to call witnesses. An illiterate inmate shall receive assistance from the inmate's unit team correctional counselor for the purpose of completing the witness form, including any waiver of the right to call witnesses.

This regulation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210 and 75-5251; effective February 15, 2002.)

**44-13-307. Administrative review of requests for witnesses; denial of requests; issuance of summons; voluntary nature of witness appearance.** (a) The disciplinary administrator or hearing officer assigned to hear the charges shall review any written requests for witnesses submitted by the accused inmate according to K.A.R. 44-13-306.

(b) The disciplinary administrator or hearing officer performing a review of a written request for witnesses may deny the request if, in the judgment of the reviewer, the testimonies proffered on the request form meet any of the following criteria:

(1) Are clearly irrelevant or immaterial;

(2) are repetitious of other proffered testimony; or

(3) are properly excluded for reasons specified in K.A.R. 4413-405a. The truth of the proffered testimony shall be presumed in making this decision.

(c) Each denial of a request for witnesses shall be documented, including the reason or reasons for the denial, either on the request form or in the disciplinary case record.

(d) If practicable in the judgment of the reviewer, the inmate shall be informed, in writing and in advance of the hearing, of any denials of requested witnesses and of the reason or reasons for the denials. If informing the inmate is determined not to be practicable, the inmate shall be informed of any denials and reasons for any denials by the hearing officer at the beginning of the hearing.

(e) If no reason appears from a review of the written proffer of testimony for denial of the request for witnesses, then the disciplinary administrator shall issue a written summons for the appearance of the witness. The appearance of a witness requested by either the reporting officer or the accused inmate shall be voluntary, and neither the request nor the issuance of summons according to this regulation shall compel an appearance. However, issuance of summons by a hearing officer to an inmate or staff

49

member pursuant to K.A.R. 44-13-403 shall compel an appearance. (Authorized by and implementing K.S.A. 2006 Supp. 75-5210 and K.S.A. 75-5251; effective Feb. 15, 2002; amended July 13, 2007.)

### HEARINGS GENERALLY

**44-13-401**. **Hearing within certain time; notice to inmate; time and place of hearing.** (a) Except as otherwise provided in these regulations, the administrative hearing by a hearing officer of the facility to determine the inmate's guilt or innocence and impose a penalty in the event of a finding of guilt shall be held not less than 24 hours or more than seven working days after the service of notice of charge on the inmate, subject to authorized continuances.

(b) Each inmate charged with an offense shall be given advance written notice of the time and place of the disciplinary hearing. This notice shall be given not less than 24 hours before the hearing. Notice shall be given by the disciplinary administrator or other responsible person designated by the warden. This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210, K.S.A. 75-5251; effective May 1, 1980; amended May 1, 1981; amended May 1, 1984; amended May 1, 1985; amended May 1, 1986; amended April 20, 1992; amended February 15, 2002.)

**44-13-401a**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing
K.S.A. 1990 Supp. 75-5210; effective May 1, 1984; amended April 20, 1992; revoked February 15, 2002.)

**44-13-402. Continuing the hearing; recesses; time limits; extensions.** (a) The disciplinary administrator or hearing officer may grant one or more continuances or recesses of appropriate and reasonable length upon application of the inmate, reporting officer, the hearing officer, a unit team manager pursuant to K.A.R. 4413-201a, or department of corrections for cause shown.

(b) The hearing officer may also continue the case for a reasonable period, as necessary, subject to the review of the status of the case every 30 days, if any of the following conditions is met:

(1) The inmate or the employee is unable to appear for medical or psychiatric reasons as certified by the facility or other licensed physician or psychiatrist.

(2) There is a delay to await determination of whether the case will go to trial in a court of law or to await the outcome of a trial.

(3) There is an unavoidable delay to await the return of evidence from an analysis laboratory.

(4) The inmate is transferred to or from a facility for diagnostic evaluation, out to court, or to a mental hospital before hearing.

(5) The inmate is on "escape" status. At the hearing officer's discretion, the case may be dismissed or heard in absentia on the record, unless the inmate has been apprehended and is available at a known location for return to department of corrections custody for the hearing within six months.
(6) The case has been placed upon diversion status pursuant to
K.A.R. 44-13-201a.
(c) To obtain a continuance in advance of the hearing, the requesting party shall make the request to the hearing officer or to the disciplinary administrator. If there is a hearing officer appointed for the case, the request shall be forwarded to that officer.
(1) Reasonable extensions may be obtained with the prior approval of the secretary of corrections or the secretary's designee, in the case of a substantial disruption of order in the facility.
(2) If an inmate has been transferred to another facility, it shall be the responsibility of the warden of the sending facility to grant an extension of the disciplinary case, which shall not exceed 10 working days.
(3) At the discretion of the hearing officer, recesses of appropriate
and reasonable length may be declared. (Authorized by and implementing
     K.S.A. 2006 Supp. 75-5210,
K.S.A. 75-5251; effective May 1, 1980; amended, T-83-23, Aug. 11, 1982; amended, T-84-6, May 1, 1983; amended May 1, 1984; amended May 1, 1988; amended April 20, 1992; amended July 11, 1994; amended Feb. 15, 2002; amended July 13, 2007.)

**44-13-403. Conducting the disciplinary hearing.** (a) The disciplinary hearing shall consist of the following procedures:
(1) The hearing officer shall initially inform the inmate of the charges and take the inmate's plea.
(2) Secondly, the hearing officer shall determine guilt or innocence.
(3) Finally, if guilt has been established, the hearing officer shall make a disposition, including the determination and imposition of sentence.
(b) Initially, the hearing officer shall read the disciplinary report to the inmate, including the date, nature of the offense, the reporting officer's name, and a synopsis of the observation. The officer shall ensure that the inmate understands the charges and that a copy of the disciplinary report was received by the inmate. The officer shall also explain the possible penalties. If the hearing officer finds that the inmate is incapable of self-representation, the hearing officer shall continue the hearing as provided in K.A.R. 44-13-402(b)(1), until the inmate regains the ability for self-representation. For purposes of this subsection, "incapable of self-representation" shall mean that the inmate, due to physical or mental disability, whether temporary or permanent, lacks the present ability to assist in the inmate's representation in the case. This term shall not include mere illiteracy.
(c) A staff assistant shall be permitted to be with the inmate at all stages of the disciplinary hearing only as provided in K.A.R. 44-13-408. The hearing

51

officer shall ensure that the inmate has staff assistance when required by K.A.R. 44-13-408.

(d) If the inmate is disruptive or refuses to be present, the hearing may proceed in absentia, and the record shall indicate the reason or reasons for the inmate's absence. A staff assistant shall then be assigned and may ask questions of witnesses, present the argument, or otherwise aid the defendant inmate, at the discretion of the staff assistant and subject to rulings of the hearing officer as otherwise provided in this regulation.

(e) The hearing officer shall entertain and determine any motion for dismissal or objections to holding the hearing, as well as any motions for additional witnesses beyond those identified already in the witness list previously submitted. Additionally, the hearing officer shall advise the inmate of the inmate's rights to proceed to a determination of guilt or innocence, and if necessary, the application of penalties, and to receive staff assistance in certain cases, according to K.A.R. 44-13-408, and of other procedural due process rights.

(f) The hearing officer shall then ask the inmate to plead guilty, not guilty, or no contest. The plea shall be entered if the presiding officer is assured that the plea is made knowledgeably and without threat or promise of reward to the inmate. If the inmate refuses to plead, the hearing officer shall enter a plea of not guilty. A plea of no contest shall be treated in the same manner as that for a plea of guilty. If the inmate pleads guilty or no contest, the inmate shall waive the right to a determination of guilt or innocence, but shall reserve the right to participate in the penalty phase of the hearing to the extent of offering a brief argument in mitigation of the penalty to be imposed. If the inmate pleads guilty or no contest, the inmate shall not be allowed to introduce evidence regarding the inmate's guilt or innocence of the charge or charges.

(g) The hearing officer shall, upon a plea of guilty or no contest, make a finding of guilt and conduct a sentencing hearing, and may impose a sentence.

(h) If the hearing officer finds that the case shall be dismissed, the officer may dismiss the charge on the officer's own motion or on motion of either party. The hearing officer shall give a brief explanation on the record and provide a copy of the explanation to the reporting officer.

(i) Only the relevant facts shall be employed in any determination of guilt or innocence. In the penalty phase, the inmate's entire facility record and other relevant facts, observations, and opinions may be considered.

(j) The hearing officer shall rule on all matters of evidence. Strict rules of evidence, as used in a court of law, shall not be required, but the hearing officer shall exercise diligence to admit reliable and relevant evidence and to refuse to admit irrelevant or unreliable evidence.

(k) The hearing officer shall rule on all matters of assistance for the accused inmate in accordance with these regulations. If the accused inmate is furnished with staff assistance according to K.A.R. 44-13-408, the staff assistant shall be permitted to fully assist the accused and shall be

permitted to question witnesses and present arguments on behalf of the accused inmate, except as otherwise provided by these regulations.

(l) (1) The disciplinary process shall, to the extent possible, discover the truth regarding charges against the inmate. For this purpose, the hearing officer shall be authorized to call and to interrogate any witness, and each inmate, staff member, volunteer, or contract employee called as a witness by the hearing officer shall be compelled to appear. The hearing officer may bring out the facts by direct or cross-examination but shall not act as prosecutor on behalf of the facility or charging officer against the accused inmate, or on behalf of the inmate. Testimony and evidence shall not be received by the hearing officer or introduced outside the presence of the accused inmate, except that the accused inmate shall not be present when the hearing officer reviews any facility security videotape evidence. An inmate shall not be required to be present at the disciplinary hearing as provided in subsections (d), (e), and (m) and K.A.R. 4413-402(b)(5), and as otherwise provided in these regulations.

(2) The hearing shall proceed as follows:

(A) The prosecution shall present its evidence, and the defense shall be permitted to cross-examine, except as otherwise provided by these regulations.

(B) The defense shall present its evidence, and the prosecution shall be permitted to cross-examine.

(C) The prosecution may make a closing argument. The defense may make a closing argument, and then the prosecution may make a short rebuttal.

(m) (1) If the hearing officer determines that the testimony of any inmate will subject that inmate to possible retaliation for having testified, the hearing officer may perform either of the following:

(A) Receive the testimony in confidence without confrontation or cross-examination by the accused inmate, and the witness may be sequestered; or

(B) receive testimony from an investigator who interviewed an inmate informant and relied on the confidential information provided.

(2) The testimony of the inmate witness given under oath shall be examined and tested by the hearing officer. The hearing officer shall closely question the testifying inmate to determine the veracity and weight of the testimony offered. The hearing officer shall complete a credibility assessment form, which shall be available for confidential review by the warden and secretary of corrections.

(3) If the informant inmate does not testify, the hearing officer may establish the reliability of the information provided to the testifying investigators by any of the following:

(A) The testimony of the investigator regarding the reliability of the informant in the past, which shall include specific examples of past instances of reliability;

(B) the testimony of the investigator regarding the truthfulness of details that the investigator has been able to verify through investigation;

(C) corroborating testimony;

53

(D) a statement on the record by the hearing officer that the hearing officer has firsthand knowledge of the informant and considers the informant to be reliable due to the informant's past record of reliability, which shall include specific examples of past instances of reliability; or

(E) in camera review of material documenting the investigator's assessment of the credibility of the informant.

(4) The accused shall be apprised of the general nature of the confidential testimony, omitting those details that would tend to identify the inmate who gave the confidential testimony or provided confidential information to the testifying investigator. The identity of any confidential witness or of any inmate informant shall not be disclosed to the accused, to any other inmate, or to any staff not required to complete the process. The staff assistant shall be permitted to be present when the board receives testimony from the confidential witness, or investigator, and the staff assistant may ask questions. The inmate's staff assistant shall not disclose the identity of the confidential witness or inmate informant to the accused, to any other inmate, or to any staff not required to complete the hearing process. The testimony shall be recorded for confidential review by the warden and, on appeal, by the secretary of corrections.

(n) The hearing officer may require the accused to explain briefly what the purpose and nature of the testimony of a witness will be. The request to call the witness may be denied or the testimony reasonably and fairly restricted if the testimony meets any of the following criteria:

(1) Relates to something already disposed of;

(2) is clearly irrelevant or immaterial;

(3) is repetitious of other testimony; or

(4) is properly excluded for reasons specified in K.A.R. 44-13405a. The truth of the testimony shall be presumed in making this decision.

(o) A witness request made at the hearing and not previously submitted shall not be permitted unless exceptional circumstances outside the control of the inmate exist and the testimony would most likely affect the outcome of the hearing. The hearing officer shall inform the inmate of any witness deemed waived by the failure to make a timely request.

(p) The hearing officer, in deciding whether or not the inmate is guilty, shall consider only the relevant testimony and report. The accused inmate's correctional and supervision record shall not be considered in determining guilt or innocence. The decision in the hearing shall be based solely on evidence presented as part of the hearing.

(q) Confrontation and cross-examination may be denied by the hearing officer if deemed necessary in any case except class I cases. In class I cases, confrontation and cross-examination may be limited or denied if necessary to protect the safety of an accuser, informant, or witness or if necessary to maintain facility safety, security, and control. Unless there is a security risk endangering some person, the explanation shall be in the record. If there is such a security risk, a written explanation of the reason shall be sent to the warden with a copy to the secretary for confidential review. However, an

inmate held in administrative or disciplinary segregation whose hearing is conducted by telephone, as provided by K.A.R. 44-13-404(e), shall not be permitted to confront any witnesses against the inmate, including the reporting officer.

(r) After the conclusion of the presentation of evidence regarding guilt or innocence or disposition, if the hearing officer needs the charging officer, the accused inmate, or both present to provide further information to clarify facts, both parties shall be present to hear what the other is saying unless exempt under subsection

(m) or (p) above. (Authorized by and implementing K.S.A. 2006 Supp. 75-5210, K.S.A. 75-5251; effective May 1, 1980; amended May 1, 1981; amended, T-83-23, Aug. 11, 1982; amended, T-84-6, May 1, 1983; amended May 1, 1984; amended May 1,1986; amended April 20, 1992; amended July 11, 1994; amended Feb. 15, 2002; amended July 13, 2007.)

### 44-13-404. Presence of inmate and presence of charging officer at disciplinary hearings; officer statements in lieu of testimony.

(a) The inmate shall be present at all stages of the disciplinary hearing and disposition except as otherwise provided by these regulations or by law. Subject to the provisions of subsection (e), if the inmate is not present, then a staff assistant shall be assigned in accordance with K.A.R. 44-13-403 and 44-13-408.

(b)(1) In class I cases, the charging officer shall be present in person or by telephone, as determined by the hearing officer, for direct examination and cross-examination, unless excused by the hearing officer or unless the inmate has been transferred to another facility. The hearing officer may excuse the charging officer only if any of the following is determined:

(A) Facility safety or correctional goals would be jeopardized.

(B) The charging officer is absent from duty due to activation for military service.

(C) The charging officer has been separated from employment with the facility for reasons unconnected to investigation of the charges or issuance of the disciplinary report.

(D) The charging officer is otherwise unlikely to be available for testimony within a reasonable time period as determined by the hearing officer, and a continuance pursuant to K.A.R. 44-13-402 either is not applicable or is not appropriate in the judgment of the hearing officer. Facility safety or correctional goals shall not include considerations of mere convenience. If the officer is not present, the officer's report and statement shall be made to the hearing officer in writing under oath. Copies of the report shall be provided to the inmate, and it shall be read aloud at the hearing unless confidentiality is required to protect an inmate accuser, informant, or witness. If the charging officer is excused from appearance, the hearing officer shall document the ground for the excuse and shall likewise document the facts underlying the ground relied upon in the case record.

(2) If an inmate has been transferred to another facility after a disciplinary

55

report was written in a class I case, the testimony of the charging officer and other witnesses regarding that report may be taken by telephone at the discretion of the hearing officer. Except as provided in K.A.R. 44-13-403(m) and (q), any testimony taken by telephone shall be taken in a manner that can be heard by all those present at the hearing and shall be subject to the same procedures as though the witness were personally present at the hearing. (c)(1) In class II and III cases, the officer's attendance shall not be required unless deemed necessary by the hearing officer. The officer's report and statement shall be submitted to the hearing officer in writing under oath. It shall be read aloud at the hearing, and a copy shall be given to the inmate unless confidentiality is required to protect an inmate accuser, informant, or witness according to K.A.R. 44-13-403(m). If such confidentiality is required, but it is possible to protect the inmate accuser, informant, or witness by editing out certain portions of the report and statement, then those portions shall be edited, and the inmate provided with a copy. The hearing officer may contact the officer, by telephone or radio, to ask questions or clarify the facts while the hearing is being conducted or while the matter is being considered for decision.

(2) In all class II and III cases, if the charging officer requests, the hearing officer shall allow the charging officer to be present. In such a case, the officer shall be present throughout and shall be subject to direct examination, confrontation, and cross-examination unless restricted by the hearing officer according to these regulations.

(d) (1) The officer's statement under oath shall consist of the officer's rendition of all the facts of the case resulting from the charging officer's complete fact investigation. To the best of the officer's ability, it shall show all relevant and material facts that might be used to support both the facility's case against the inmate and the inmate's defense. If the officer is uncertain of a fact, the officer shall state that with respect to the fact. The charging officer may either adopt or defer under oath to any official neutral fact investigation report that might be conducted by another person or may submit the charging officer's own statement in addition to the investigation report.

(2) Confidential inmate testimony may be deleted from the statement in lieu of testimony and reported separately. The hearing officer shall receive any confidential inmate testimony in accordance with K.A.R. 44-13-403.

(e) Hearings for inmates detained or held in administrative or disciplinary segregation status may be conducted by telephone, with the inmate remaining in the inmate's cell and outside the immediate physical presence of the hearing officer and any witnesses, including the reporting officer, at the discretion of the hearing officer. Except as provided in K.A.R. 44-13-403(m) and (q), any testimony taken by telephone shall be taken in a manner that allows the testimony to be heard by all those present at the hearing. The testimony taken by telephone shall be subject to the procedures governing the testimony of any witness personally present at a hearing. A staff assistant shall not be required to be appointed to render assistance to the inmate

unless at least one of the circumstances set forth in K.A.R. 44-13403 or 44-13-408 is present. The inmate shall be permitted to submit written motions, exhibits, or affidavits on the inmate's behalf to the hearing officer to the extent and under the circumstances applicable to documentary presentations under these regulations.

(Authorized by and implementing K.S.A. 2006 Supp. 75-5210,

K.S.A. 75-5251; effective May 1, 1980; amended, T-83-23, Aug. 11, 1982; amended, T-84-1, Jan. 5, 1983; amended May 1, 1984; amended April 20, 1992; amended Feb. 15, 2002; amended July 13, 2007.)

**44-13-405.** (Authorized by and implementing K.S.A. 1983 Supp. 75-5210; effective May 1, 1980; amended May 1, 1981; amended, T-83-23, Aug. 11, 1982; amended, T-84-6, May 1, 1983; amended May 1, 1984; revoked April 20, 1992.)

**44-13-405a. Calling witnesses**. (a) In determining whether to allow the inmate to call a witness from the facility population or from among facility employees, the hearing officer shall balance the inmate's interest in avoiding loss of good time and assessment of a fine or placement in disciplinary segregation against the needs of the facility. These needs of the facility shall include the following:

(1) The need to keep the hearing within reasonable time limits;

(2) the need to prevent the creation of a risk of retaliation and reprisal;

(3) the need to prevent the undermining of authority;

(4) the need to limit, to a reasonable level, access to other inmates for the purpose of collecting statements or compiling documentary evidence;

(5) the need to prevent disruption;

(6) the need to administer swift punishment;

(7) the need to avoid irrelevant, immaterial, or unnecessary testimony and evidence;

(8) the need to reduce or prevent security hazards that could be presented in individual cases;

(9) the need to use the disciplinary process as a rehabilitative tool to modify inmate behavior;

(10) the need to prevent the creation of undue risk to personal or facility safety;

(11) the need to reduce the chances of seriously inflaming tension, frustration, resentment, and antagonism in the relationship between inmates and facility personnel;

(12) the need to correct the behavior of inmates and develop in them a value system in order to foster their eventual return to the community; and

(13) the need for the prompt, efficient, and effective resolution of the disciplinary case with accurate and complete fact-finding consistent with the level of process required by law for facility disciplinary cases.

(b) The hearing officer shall have broad discretion in permitting or denying the witness request. In exercising the discretion, the hearing officer shall

balance the inmate's request and wishes against the needs of the facility. The goal of the hearing officer shall be to conduct the fact-finding process in a manner leading to the discovery of the truth.

(c) The hearing officer shall neither abuse the discretion entrusted to that officer nor interfere with the level of process that is reasonably necessary to find the truth.

(d) With the charged inmate's consent, the hearing officer may admit the affidavit of a nonparty witness in lieu of an appearance by the witness. If a witness is denied or cannot attend in a timely manner, the hearing officer may also admit the affidavit of this witness.

(e) If a request to call a witness is denied, a written explanation shall be made on the record unless it would endanger any person. In this case, a written explanation shall be made to the warden with a copy, on appeal, to the secretary of corrections for confidential review. Authorized by and implementing K.S.A. 2006 Supp. 75-5210, K.S.A. 75-5251; effective May 1, 1984; amended May 1, 1987; amended April 20, 1992; amended Feb. 15, 2002; amended July 13, 2007.)

**44-13-406. Disposition.** (a) The disposition shall be rendered by the hearing officer in an official session with the inmate present unless otherwise provided by law or regulation. The disposition shall be made without unreasonable delay following the hearing, preferably at the conclusion of the hearing.

(b) The disciplinary hearing officer shall sentence the inmate by selecting an appropriate disposition, or appropriate combination of dispositions, from the following options:

(1) Impose a penalty or penalties in accordance with the applicable penalty regulation for that class of offense;

(2) In the instance of two or more offenses, including imposition of previously suspended sentences, in which the penalty has a time component, order whether the sentences are to be served concurrently or consecutively. If the hearing officer makes no specific order in this regard, the sentences shall be computed on a concurrent basis;

(3) impose previously suspended sentences; or

(4) suspend all or part of the sentence imposed for a period of not less than 90 and not more than 180 days.

(c) The hearing officer shall make a recommendation regarding disposition of evidence. The warden shall determine final disposition of the evidence, in accordance with K.A.R. 44-5-111, in the warden's administrative review of the disciplinary report pursuant to K.A.R. 44-13-701.

(d) Upon request, the reporting staff person may be notified of the disposition. (Authorized by and implementing K.S.A. 2006 Supp. 75-5210; effective May 1, 1980; amended, T-83-23, Aug. 11, 1982; amended, T-84-6, May 1, 1983; amended May 1, 1984; amended, T-86-4, March 22, 1985; amended May 1, 1986; amended May 1, 1987; amended April 20, 1992; amended Feb. 15, 2002; amended July 13, 2007.)

**44-13-407.** (Authorized by and implementing K.S.A. 755210; effective May 1, 1980; amended, T-83-23, Aug. 11, 1982; amended, T-84-6, May 1, 1983; amended May 1, 1984; amended May 1, 1985; amended May 1, 1986; revoked April 20, 1992.)

**44-13-408. Assistance from staff.** (a) If the hearing officer finds that at least one of the following conditions is met, the hearing officer shall appoint a staff member from an approved list to act as staff assistant to aid the inmate at the disciplinary hearing and to question relevant witnesses:

(1) The inmate is incapable of self-representation due to physical or mental disability, whether temporary or permanent.

(2) The inmate is illiterate in the English language.

(3) The charge is too complex for the inmate to readily comprehend or defend against.

(4) Testimony or other evidence will be given, either directly or indirectly, by a confidential inmate informant or witness.

(5) The inmate either refuses to attend or has been removed from the hearing.

(6) Any other circumstance exists that, in the judgment of the hearing officer, substantially impairs the inmate's ability to participate meaningfully in the inmate's defense.

(b) A list of staff members to aid the inmate as staff assistants shall be made available to the hearing officer by the warden.

(Authorized by and implementing K.S.A. 2006 Supp. 75-5210; effective May 1, 1980; amended, T-83-23, Aug. 11, 1982; amended, T-84-6, May 1, 1983; amended May 1, 1984; amended May 1, 1986; amended April 20, 1992; amended Jan. 3, 1995; amended Feb. 15, 2002; amended July 13, 2007.)

**44-13-409**. **Standard of proof.** No finding of guilty shall be made in a disciplinary proceeding unless the institution or facility has produced evidence and testimony sufficient to show guilt of the inmate by a preponderance of the evidence. "Preponderance of the evidence" shall be that standard of proof by which a factual proposition is shown to be more likely true than not. This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210; effective May 1, 1980; amended February 15, 2002.)

## REPORTS AND RECORDS

**44-13-501**. **Preservation of all reports.** No disciplinary reports or summary judgment citations shall be destroyed for any reason. If written in error, or incorrectly written, the report or citation with the case number shall be marked "void" and placed in the disciplinary chronological file at the facility. If the charge was dismissed or a finding of not guilty was made by the disciplinary hearing officer, then the report shall be marked accordingly and

placed in the disciplinary chronological file at the facility.
This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210; effective May 1, 1980; amended May 1, 1984; amended April 20, 1992; amended February 15, 2002.)

**44-13-502.** (Authorized by K.S.A. 1979 Supp. 75-5210; 75-5210(f) effective May 1, 1980; revoked April 20, 1992.)

**44-13-502a**. **Hearing record.** A complete written record shall be made of the disciplinary hearing by the hearing officer who conducted the hearing. The written record shall include the following information:
(a) A summary of the disciplinary hearing showing compliance with the provisions of K.A.R. 44-13-403, K.A.R. 4413-404, and K.A.R. 44-13-405a;
(b) a summary of compliance with the provisions of K.A.R. 44-13-lOla and K.A.R. 44-13-403 if the inmate pleads guilty or no contest, including attachment of the required waiver form and acceptance of the plea by the hearing officer;
(c) a complete summary of all the evidence and arguments relied on to find the inmate guilty of the charge at the conclusion of the hearing, including the following:
(1) A summary of the testimony or sworn statement of the reporting officer, subject to applicable provisions of K.A.R. 44-13-403;
(2) a summary of the testimony or sworn statements of all other witnesses;
(3) any investigative reports;
(4) a list of all physical evidence;
(5) a list of any witnesses whose testimony was requested and denied and the reasons for that denial;
(6) the reasons for the denial of confrontation and cross-examination of any witness by the inmate; and
(7) the reasons for the denial of any request for assistance by the inmate at any stage of the hearing; and
(d) the disposition of the case provided for in K.A.R. 4413-406, including a summary of the evidence and arguments heard and the reasons for the penalties imposed during the penalty phase of the hearing.
This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210, 75-5251; effective April 20, 1992; amended February 15, 2002.)

**44-13-503.** (Authorized by and implementing K.S.A. 755210; effective May 1, 1980; amended May 1, 1984; amended May 1, 1986; amended May 1, 1987; revoked April 20, 1992.)

**44-13-504.** (Authorized by K.S.A. 75-5210; effective May 1, 1980; amended May 1, 1984; amended May 1, 1986; revoked April 20, 1992.)

**44-13-505. Copy to the inmate.** No charge shall be made for the first single copy of the disciplinary case record provided to an inmate. (Authorized by K.S.A. 1979 Supp. 755210, 75-5210(f); effective May 1, 1980.)

**44-13-506**. **Preparation of the record in 10 working days.** The record of the disciplinary hearing shall be caused by the warden or designee to be prepared within 10 working days after the rendering of the disposition by the hearing officer, unless extenuating circumstances arise. If such circumstances arise, the record shall be prepared as soon as possible, and the reason for the delay shall be attached in writing and delivered to the inmate upon completion of administrative review by the warden.
This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210, 75-5251; effective May 1, 1980; amended April 20, 1992; amended February 15, 2002.)

**44-13-507**. **Docket.** (a) A docket of disciplinary cases shall be maintained, showing the following:
(1) The case number;
(2) the inmate's name;
(3) the inmate's number;
(4) the cell house;
(5) the offense and its classification; and
(6) the name and title of the reporting officer. Space shall be left on each line on the docket to enter the plea of the inmate, the findings of the hearing officer, and the sentence imposed.
(b) A copy of this docket shall be maintained in the facility.
This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210, 75-5251; effective May 1, 1980; amended April 20, 1992; amended February 15, 2002.)

**44-13-508**. **Disciplinary reports in file.** The case disposition report and disciplinary report shall be placed in the inmate's file if there is a finding of guilty. No reference to the case shall be made in the inmate's file if the inmate is not found to be guilty or if the case is dismissed.
This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210, 75-5251; effective May 1, 1980; amended May 1, 1984; amended February 15, 2002.)

**44-13-509**. **Disciplinary case log.** The disciplinary administrator shall keep a continuous log of all disciplinary reports. The reports shall be numbered and recorded. If any disciplinary report is voided, dismissed, or otherwise terminated, the log and the report shall reflect that fact. No numbers or entries shall be altered, nor any report destroyed.
This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210; effective May 1, 1984; amended February 15, 2002.)

61

## SENTENCES

**44-13-601**. **Serving sentence.** Each inmate shall begin serving the sentence immediately upon imposition of sentence by the hearing officer, unless the warden or designee determines that space in the disciplinary segregation area is not immediately available or that immediate placement of the inmate in segregation is not otherwise feasible. If either determination is made, the sentence shall be served when the space is available or when placement of the inmate in segregation becomes feasible.

This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210, 75-5251; effective May 1, 1980; amended, T-83-23, Aug. 11, 1982; amended, T-84-6, May 1, 1983; amended May 1, 1984; amended May 1, 1985; amended May 1, 1987; amended April 20, 1992; amended February 15, 2002.)

**44-13-602. Time not credited for administrative segregation.** If the inmate is held in administrative segregation before the disciplinary hearing for some administrative reason, other than merely to await the disciplinary hearing or for investigation of the offense, then that time spent in administrative segregation shall not be credited against the service of the sentence in disciplinary segregation. However, any time during which the inmate is held pending the hearing, which is solely for the purpose of awaiting the disciplinary hearing or awaiting completion of the investigation, shall be credited and subtracted from the inmate's disciplinary segregation sentence, if such a sentence is rendered on the charge. (Authorized by and implementing K.S.A. 1983 Supp. 75-5210; effective May 1, 1980; amended, T-83-23, Aug. 11, 1982; amended T-846, May 1, 1983; amended May 1, 1984.)

**44-13-603. Absence from facility.** (a) If the inmate is sentenced to disciplinary segregation, restriction to cell, or restriction from privileges and if the inmate is then transferred out to court or to a mental hospital before commencing or completing the sentence, that time spent outside the facility shall not be credited against the service of the sentence. Upon return to the facility, the inmate shall serve the remainder of the sentence, unless the warden determines that the best interests of the inmate or facility warrant that the sentence be suspended. (b) If the inmate is paroled, conditionally released, or released on postrelease supervision before completion of serving the sentence, the inmate may be required to complete serving the sentence upon the inmate's subsequent return to a facility.

(Authorized by and implementing K.S.A. 2006 Supp. 75-5210,

K.S.A. 75-5251; effective May 1, 1986; amended April 20, 1992; amended July 11, 1994; amended Feb. 15, 2002; amended July 13, 2007.)

**44-13-604. through 44-13-609. Reserved.**

**44-13-610. Collection of fines.** (a) Upon disposition of the case, a fine

may be collected immediately, without further hearing process, from the inmate's trust account. The fine shall be collected only on written order of the disciplinary administrator.

(b) The fine shall be taken from any money that the inmate has credited to the trust account administered by the department of corrections or the contract facility. The fine shall not be deducted or taken from the gratuity, travel, or clothing allowance provided to the inmate upon release.

(c) No inmate, while released from incarceration, shall be required to continue payment on any fine imposed under these regulations. Upon any subsequent admission, the fine may be collected.

(d) If the inmate is transferred to another department of corrections or contract facility before collection, collection may be made by the receiving facility on order of the warden of the sending facility, as approved and confirmed by the warden of the receiving facility. The proceeds of the fine shall be deposited to the inmate benefit fund at the facility where the collection is made. (Authorized by and implementing K.S.A. 2006 Supp. 75-5210,

K.S.A. 75-5251; effective May 1, 1984; amended May 1, 1985; amended April 20, 1992; amended Feb. 15, 2002; amended July 13, 2007.)

## APPEALS

**44-13-701. Administrative review.** (a) In class I and II offense cases, within seven working days after preparation of the record, there shall be a review of the case, without the presentation of further arguments from either side, regarding compliance with the disciplinary procedure. One or more of the following actions may be performed by the warden

(1) Approve the decision;

(2) reinstate a charge that has been dismissed without a factual finding of guilt or innocence and remand the disciplinary case to the disciplinary administrator;

(3) amend the charge in accordance with the provisions of K.A.R. 44-13-202 and remand to the disciplinary administrator;

(4) disapprove the decision and dismiss the case;

(5) reduce the penalty;

(6) suspend all or part of a sentence for a period of at least 90 but not more than 180 days;

(7) remand the case to the disciplinary administrator and order a new hearing;

(8) remand the case to the disciplinary administrator for clarification of the record, and return the case to the warden for further consideration; or

(9) reduce the disciplinary report to a summary judgment and impose one of the following:

(A) Restriction from privileges for not more than 10 days;

(B) a fine not to exceed $10.00;

(C) extra work without incentive pay for not more than two hours each day,

63

not to exceed five days;

(D) work without incentive pay, not to exceed five days. This penalty shall not include a fine and shall apply only to ordinary inmate work assignments; or

(E) restitution of not less than $3.00 and not more than $20.00.

(b) Disposition of personal property that has been found to be the subject of a violation of one or more disciplinary regulations shall be provided for by the warden in accordance with K.A.R. 445-111 if the property is the subject matter of the offense.

(c) The inmate shall be notified by the warden of the results of the review by way of service of a copy of the disciplinary case record, without unnecessary delay, but in no case later than seven working days after review of the record. The date of review shall not be counted.

(d) Any mistake of law or other clear error may be corrected by the warden, at any time before a decision is made by the secretary in any ensuing appeal by the inmate, with the appeal permitted to continue as to any other point still unresolved by the warden's action as required by K.A.R. 44-13-703.

(e) In class III offense cases that do not include class I or class II offenses, if possible, the reviewer shall not be the warden. An impartial employee of suitable rank and experience shall be designated by the warden to perform the review. A person who was the hearing officer shall not act as reviewing authority, nor shall the reviewer be any person involved in the offense as witness or reporting officer. (Authorized by and implementing K.S.A. 2006 Supp. 75-5210; effective May 1, 1980; amended May 1, 1981; amended, T-84-6, May 1, 1983; amended May 1, 1984; amended May 1, 1987; amended April 20, 1992; amended Feb. 15, 2002; amended July 13, 2007.)

**44-13-702**. **Appeal on the record to the warden of the facility in class III offense cases.** (a) In class III offense cases, the inmate shall have a right of appeal to the warden of the facility and shall not have a right of appeal to the secretary of corrections.

(b) The procedure for appeal to the warden of the facility shall be the same as that for appeal to the secretary of corrections in class I and II offense cases.

(c) The same time to answer the appeal shall be provided to the warden as that provided for the secretary of corrections in class I and II offense cases. This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210; effective May 1, 1980; amended, T-83-23, Aug. 11, 1982; amended, T84-6, May 1, 1983; amended May 1, 1984; amended April 20, 1992; amended February 15, 2002.)

**44-13-703. Appeal on the record to secretary of corrections in class I and II offense cases only.** (a) In class I and II offense cases, the inmate shall have the right to appeal on the record to the secretary of corrections from a final decision made by the disciplinary hearing officer, after review of the decision by the warden. If a class III offense is included

among class I or II offenses, the class III offense shall be subject to review by the secretary of corrections. The inmate shall be notified of the right of appeal before or immediately following the warden's review.

(b) The inmate may, on forms provided by the unit team, prepare the inmate's own appeal. The unit team shall ensure that all data necessary to identify and properly log the appeal is provided and forwarded to the disciplinary administrator.

(c) The inmate shall submit the appeal within 15 days of the date of receiving the inmate's copy of the final action.

(d) If the inmate pleads guilty or no contest at the hearing, an appeal of the penalty imposed may be brought, but no appeal of the finding of guilt shall be permitted unless the inmate alleges and shows any of the following:

(1) The inmate was under duress at the time of the plea.

(2) Fraud or substantial error was involved in the inmate's plea of guilty or no contest.

(3) The inmate was not advised of the nature of the hearing and the rights that the inmate would waive by that plea.

(e) The facility's legal counsel may be asked by the secretary to prepare and submit a responsive argument. The responsive argument shall be submitted to the secretary within five calendar days of receipt of the request. The secretary's request for a responsive argument shall not extend the time limits for the secretary's review of the inmate's disciplinary appeal as established in K.A.R. 44-13 704.

(f) Any mistake of law or other clear error may be corrected by the warden at any time before a decision is made by the secretary in any ensuing appeal by the inmate, with the appeal permitted to continue as to any other point still unresolved by the warden's action, as required by K.A.R. 44-13-701. (Authorized by and implementing K.S.A. 2005 Supp. 75-5210; effective May 1, 1980; amended May 1, 1985; amended May 1, 1987; amended April 20, 1992; amended Feb. 15, 2002; amended July 13, 2007.)

### 44-13-704. Secretary of corrections' final review on appeal.

(a) Within 15 working days after an appeal is received, all cases appealed to the secretary shall be reviewed by the secretary or designee. Any of the following actions may be taken by the secretary or designee:

(1) Approve the decision;

(2) reinstate a charge that has been dismissed without a factual finding of guilt or innocence and remand the disciplinary case to the disciplinary administrator for a new hearing;

(3) amend the charge in accordance with K.A.R. 44-13- 202 and remand the disciplinary case to the disciplinary administrator for a new hearing;

(4) disapprove the decision and dismiss the case;

(5) reduce the penalty;

(6) suspend all or part of a sentence for at least 90 and not more than 180 days;

(7) remand the case to the disciplinary administrator and order a new

65

hearing;

(8) remand the case to the disciplinary administrator for clarification of the record and return the case to the secretary for further consideration;

(9) reduce the disciplinary report to a summary judgment and impose one of the following:

(A) Restriction from privileges for not more than 10 days;

(B) a fine not to exceed $10.00;

(C) extra work without incentive pay for not more than two hours each day, not to exceed five days;

(D) work without incentive pay, not to exceed five days. This penalty shall not include a fine and shall apply only to ordinary inmate work assignments; or

(E) restitution of at least $3.00 and not more than $20.00; or

(10) remand the case to the disciplinary administrator with any instructions necessary to ensure compliance with the disciplinary procedure and rules of conduct. The date of receipt shall not be counted. The secretary's decision shall be final. A copy of the written appeal decision shall be given to the inmate within 15 working days following the secretary's decision. If the appeal is denied, the reason for that decision shall be included in the written appeal decision.

(b) The secretary's review shall determine the following:

(1) Whether there was substantial compliance with departmental and facility standards and procedures;

(2) whether the hearing officer's decision was based on some evidence; and

(3) whether, under the circumstances, the penalty imposed was appropriate and proportionate to the offense. (Authorized by and implementing K.S.A. 2006 Supp. 75-5210; effective May 1, 1980; amended May 1, 1981; amended, T-83-23, Aug. 11, 1982; amended, T-84-6, May 1, 1983; amended May 1, 1984; amended May 1, 1985; amended May 1, 1988; amended April 20, 1992; amended Jan. 3, 1995; amended Feb. 15, 2002; amended July 13, 2007.)

**44-13-705**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing
K.S.A. 1990 Supp. 75-5210; effective May 1, 1980; amended April 20, 1992; revoked February 15, 2002.)

**44-13-706**. Administrative review board to review and make recommendations. The administrative segregation review board established under the applicable internal management policy and procedure of the secretary may review the inmates held in disciplinary segregation. This board may, at any time, recommend to the warden or designee that the disciplinary segregation sentence of an inmate be modified to suspend the remaining segregation time based on a finding of the administrative disciplinary segregation review board that the inmate has maintained exceptionally good behavior while in segregation. The remaining segregation

66

time of the inmate's sentence may be suspended by the warden or designee, acting on the recommendation of the administrative segregation review board.

This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210, 75-5251; effective May 1, 1980; amended April 20, 1992; amended February 15, 2002.)

**44-13-707**. Harmless error; plain error. None of the following types of errors shall be grounds for granting a new hearing, for setting aside a finding, or for vacating, modifying or otherwise disturbing a disposition or order, unless refusal to take that action appears to the hearing officer or the reviewing authority inconsistent with substantial justice:

(a) An error in either the admission or exclusion of evidence;

(b) an error or defect in any ruling or order;

(c) an error in anything done or omitted by the hearing officer or by any of the facility officials in processing the disciplinary case; or

(d) an error by the inmate in processing the inmate's defense of the case.

Throughout the disciplinary process, the hearing officer or the reviewing authority shall disregard any error or defect in the proceeding that does not affect the substantial rights of the inmate or the facility.

This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210, 75-5251; effective, T-83-23, Aug. 11, 1982; effective, T-846, May 1, 1983; effective May 1, 1984; amended April 20, 1992; amended February 15, 2002.)

## Article 14.—ADMINISTRATIVE AND DISCIPLINARY SEGREGATION SEGREGATION GENERALLY

**44-14-101**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 1992 Supp. 75-5210, 75-5251, 75-7552; effective May 1, 1980; amended May 1, 1984; amended Dec. 6, 1993; revoked February 15, 2002.)

**44-14-102**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 1992 Supp. 75-5210, 75-5251, 75-7552; effective May 1, 1980; amended May 1, 1984; amended Dec. 6, 1993; revoked February 15, 2002.)

### DISCIPLINARY SEGREGATION

**44-14-201**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 1992 Supp. 75-5251, 75-5252; effective May 1, 1980; amended May 1, 1981; amended Dec. 6, 1993; revoked February 15, 2002.)

**44-14-202**. This revocation shall be effective on and after February 15,

2002. (Authorized by K.S.A. 75-5251, K.S.A. 1979 Supp. 75-5252, 75-5252(c); effective May 1, 1980; revoked February 15, 2002.)

## ADMINISTRATIVE SEGREGATION

**44-14-301**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 1992 Supp. 75-5210, 75-5251, 75-5252; effective May 1, 1980; amended May 1, 1981; amended Dec. 6, 1993; revoked February 15, 2002.)

**44-14-302**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 1993 Supp. 75-5210, 75-5251, 75-5252; effective May 1, 1980; amended May 1, 1981; amended, T-83-23, Aug. 11, 1982; amended, T-84-6, May 1, 1983; amended May 1, 1984; amended Dec. 6, 1993; amended July 11, 1994; revoked February 15, 2002.)

**44-14-303**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 1992 Supp. 75-5210, 75-5251, 75-5252; effective May 1, 1980; amended May 1, 1984; amended May 1, 1985; amended Dec. 6, 1993; revoked February 15, 2002.)

**44-14-304**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5251, K.S.A. 1983 Supp. 75-5210, 75-5252; effective May 1,1980; amended May 1, 1984; revoked February 15, 2002.)

**44-14-305**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 1992 Supp. 75-5210, 75-5251, and 75-5252; effective May 1, 1980; amended May 1, 1984; amended Dec. 6, 1993; revoked February 15, 2002.)

**44-14-305a.** (Authorized by and implementing K.S.A. 755210, 75-5251, 75-5252; effective May 1, 1984; amended May 1, 1986; revoked Dec. 6, 1993.)

**44-14-306**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 1992 Supp. 75-5251, 75-5252; effective May 1, 1980; amended Dec. 6, 1993; revoked February 15, 2002.)

**44-14-307**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 1992 Supp. 75-5251, 75-5252; effective May 1, 1980; amended May 1, 1987; amended Dec. 6, 1993; revoked February 15, 2002.)

**44-14-308**. This revocation shall be effective on and after February 15, 2002. (Authorized by K.S.A. 75-5251, 75-5252; effective May 1, 1980;

amended May 1, 1986; revoked February 15, 2002.)

**44-14-309**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 1992 Supp. 75-5251, 75-5252; effective May 1, 1980; amended Dec. 6, 1993; amended February 15, 2002.)

**44-14-310**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 1992 Supp. 75-5210, 75-5251, 75-5252; effective May 1, 1980; amended, T-83-23, Aug. 11, 1982; amended, T-84-6, May 1, 1983; amended May 1, 1984; amended Dec. 6, 1993; revoked February 15, 2002.)

**44-14-311**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 1992 Supp. 75-5210, 75-5251, 75-5252; effective May 1, 1980; amended May 1, 1984; amended Dec. 6, 1993; revoked February 15, 2002.)

**44-14-312**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5251, K.S.A. 1983 Supp. 75-5210, 75-5252; effective May 1, 1980; amended May 1, 1984; revoked February 15, 2002.

**44-14-313**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5251, K.S.A. 1983 Supp. 75-5210, 75-5252; effective May 1, 1984; revoked February 15, 2002.)

**44-14-314**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 1992 Supp. 75-5210, 75-5251, and 75-5252; effective May 1, 1984; amended Dec. 6, 1993; revoked February 15, 2002.)

**44-14-315**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5251, K.S.A. 1983 Supp. 75-5210, 75-5252; effective May 1, 1984; revoked February 15, 2002.)

**44-14-316**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 1992 Supp. 75-5210, 75-5251, 75-5252; effective May 1, 1984; amended Dec. 6, 1993; revoked February 15, 2002.)

**44-14-317**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210, 75-5251, 75-5252; effective May 1, 1987; revoked February 15, 2002.)

**44-14-318**. This revocation shall be effective on and after February 15,

2002. (Authorized by and implementing K.S.A. 1992 Supp. 75-5210, 75-5251, 75-5252; effective Dec. 6, 1993; amended February 15, 2002.)

## Article 15.—GRIEVANCE PROCEDURE FOR INMATES AND PAROLEES

### PROCEDURES GENERALLY

**44-15-101**. **Inmate or parolee grievance procedure; informal resolution; formal levels.** (a) Throughout this article comprising the grievance procedure, all references to inmates shall include parolees, offenders, or both, supervised on either conditional release or post release supervision unless the meaning is clearly to the contrary. References to parolees shall include offenders supervised on either conditional or post release supervision. References to the warden shall include the parole director. The unit team equivalent shall be the parole officer.

(b) Before utilizing the grievance procedure, the inmate shall be responsible for attempting to reach an informal resolution of the matter with the personnel who work with the inmate on a direct or daily basis. An inmate in a facility or parole setting shall contact the unit team members for the attempt at informal resolution. That attempt shall be documented. The facility's inmate request forms may be used to document this process. If this informal resolution attempt fails, the grievance system may then be used. If an emergency exists and a resolution could not be obtained by going to the unit team, the inmate may go directly into the grievance process.

(c) At each stage, all grievances shall be answered in as short a time as possible to insure that delay will not impose additional hardship upon the inmate or unnecessarily prolong a misunderstanding. Grievances of inmates who have since been transferred, paroled, or discharged shall be answered to the extent possible.

(d) The grievance procedure shall incorporate several levels of problem solving to assure solution at the lowest administrative level possible.

(1) Level 1. The inmate shall first submit the grievance report form to an appropriate unit team member of the facility. The parolee shall first submit the form to the parole officer.

(2) Level 2. The inmate shall then submit the grievance report form to the warden of the facility. The parolee shall then submit the form to the regional parole director.

(3) Level 3. If not resolved, the grievance may be next submitted to the office of the secretary of corrections. Either a response to the grievance or referral of the matter to a deputy secretary of corrections for additional investigation, if necessary, shall be made by the warden. Grievances of inmates may be referred by the secretary to the deputy secretary of corrections for facility management. Grievances of parolees may be referred by the secretary to the deputy secretary of corrections for community and field services management.

70

(e) Inmate grievance report forms and appeal forms shall be made available to all inmates. Grievance forms and appeal forms shall be provided in containers in each inmate living unit and on each segregation wing or tier. The unit team shall assist the inmate in obtaining copies of supporting material necessary to complete the grievance if the number of photocopies requested by the inmate is reasonable.

(f) No staff member shall refuse to sign, date, and return an inmate request form, an inmate grievance form, or a grievance receipt slip showing that the inmate came to that person for assistance.

(g) Each inmate shall be entitled to invoke the grievance procedure. The procedure shall be made accessible to mentally impaired and physically handicapped inmates by the warden. This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210,

K.S.A. 75-5251; effective May 1, 1980; amended May 1, 1984; amended May 1, 1987; amended April 20, 1992; amended February 15, 2002.)

**44-15-101a. Grievance procedure distribution; orientation; applicability; remedies; advisory committee; investigation.** (a) Grievance procedure regulations shall be distributed or made readily available to all employees and inmates in each correctional facility.
(b) Each inmate and employee, upon admittance to or employment by the facility, shall receive an oral explanation of the grievance procedure, including an opportunity to have questions regarding the procedure answered orally. Explanatory materials and the oral presentation shall be available in any language spoken by a significant portion of the facility's population. To the extent feasible, inmates who do not understand English shall receive an explanation of the grievance procedure in a language in which the inmate is fluent. Mentally impaired and physically handicapped inmates shall receive explanations in a manner comprehensible to them. Parole officers shall provide each parolee with a brief grievance procedure orientation that explains the manner in which the system functions for parolees. Following the explanation, each inmate and each parolee shall sign a statement indicating that the required explanation has been given.
(c) All employees of the facility who are directly involved in the operation of the grievance procedure shall receive training in the skills necessary to operate, or participate in, the grievance procedure.
(d) (1) The grievance procedure shall be applicable to a broad range of matters that directly affect the inmate, including the following
(A) Complaints by inmates regarding policies and conditions within the jurisdiction of the facility or the department of corrections; and
(B) actions by employees and inmates, and incidents occurring within the facility.
(2) The grievance procedure shall not be used in any way as a substitute for, or as part of, the inmate disciplinary procedure, the classification decision-making process, or the property loss or personal injury claims

71

procedure, or the procedure for censorship of publications specified in the secretary's internal management policy and procedure.

(e) The remedies available to the inmate may include action by the warden of the facility to correct the problem or action by the secretary of corrections to cause the problem to be corrected. Relief may include an agreement by facility officials to remedy an objectionable condition within a reasonable, specified time, or to change a facility policy or practice.

(f) A procedure shall be established by the warden for investigating the allegations and establishing the facts of each grievance. An inmate or employee who appears to be involved in the matter shall not participate in any capacity in the resolution of the grievance.

(g) A copy of the grievance response at each level shall be delivered to the unit team, to the inmate, and to the warden last responding. (Authorized by and implementing K.S.A. 2005 Supp. 75-5210, K.S.A. 75-5251; effective May 1, 1984; amended May 1, 1985; amended Feb. 15, 2002; amended June 1, 2007.)

**44-15-101b. Time limit for filing grievance.** Grievances shall be filed within 15 days from the date of the discovery of the event giving rise to the grievance, excluding Saturdays, Sundays and holidays. No grievance, regardless of time of discovery, shall be filed later than one year after the event. Any grievance filed later than these deadlines may be returned to the inmate without investigation. The name of the individual returning the grievance, the date of the return, and the reasons for the return shall be noted on the grievance. An inmate may move to the next stage of the grievance procedure if a timely response is not received at any step in the grievance process, unless an extension of time for the response is agreed to in writing by the inmate and staff person answering the grievance. (Authorized by and implementing K.S.A. 75-5210, 75-5251; effective May 1, 1984; amended May 1, 1988.)

**44-15-102. Procedure.** (a) Grievance step one: preliminary requirement; informal resolution and problem solving at unit team level.

(1) Each inmate shall first seek information, advice, or help on any matter from the inmate's unit team, or from a member of the team. If unable to solve the problem, the unit team shall refer the inmate to the proper office or department. The unit team shall assist those inmates who are unable to complete the form themselves.

(2) If an inmate does not receive a response from the unit team within 10 calendar days, a grievance report may be sent to the warden without the unit team signature or signatures. Each grievance report form shall include an explanation of the absence of the signature or signatures.

(b) Grievance step two: complaint to the warden. If any inmate receives a response but does not obtain a satisfactory solution to the problem through the informal resolution process within 10 calendar days, the inmate may fill out an inmate grievance report form and submit it, within three calendar

days after the deadline for informal resolution, to a staff member for transmittal to the warden.

(1) The inmate shall attach a copy of each inmate request form used to attempt to solve the problem and shall indicate on the inmate grievance report the following information:

(A) A specific complaint that states what or who is the subject of the complaint, related dates and places, and what effect the situation, problem, or person is having on the inmate that makes the complaint necessary;

(B) the title and number, if possible, of any order or regulation that could be the subject of the complaint;

(C) the action that the inmate wants the warden to take to solve the problem;

(D) the name and signature of the responsible institution employee or employees or of the parole officer from whom the inmate sought assistance. This signature shall be on either an inmate request form or the grievance report form. The date on which the help was sought shall be entered by the employee on the form; and

(E) the date on which the completed grievance report was delivered to the staff member for transmittal to the office of the warden.

(2) The staff member shall forward the report to the warden before the end of the next working day and shall give a receipt to the inmate.

(3) Warden's response.

(A) (i) Upon receipt of each grievance report form, a serial number shall be assigned by the warden or designee, and the date of receipt shall be indicated on the form by the warden or designee. The nature of the grievance shall be ascertained by the warden or designee.

(ii) Each inmate grievance shall be returned to the inmate, with an answer, within 10 working days from the date of receipt.

(B) Each answer shall contain findings of fact, conclusions drawn, the reasons for those conclusions, and the action taken by the warden. Each answer shall inform the inmate that the inmate may appeal by submitting the appropriate form to the secretary of corrections.

(C) In all cases, the original and one copy of the grievance report shall be returned by the warden to the inmate. The copy shall be retained by the inmate for the inmate's files. The original may be used for appeal to the secretary if the inmate desires. The necessary copies shall be provided by the warden.

(D) A second copy shall be retained by the warden.

(E) Each facility shall maintain a file on grievance reports indexed by inmate name and subject matter. Grievance report forms shall not be placed in the inmate's institution file.

(F) Any grievance report form may be rejected by the warden if the form does not document any unit team action as required for the preliminary informal resolution process. The grievance report form shall then be sent back to the unit team for an immediate answer to the inmate.

(G) If no response is received from the warden in the time allowed, any

73

grievance may be sent by an inmate to the secretary of corrections with an explanation of the reason for the delay.

(c) Grievance step three: appeal to the secretary of corrections.

(1) If the warden's answer is not satisfactory, the inmate may appeal to the secretary's office by indicating on the grievance appeal form exactly what the inmate is displeased with and what action the inmate believes the secretary should take. The inmate's appeal shall be made within three calendar days of receipt of the warden's decision, or within three calendar days of the deadline for that decision, whichever is earlier.

(2) The appeal shall then be sent directly and promptly by U.S. mail to the department of corrections central office in Topeka.

(3) When an appeal of the warden's decision is made to the secretary, the secretary shall then have 20 working days from receipt to return the grievance report form to the inmate with an answer. The answer shall include findings of fact, conclusions made, and actions taken.

(4) If a grievance report form is submitted to the secretary without prior action by the warden, the form may be returned to the warden. If the warden did not respond in a timely manner, the form shall be accepted by the secretary.

(5) An appropriate official may be designated by the secretary to prepare the answer.

(d) General provisions: page limits; partial responses; repetitive filings.

(1) At each step of the grievance procedure, the total number of pages of inmate grievance text shall not exceed 10 pages. Text appearing on the front and back of a page shall count as two pages. Any page of text beyond 10 pages shall not be considered when determining the merits of the grievance.

(2) Responding to parts of grievances that are procedurally or substantively appropriate shall not constitute a waiver of defects with the remaining parts of the grievance that are not procedurally or substantively appropriate.

(3) No offender shall abuse the grievance system by repeatedly filing the same complaint.

(A) Each offender who has been identified as being abusive of the grievance system by filing the same complaint on more than one occasion shall be notified in writing of this finding by the warden or secretary's designee responsible for responding to inmate grievance appeals who receives the repeated filing.

(i) The notification shall be given at the time of the repeated filing.

(ii) The repeated filing shall be returned to the offender with the notification but without further substantive response.

(iii) The notification shall contain reference to the matter of which the grievance is repetitive.

(B) If, following this notification, an offender continues to file the same complaint, the warden or secretary's designee may make application to the secretary to impose sanctions to remedy the abuse.

(C) Upon the finding by the secretary of an abusive filing, a fee of not more than five dollars may be imposed on the offender.

(D) Any application for sanctions submitted to the secretary by a warden or secretary's designee for consideration may be referred by the secretary to a designee other than a person responsible for responding to grievance or grievance appeals.

(Authorized by and implementing K.S.A. 75-5210, K.S.A. 755251; effective May 1, 1980; amended May 1, 1984; amended May 1, 1985; amended May 1, 1988; amended April 20, 1992; amended Feb. 15, 2002; amended June 1, 2007.)

### 44-15-103. Reserved.

**44-15-104. Reprisals prohibited**. (a) Inmates. No adverse action shall be taken against any inmate for use of the grievance procedure unless the inmate uses the grievance procedure for any of the following purposes:

(1) To communicate a threat to another person or to the security of the facility;

(2) to make a complaint knowing that it is false, malicious, or made in bad faith; or

(3) to commit any unlawful act.

(b) Employees. No adverse action shall be taken against any employee for good faith participation in the grievance procedure. Employees shall be entitled to grieve reprisals for participation in inmate grievance systems by use of the department of corrections' employee grievance system.

(Authorized by and implementing K.S.A. 2005 Supp. 75-5210, K.S.A. 75-5251; effective May 1, 1984; amended June 1, 2007.)

**44-15-105. Records.** (a) Nature. Records regarding the filing and disposition of grievances shall be collected and maintained systematically by the correctional facility. These records shall be preserved for at least three years following final disposition of the grievance. These records shall include aggregate information regarding the numbers, types and dispositions of grievances, as well as individual records of the date of and the reasons for each disposition at each stage of the procedure. The logs and records shall be in a form and manner prescribed by secretary of corrections policy and procedure. (b) Confidentiality. Records regarding the participation of an individual in grievance proceedings shall be considered confidential and shall be handled under the same procedures used to protect other confidential case records. Consistent with ensuring confidentiality, members of the staff who are participating in the disposition of a grievance shall have access to records essential to the resolution of the grievance. This, however, shall not permit review of inmate files by other inmates. Grievance report forms shall not be placed in the inmate's departmental file. (Authorized by and implementing

K.S.A. 75-5251, K.S.A.1983 Supp. 75-5210, 75-5210(F); effective May 1,

1984.)

**44-15-105a. Annual Review.** The records regarding the filing and disposition of grievances shall be reviewed annually by the secretary of corrections to determine the effectiveness and credibility of the grievance process. The review shall include an analysis of the types of grievances received, the types and levels of disposition, and any complaints that have been received about the grievance procedure itself. The review shall also include solicitation and consideration of employee and inmate comments on the effectiveness and credibility of the grievance procedure. The secretary of corrections may designate an appropriate deputy secretary of corrections to conduct the review. (Authorized by and implementing K.S.A. 1991 Supp. 75-5210, 75-5251; effective April 20, 1992.)

**44-15-106. Emergency procedure.** "Emergency grievances" shall mean those grievances for which disposition according to the regular time limits would subject the inmate to a substantial risk of personal injury, or cause other serious and irreparable harm to the inmate. In emergency situations the inmate may bypass the prerequisite of informal resolution if going to the unit team would not obtain a solution to the problem. The inmate shall indicate on the face of the grievance form the nature of the emergency and shall write the word "emergency" at the top of the grievance report form. Emergency grievances shall be forwarded immediately, without substantive review, to the level at which corrective action can be taken. Emergency grievances shall be expedited at every level. The same external review provisions that apply to regular grievances shall apply to emergency grieva If the person at the corrective action level determines that the grievance is not an emergency, that fact shall be included on the grievance form and the form shall be signed by the person who made that determination. The grievance may then be processed from that point on as a regular grievance. If necessary for a proper response the grievance may be sent for processing at a lower level. (Authorized by and implementing K.S.A. 75-5251, K.S.A.1983 Supp. 75-5210, 75-5210(f); effective May 1, 1984.)

## SPECIAL PROCEDURES

**44-15-201**. **Special kinds of problems.** (a) If an inmate wants to bring a problem to the attention of a higher authority without going through the grievance procedure, the inmate may address as official mail a sealed letter or grievance report form to the warden of the facility, the secretary of corrections, or the state pardon attorney. However, these letters or grievance report forms should be reserved for the most difficult and complex problems. Generally, any matter that can be internally handled under the inmate grievance procedure shall not be considered as appropriate for the use of the official mail correspondence privilege.

(b) Any department of corrections or facility official who receives a

complaint letter may return it to the inmate with instructions to the inmate to make use of and follow the proper grievance procedure if; in the opinion of the official, the matter is appropriate for handling through the grievance procedure. This amendment shall be effective on and after February 15, 2002.
(Authorized by and implementing K.S.A. 75-5251, K.S.A. 75-5210; effective May 1, 1980; amended February 15, 2002.)

**44-15-202.** (Authorized by K.S.A. 75-5251, K.S.A.1979 Supp. 75-5210, 75-5210(f); effective May 1, 1980; revoked May 1, 1984.)

**44-15-203. Ombudsman.** The department of corrections grievance procedure is provided for its inmates and parolees, and shall not in any way replace any other complaint system provided by the state ombudsman for corrections. The functions of the ombudsman for corrections are described in writing and made available to inmates. (Authorized by and implementing K.S.A. 75-5210, 75-5251; effective May 1, 1980; amended May 1, 1987.)

**44-15-204. Special procedures for sexual abuse grievances; sexual harassment grievances and grievances alleging retaliation for filing same; reports of sexual abuse or sexual harassment submitted by third parties**. (a) Definitions. For the purpose of this regulation, each of the following terms shall have the meaning specified in this subsection:
(1) "Sexual abuse of an inmate by another inmate" means any of the following acts if the victim does not consent, is coerced into the act by overt or implied threats of violence, or is unable to consent or refuse:
(A) Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;
(B) contact between the mouth and the penis, vulva, or anus;
(C) penetration of the anal or genital opening of another person, however slight, by a hand, finger, or object; or
(D) any other intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or the buttocks of another person, excluding contact incidental to a physical altercation.
(2) "Sexual abuse of an inmate by a staff member, contractor, or volunteer" means any of the following acts, with or without the consent of the inmate:
(A) Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;
(B) contact between the mouth and the penis, vulva, or anus;
(C) contact between the mouth and any body part if the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;
(D) penetration of the anal or genital opening, however slight, by a hand, finger, or object, that is unrelated to official duties or if the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

(E) any other intentional contact, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh, or the buttocks, that is unrelated to official duties or if the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

(F) any attempt, threat, or request by a staff member, contractor, or volunteer to engage in the acts described in paragraphs (a)(2)(A)-(E);

(G) any display by a staff member, contractor, or volunteer of that individual's uncovered genitalia, buttocks, or breast in the presence of an inmate; or

(H) voyeurism by a staff member, contractor, or volunteer.

(3) "Voyeurism by a staff member, contractor, or volunteer" means an invasion of privacy of an inmate by staff for reasons unrelated to official duties, including peering at an inmate who is using a toilet in the inmate's cell to perform bodily functions; requiring an inmate to expose the inmate's buttocks, genitals, or breasts; or taking images of all or part of an inmate's naked body or of an inmate performing bodily functions.

(4) "Sexual harassment" means either of the following:

(A) Repeated and unwelcome sexual advances, requests for sexual favors, or verbal comments, gestures, or actions of a derogatory or offensive sexual nature by one inmate directed to another; or

(B) repeated verbal comments or gestures of a sexual nature to an inmate by a staff member, contractor, or volunteer, including demeaning references to gender, sexually suggestive or derogatory comments about body or clothing, or obscene language or gestures.

(b) Submission of grievances concerning sexual abuse.

(1) Each inmate submitting a grievance concerning sexual abuse alleged to have already occurred shall state that inmate's intentions by writing "Sexual Abuse Grievance" clearly on the grievance form.

(2) Inmates shall not be required to use any informal grievance process, or to otherwise attempt to resolve with staff, an alleged incident of sexual abuse by a staff member, contractor, or volunteer, or a grievance in which it is alleged that sexual abuse by another inmate or by a staff member, contractor, or volunteer was the result of staff neglect or violation of responsibilities.

(3) Any inmate may submit a grievance to security staff, a unit team member, or administrative personnel in person or by utilizing the inmate internal mail system.

(4) Any inmate who alleges sexual abuse may submit a grievance without submitting it to a staff member who is the subject of the complaint. The grievance shall not be referred to a staff member who is the subject of the complaint.

(c) Warden's response.

(1) Upon receipt of each grievance report form alleging sexual abuse, a serial number shall be assigned by the warden or designee, and the date of receipt shall be indicated on the form by the warden or designee.

(2) Each grievance alleging sexual abuse shall be returned to the inmate,

with an answer, within 10 working days from the date of receipt.

(3) Each answer shall contain findings of fact, conclusions drawn, the reasons for those conclusions, and the action taken by the warden. Each answer shall inform the inmate that the inmate may appeal by submitting the appropriate form to the secretary of corrections.

(4) In all cases, the original and one copy of the grievance report shall be returned by the warden to the inmate. The copy shall be retained by the inmate for the inmate's files. The original may be used for appeal to the secretary if the inmate desires. The necessary copies shall be provided by the warden.

(5) A second copy shall be retained by the warden.

(6) Each facility shall maintain a file for grievance reports alleging sexual abuse, with each grievance report indexed by inmate name and coded as a sexual abuse complaint. Grievance report forms shall not be placed in the inmate's institution file.

(7) If no response is received from the warden in the time allowed, any grievance may be sent by an inmate to the secretary of corrections with an explanation of the reason for the delay, if known, with a notation that no response from the warden was received.

(d) Appeal to the secretary of corrections.

(1) If the warden's answer is not satisfactory to the inmate, the inmate may appeal to the secretary's office by indicating on the grievance appeal form exactly what the inmate is displeased with and what action the inmate believes the secretary should take.

(2) The inmate shall send the appeal directly and promptly by U.S. mail to the department of corrections' central office in Topeka.

(3) If an appeal of the warden's decision is made to the secretary, the secretary shall have 20 working days from receipt to return the grievance report form to the inmate with an answer. The answer shall include findings of fact, conclusions made, and actions taken.

(4) If a grievance report form is submitted to the secretary without prior action by the warden, the form may be returned to the warden for further action, at the option of the secretary's designee.

(5) In all cases, a final decision on the merits of any portion of a grievance alleging sexual abuse, or an appeal thereof, shall be issued by the secretary within 90 days of the initial filing of the grievance.

(6) Computation of the 90-day time period shall not include time taken by inmates in preparing and submitting any administrative appeal.

(7) At any level of the administrative process, including the final level, if the inmate does not receive a response within the time allotted for reply, including any properly noticed extension, the inmate may consider the absence of a response to be a denial at that level and may proceed to the next level of appeal.

(8) An appropriate official may be designated by the secretary to prepare the answer.

(e) Imminent sexual abuse.

(1) Each inmate submitting a grievance concerning imminent sexual abuse shall state that inmate's intentions by writing "Emergency Sexual Abuse Grievance" clearly on the grievance form.

(2) Each grievance alleging that an inmate is subject to a substantial risk of imminent sexual abuse shall be treated as an emergency grievance under K.A.R. 44-15-106.

(3) After receiving an emergency grievance alleging imminent sexual abuse, the warden or designee shall provide an initial response within 48 hours and shall issue a final decision within five calendar days. The initial response and final decision shall document the determination whether the inmate is in substantial risk of imminent sexual abuse and the action taken in response to the emergency grievance.

(f) Submission of grievances concerning sexual harassment or concerning retaliation for submission of a report or grievance concerning sexual abuse or harassment.

(1) Each inmate shall be required to use the informal grievance process specified in K.A.R. 44-15-101 and 44-15-102 for grievances concerning sexual harassment or concerning retaliation for submission of a report or grievance concerning sexual abuse or harassment. These grievances shall otherwise be treated and processed according to the ordinary grievance procedure specified in K.A.R. 44-15-101 and 44-15-102.

(2) Any inmate who alleges sexual harassment or retaliation may submit a grievance without submitting it to a staff member who is the subject of the complaint. The grievance shall not be referred to a staff member who is the subject of the complaint.

(3) Each facility shall maintain a file for grievance reports alleging sexual harassment or retaliation for submission of a report or grievance alleging sexual abuse or harassment, with each grievance report indexed by inmate name and coded accordingly. No grievance report form shall be placed in the inmate's institution file.

(g) Time limits.

(1) There shall be no time limit for submission of a grievance regarding an allegation of sexual abuse.

(2) The time limits for any grievance or portion thereof that does not allege an incident of sexual abuse or imminent sexual abuse shall be the limits specified in K.A.R. 44-15-101b.

(h) Third-party submissions.

(1) Third parties, including fellow inmates, staff members, family members, attorneys, and outside advocates, shall be permitted to assist any inmate in filing requests for administrative remedies relating to allegations of sexual abuse and shall also be permitted to file these requests on behalf of any inmate.

(2) If a third party files such a request on behalf of an inmate, the alleged victim shall agree to have the request filed on behalf of the alleged victim. The alleged victim shall personally pursue any subsequent steps in the administrative remedy process.

80

(3) If the inmate declines to have the request processed on that individual's behalf, the facility shall document the inmate's decision.

(i) Grievances in bad faith. Any inmate may be disciplined for filing a grievance related to alleged sexual abuse only if it can be demonstrated that the inmate filed the grievance in bad faith. In this instance, a disciplinary report alleging violation of K.A.R. 44-12-303 or 44-12-317, as appropriate, may be issued. (Authorized by and implementing K.S.A. 2012 Supp. 75-5210 and 75-5251; effective, T-44-6-28-13, June 28, 2013; effective Sept. 27, 2013.)

## Article 16.—REPORTING AND CLAIMS PROCEDURE FOR LOST OR DAMAGED PROPERTY OR FOR PERSONAL INJURY

### 44-16-101. Reserved.

### 44-16-102. Reporting loss or damage to property.
(a) Each inmate shall report every loss of or damage to the inmate's own property immediately. In reporting property damage or loss, inmates shall use applicable avenues of redress as established by internal management policies and procedures. These procedures shall be strictly followed.

(b) The facility warden shall not be required to accept any property loss or damage claim unless it is made within 15 working days of the discovery of the loss. The warden shall not be required to accept any claim at all if both of the following conditions are met:

(1) The claim is submitted later than one year and one day after the date of the loss, regardless of when the loss was discovered.

(2) The inmate could have discovered the loss by exercising reasonable effort to know the status of the inmate's property and money. This amendment shall be effective on and after February 15, 2002. (Authorized by K.S.A. 75-5251; implementing K.S.A. 46-920, 75-5254, 75-5255, 75-5257, 75-5210; effective May 1, 1980; amended May 1, 1984; amended February 15, 2002.)

**44-16-103**. This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 46-920, as amended by L. 1988,-Ch. 183, Sec. 1, K.S.A. 755210, 75-5251, 75-5254, 75-5257; effective May 1, 1980; amended May 1, 1984; amended, Jan. 2, 1989; revoked February 15, 2002.)

**44-16-104.** This revocation shall be effective on and after February 15, 2002. (Authorized by K.S.A. 1990 Supp. 75-5210,
K.S.A. 75-5251; implementing K.S.A. 1990 Supp. 46-920, 755254, 75-5257; effective May 1, 1980; amended May 1, 1984; amended, Jan. 2, 1989; amended April 20, 1992; revoked February 15, 2002.)

81

**44-16-104a. Inmate claims for personal injury.** (a) Each inmate claim for personal injury shall be submitted to the facility and secretary of corrections within 10 calendar days of the claimed personal injury.

(b) Each claim described in subsection (a) shall be submitted and processed in accord with the department of corrections' internal management policies and procedures.

(c) The requirement that the inmate submit the claim as described in subsection (a) shall apply whether or not the inmate pursues a grievance pursuant to article 15 and whether or not the inmate files a claim with the legislative joint committee on special claims against the state.

(Authorized by K.S.A. 75-5251; implementing K.S.A. 75-52,138; effective June 1, 2007.)

**44-16-105. Property at own risk.** An inmate shall be deemed to own personal property at the inmate's own risk. Loss or damage of personal property shall not provide a basis for recovery on a claim unless the loss or damage directly resulted from the intentional or negligent act or omission of a correctional employee and was reported according to applicable internal management policies and procedures.

This amendment shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5210; effective May 1, 1980; amended May 1, 1984; amended February 15, 2002.)

**44-16-106.** This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 75-5251, K.S.A. 1979 Supp. 75-5252; effective May 1, 1980; revoked February 15, 2002.)

**44-16-107.** This revocation shall be effective on and after February 15, 2002. (Authorized by K.S.A. 1983 Supp. 75-5210, 75-5251; implementing K.S.A. 1983 Supp. 75-5210, 46-920, 75-5251, 75-5254, 75-5257; effective May 1, 1984; revoked February 15, 2002.)

**44-16-108.** This revocation shall be effective on and after February 15, 2002. (Authorized by and implementing K.S.A. 46-920, as amended by L. 1988, -Ch. 183, Sec. 1, K.S.A. 755210, 75-5251, 75-5254, 75-5257; effective May 1, 1980; effective May 1, 1984; amended Jan. 2, 1989; revoked February 15, 2002.)

Exhibit 2

# Grievance-Response on Appeal

**FACILITY:**      **Lansing Correctional Facility**

**INMATE:**        **0052888 BASKIN, BENTON**

**GRIEVANCE NO.:**  AA20160406

**DATE:**          **June 28, 2016**

## FINDINGS OF FACT

The response provided to the inmate by staff at the facility is incorporated herein by reference and made part of this response.

On appeal, the inmate offers no evidence or argument that suggests that the response rendered by staff at the facility is wrong.

## CONCLUSIONS MADE

The response rendered to the inmate by staff at the facility is appropriate.

## ACTION TAKEN

None further.

**Douglas W. Burris**
**SECRETARY OF CORRECTIONS DESIGNEE**

cc:    Warden Cline
       Image: SOCRESP w/attachments

The original response on appeal and all attached documents were mailed to the inmate by way of United States Mail on _____.

## APPEAL OF GRIEVANCE TO SECRETARY OF CORRECTIONS

Inmate Name: Benton G. Baskin                    Facility: L.C.F Medium

Inmate Number: 0052888                    Grievance Serial No. AA20160406

(Attach grievance report with Principal Administrator's response or explanation why Principal Administrator is bypassed.)

MAIL TO:    Secretary of Corrections            Date Mailed: June 23, 2016
            Landon State Office Building
            900 Jackson, 4th Floor
            Topeka, Kansas 66612

Tell the Secretary what you feel the Principal Administrator should have done, and state what action you believe the Secretary should take. (Use extra paper as needed.)   The Principal Administrator should have awarded Inmate Baskin's Good Time back to the original Available Good Time Credits for the Award Period of 07/07/2014 To 12/07/2015 in the amount of (89) days, and Restoring the (42) days Good Time Withheld For the Dismissed (Battery,Incitement of Riot, and Failure to Complies) , [SEE ATTACHMENT]                    Signature of Inmate _Benton G. Baskin_

---

**DECISION BY SECRETARY OF CORRECTIONS** (to be completed and returned within 20 days)

If applicable - Confidential File No. _____

Date Received in Office of Secretary of Corrections: _____

Date of Final Answer: _____        Date Sent to Inmate: _____

Finding of Fact:

Conclusions Made:

*RECEIVED*
*JUN 2 8 2016*
*DOC Facility Management Area*

Action Taken:

_____
Signature of Secretary of Corrections

---

**For D.O.C. Staff Use Only**

Type of Response (Item 6b: Code    Ø1,   Ø2,   Ø8   or   Ø9)    ___ ___

DC Ø9Ø, Effective May 1, 1988

P-157a

APPEAL OF GRIEVANCE TO SECRETARY OF CORRECTIONS
ATTACHMENT SHEET


[See Unit Team Work Sheet] - (42) days of Good Time Withheld for the
Mentioned Infractions, which were dismissed and documented by J.
Anderson CC2 and placed onto the Inmate Imaging File, [See Grievance].

Inmate Baskin's Good Time Award Credits were forfeited outside of the
Statutory and Regulatory Scheme, this is a Substantive Due Process
Violation, which violates Baskin's Liberty Interest Clause of the (14th)
Fourteenth Amendment of the U.S. Constitution.

Honorable Judge Terry L. Pullman, Commenced - Sentencing Disposition
of Inmate Baskin on 10/23/2015, and Remanded Inmate Baskin to the
Kansas Department of Corrections, and Awarded Mr. Baskin (473) days
Jail Credit. Mr. Baskin was not in K.D.O.C Custody when the alleged
Disciplinary Reports were written, sanctioned and dispositioned.
Honorable Judge Terry L. Pullman was well aware of the Disciplinary
Infractions received prior to the sentencing of Inmate Baskin and did
not Withhold any of the Jail Credit earned From 07/07/2014 To 10/23/2015.

Withholding of Good Time Award after 10/23/2015, would be correct, as
Inmate Baskin was at that time in K.D.O.C, Custody and Jurisdicition.
K.A.R 44-6-115a has been Manipulated outside of it's scope to withhold
Good Time in Inmate Baskin's case.

Inmate Baskin was Transported and Housed at El dorado Receiving and
Discharge Unit on 11/16/2015, and Transfered to Lansing Correctional
Facility-Max on 12/15/2015, Mr. Baskin has maintained a Job Assignment
and has been Disciplinary Report Free 11/16/2015 To June 23, 2016.

Your prompt attention in regard to the above matters will be greatly
appreciated.

Sincerely,

Benton G. Baskin # 52888
Grievant

*NOT An Emergency EMERGENCY !*   Received
05/04/16

## KANSAS DEPARTMENT OF CORRECTIONS INMATE GRIEVANCE FORM

MAY - 4 2016

### INMATE COMPLAINT

Inmate's Name __Benton G. Baskin__    Q-200    Number __52888__    Warden's Office - LCF

Facility __L.C.F. Medium__    Housing Unit __K-Unit 410-U__    Work Detail __Office Porter__

---

**NATURE OF COMPLAINT** BE SPECIFIC. (Include names, dates, places, rules, regulation, etc.; how you have been affected and action you believe the Warden should take.) Use additional paper if necessary. ATTACH DOCUMEN-TATION OF ATTEMPTS AT INFORMAL RESOLUTION PRIOR TO FILING THIS FORMAL GRIEVANCE (i.e. Form 9s or other correspondence and response from staff member).    CC I Anderson / UTM Parker

February 12, 2016, L.C.F. Max B-2 Cell House, <u>GOOD TIME AWARD WITHHELD</u>.
CC I Anderson received Certified Documentation of the Dismissed Disciplinary Reports Affecting my Custody and Good Time Award, From the Sedgwick County Detention Facility. The Documentation was placed into the Inmate Imaging File. I asked CC I Anderson for a Copy of the Documentation. CC I Anderson's reply was: "No, due to the nature that it was addressed

Date this report was given to Unit Team for informal resolution (to be completed by inmate). _____

SEE ATTACHMENT >> >>>>>

---

I have investigated your concerns outlined in the attached grievance. K.A.R 44-6-115 states: "At the conclusion of the initial inmate classification, 100% of the good time credits available from the sentence begin date to the date of the initial good time award shall be awarded, unless there is written documentation of maladjustment before the date of the initial award." While you were in the county jail, you were written up 7 times for several infractions,    which were noted on your initial Good Time award, 11/4/14 - Failure to comply(disobeying orders); 7/21/15 - Failure to comply (disobeying orders), 10/20/15 Failure to comply (disobeying orders). Each of these infractions placed you on 72 hour lockdown. Additionally K.A.R. 44-6-115 states that between 10% to 100% of Good Time can be withheld for maladaptive behavior / disciplinary actions. CCII Anderson was appropriate in withholding 42 of the possible 89 days of Good Time for your maladaptive behavior while in the county jail (the Battery was dismissed; the Riot included Failure to comply).

_____    2-15-16
Unit Team Signature    Date

---

**INMATE RESPONSE** (Complete and return to Unit Team within 3 calendar days)

_____ I am satisfied with the Unit Team response and wish to withdraw my formal grievance.

___✓__ I am not satisfied with the Unit Team response, and wish to forward to the Warden's office. (This must be done within 3 calendar days.) Date forwarded to Warden's Office (to be completed by staff). _6/16/16_

_Bent G B_    6-16-16
Inmate Signature    Date

---

**WARDEN RESPONSE** (Complete, attach response and return within 10 Working days.)

Date Received __JUN 2 0 2016__  Date of Final Answer __JUN 2 0 2016__  Date Returned to Inmate _____

_____    CCI Schmidt    6/21/16
Inmate's Signature    Date    Unit Team Signature    Date

If dissatisfied with this response, the inmate may appeal to the Secretary of Corrections within three (3) calendar days of receipt of this decision from the Warden.

---

### TO BE COMPLETED BY STAFF ONLY

Grievance Serial Number _____ __AA 20160406__

Type of Complaint (Item 4: Code 01-75) _____ __04__

Cause of Complaint (Item 5: Code 01-30) _____ __03__

Type of Response (Item 6a: Code 01,02,08 or 09) _____ __01__

**Form 9**
For Cellhouse Transfer
Work Assignment     Interview Request
Interview Requests

BASKIN
_____
Last Name Only

### KANSAS DEPARTMENT OF CORRECTIONS

52888
_____
**Number**

### INMATE REQUEST TO STAFF MEMBER

To:   Classification             Date:   March 01, 2016

(Name and Title of Officer or Department)

State completely but briefly the problem on which you desire assistance. (Be specific.)

RE: Formal resolution per IMPP, in regard to restoring Good Time
Award of 42 days which were illegally taken. I would greatly appreciate
if this illegal action could be corrected before proceeding to the
next phase. Your prompt attention in regard to this matter will be
greatly appreciated

Work Assignment:   UAA       Living Unit Assignment:   Q-2 227

Comment: _____ Detail or C.H. Officer:   CSI _____

Disposition: _____

To: _____ Date: _____
(Name & Number)

Disposition: _We can take good time for negative behavior and_
_you were documented with negative behavior at county_
_jail which is why good time was taken_

Employee's Signature

P-0009

**To be returned to inmate.**

# Good Time Award Record

(Unit Team Work Sheet)

## Lansing Correctional Facility

Inmate Name: <u>Baskin, Benton</u>    Inmate Number: <u>52888</u>

Record Type: <u>Initial</u>   Record #: <u>1</u>    Award Date <u>12-17-15</u>

Award Period: From <u>07.-07-2014</u>    To: <u>12-07-2015</u>
(Except for the "I"nitial and Final "R"egular Award, All Good Time Award Periods must be for 120 days).

Type of Award: <u>SB: 14</u>
(If the inmate is serving active concurrent sentences good time awards, withholdings and forfeitures may need to be created for each sentence).
**************************************************************************************************

Available Good Time Credits for the Award Period...............................<u>89</u> days.

Good Time Credits Awarded................................................ <u>47</u> days.

Good Time Withheld................................................... <u>42</u> days.

Disciplinary Convictions during Review Period: (to list multiple DR's, press enter after each DR entry)
11/4/14 SGCO 304 Disobeying Orders Class 1, 11/17/14 SGCO 324 Battery Class 1, 8/21/15 SGCO 319
Inciting a Riot Class 1, 10/20/15 SGCO 304 Disobeying Orders Class 1

Program Refusal/Termination: <u>N/A</u> (program/refusal date) _____.
Work-Related Termination: <u>N/A</u> (DR #/date) _____.

Good Time Forfeited: ...............................................................<u>0</u> days.
Disciplinary Case #s: (to list multiple DR's, press enter after each DR entry)

**************************************************************************************************

| | | | |
|---|---|---|---|
| ERD/PE on this portion of the sentence: | <u>2049/5/13</u> | LRD/PE on this portion of the sentence: | <u>2055/7/7</u> |
| Projected release date from previous award: | <u>2049/5/13</u> | Current release date from previous award: | <u>2055/7/7</u> |
| Plus the number of days forfeited during this period: | <u>0</u> | Plus the number of days forfeited during this period: | <u>0</u> |
| Plus the number of days withheld during this period: | <u>42</u> | Minus the number of days awarded during the period: | <u>47</u> |
| Minus program credit awarded: | <u>N/A</u> | Minus program Credit awarded: | <u>N/A</u> |
| New projected release date: | <u>2049/6/25</u> | New current release date: | <u>2055/5/20</u> |

Good time remaining to earn: <u>2125</u> days
**************************************************************************************************

<u>J Anderson CC2</u>
_____
(Staff member awarding good time and date)

_____
(Reviewer signature and date)

_____
(Warden's Designee and date)

_____
(Records Clerk/Designee/Date)

Rev. 2/09

P.O. Box 2
301 East Kansas Ave.
Lansing, KS 66043

# Kansas
### Department of Corrections
*Lansing Correctional Facility*

Phone:  (913) 727-3235
Fax:  (913) 727-2672
www.doc.ks.gov/facilities/lcf

Joe Norwood, Secretary
Sam Cline, Warden

Sam Brownback, Governor

**DATE:**    June 20, 2016

**TO:**    Benton Baskin #52888

**FROM:**    Sam Cline, Warden

**SUBJECT:**    **Grievance # AA20160406**

**Findings of Fact:**  Your grievance was received and an investigation into your allegations has been completed.

**Conclusions Made:**   After an investigation by the Grievance Officer, and a complete review of the applicable documentation, it was determined the response provided by Unit Team Manager Wagner is appropriate regarding your issues.

Your good time has been calculated correctly in accordance with K.A.R. 44-6-115a.

**Action Taken:**    No further action is deemed necessary.

**Pursuant to K.A.R. 44-15-102 (3) (B), you may appeal this answer by submitting the appropriate form to the Secretary of Corrections by mail.**

SC: CBR/cr

Cc: File

## EMERGENCY GRIEVANCE ATTACHMENT

>>CONT. to me. " CC I Anderson then stated: " Be patient and you will be transferred to the Medium Security Facility. " " You did what was required to Correct your Custody when you corresponded with the Sedgwick County Detention Facility, and in return the Authority sent the necessary Documentation.

On February 17, 2016, I received a notification in the mail regarding a Income Wage Withholding order, i noticed that my Good Time Award was changed from 05/13/2049 to 06/25/2049. I addressed the issue with CC I Anderson. Mr. Anderson states: " Your Custody has been corrected, you're no longer my problem. " " Discuss it with your Unit Team Counselor in C-2. "

On February 22, 2016, I was transferred to L.C.F. Medium Security Facility, and Housed in Q-2 Bunk# 227. I discussed the Good Time Award Withheld with CC I Blaney, He contacted CC I Anderson and Confirmed that the Documentation was in my Imaging File.

On March 06, 2016, I was transfered to K-Unit. I then discussed the above mentioned matter with CC I Howlett. March 01, 2016 i submitted an INMATE REQUEST TO STAFF MEMBER to Classification, per IMPP FORMAL RESOLUT- ION.

CC I Howlett stated that he would contact CC I Anderson in regard to my Good Time Award Withheld, and get it squared away.

On April 13, 2016, During Count time, CC I Howlett stated in the presence of Cell mate Gordon Martis # 72615, that i would receive the Good Time Withheld, and further stated: " They have to give your Good Time back because the Documentation is in your Imaging File. " " I'll E-Mail Mr. Anderson and you should be good. "

On April 20, 2016, I inquired with CC I Howlett about the status of my Good Time Award being restored. CC I Howlett states: " I'll send Mr. Anderson another E-Mail. " " Mr. Baskin, you will get your Good Time Back, it's just a matter of when. " " I've done my part. "

## EMERGENCY GRIEVANCE ATTACHMENT

A few days elapsed, and upon passing CC I Howlett in route to the Law Library. CC I Howlett states: " I talked to Mr. Anderson at the meeting we just had, and so your Good Time should be restored.

On April 28, 2016, At approximately 8:10 a.m. I entered CC I Howlett's Office to refresh his memory of the status of my Good Time Award being restored. CC I Howlett checked his computer and then stated: " I don't understand why it hasn't been done yet! "  " I just spoke to Mr. Anderson and he said he would take care of it. "  " Give me a minute and i will find out what his deal is.

I then departed from CC I Howlett's Office and walked in route to the Law Library.

Approximately (40) Minutes later i was approached by Corrections Officer Watkins and directed back to the Housing Unit to report to see Unit Team.

Upon arrival CC I Howlett asked me if i had a Copy of the Documentation verifying the Dismissal of the Disciplinary Reports received from Sedgwick County Detention Facility. My reply was respectfully " No. "
I then stated: " You stated that Necessary Documented Information is in the Inmate Imaging File. "  " I explained to you previously that i had not a Copy in my Possession, because as you stated it is in the Inmate Imaging File. "

CC I Howlett then began to raise his voice in an Aggressive and Argument- ative fashion exhibiting a Confrontational and hostile behavior when i stated that i would Grievance the issue of my Good Time Award Withheld. CC I Howlett states: " I'm done with it! "  " I don't care if you get it back! "  " I'll let Anderson deal with it! "

CC I Howlett states out of anger spell my name right!

Inmate Eric Wilkins # 105845 is a witness to the above statements made by CC I Howlett.

I then went to Unit Team Manager Latzke's Office and began to explain the situation to her. UTM Latzke then called CC I Howlett to her Office and

(2)

## EMERGENCY GRIEVANCE ATTACHMENT

He continued in a tirade about trying to explain and question Mr. Baskin about having a copy of the documentation of the Dismissed Disciplinary Reports, he kept interrupting me, so i made him leave my office! I don't even let my kids interrupt me.

CC I Howlett continues to state: " I don't care if he gets it back! " " It's Anderson's problem! "

Unit Team Manager states: " I don't support you receiving the Good Time Award being withheld back! "

I then promptly and respectfully removed myself from CC I Howlett and Unit Team Manager Latzke's presence.

I ask that the E-Mails transmitted between CC I Howlett and CC I Anderson be reviewed for validity and verification that the Documentation proving the Disciplinary Reports received while in Sedgwick County Detention Facility  were Dismissed and placed onto the Inmate Baskin's Imaging File.

Misleading and False Information is a Violation of the IMPP SECTION NUMBER 02-118 D CODE OF ETHICS and shall be dealt with in accordance with it's policy.

This Grievance is not in any means a substitute for Disciplinary Action against the Correctional Counselors or Unit Team Managers. It is; However, A means to prompt the Authorities to make the necessary adjustments and Award the Withheld Good Time Award back to Inmate Baskin.

Inmate Baskin's Good Time Award Credits were forfeited outside the Statutory and Regulatory Scheme, this is a Substantive Due Process Violation which violates the Inmate's Liberty Interest Clause of the 14th Amendment of the U.S. Constitution.

Mr. Baskin was not in K.D.O.C Custody when the allege Disciplinary Reports were written and sanctioned or dispositioned. Withholding of Good Time Award Credits Poses Double Jeopardy. Inmate Baskin has been Disciplinary Free 11/16/2015 thru May 02, 2016 and has a Good Institutional Record

(3)

## EMERGENCY GRIEVANCE ATTACHMENT

Also has maintained a Good Work Performance.

The Disciplinary Reports written on Inmate Baskin while in the Sedgwick
County Detention Facility were Dismissed prior to Mr. Baskin being
Remanded to the Kansas Department of Corrections on November 16, 2015.

### PLEASE CONTACT

**1st Shift Lieutenant Milan** @ Sedgwick County Detention Facility (316)-660-
0883 or (316)-660-0886, He presided over the Battery D.R. Occuring on
11/19/2014, The Disposition: Not Guilty - Dismissed.

**2nd Shift Lieutenant Taylor** @ Sedgwick County Detention Facility (316)-660-
0883 or (316)-660-0886, He presided over the Incitement of Riot D.R.
The D.R. was Grievanced through the Facility Grievance Procedure.
After reviewing the Witnesses corroboration and reviewing the Pod's
Surveillance Equipment on 07/21/2015, LT. Taylor ruled in my favor and
Pod Deputy Killian was reassigned to another post in the Detention Facility.

On 10/20/2015 Failure to Comply D.R. was Grieved and Ruled in my favor due
to a number of Inmates Witnessing the Incident and the Surveillance Equipment
captured me Complying. No Physical Force was Required to place me into
the Housing Cell, No Officers or Sergeants had to respond.

I ask that the above mentioned Lieutenants be contacted in order to clarify
the Validity of the Dismissal, as Documentation had already been sent to
Unit Team J. Anderson upon my Request.

Mr. Anderson CC I had in his possession the Certified Documentation of the
Dismissed Disciplinary Reports, from the Sedgwick County Detention Facility
Authority.

Your prompt attention in regard to the above mentioned matter will be
greatly appreciated.

Respectively submitted,

Benton G. Baskin # 52888
Grievant                        (4)

**Exhibit H**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **BENTON GENE BASKIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 23-3212-JAR-ADM** |
| | ) | |
| **TODD THOMAS,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## DECLARATION OF VICKIE HENNES

I, Vickie Hennes, being of lawful age, make the following declaration pursuant to 28 U.S.C. § 1746 relating to the captioned matter based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment.

1. I served as a Public Service Executive, Facilities Management Administrator for the Kansas Department of Corrections (KDOC) from March 2020 up and to the date of my resignation on February 16, 2024.

2. I previously served as a Corrections Manager for KDOC from at least December 2011 to March 2020.

3. I worked for KDOC for twenty years.

4. As part of my job duties, I had access to inmate grievance records.

5. In November 2023, I searched KDOC's records and did not find any grievances filed by Baskin while he was at Saguaro Correctional Center.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on February _28_, 2024.

Vickie Hennes
Public Service Executive, Facilities Management Administrator
Kansas Department of Corrections

2