## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **BENTON GENE BASKIN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case. No. 23-3212-JAR-ADM** |
| ) | |
| **TODD THOMAS,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |
| ———————————————————) | |

## MOTION FOR SUMMARY JUDGMENT

Defendants Armen Gaboian and Javier Diaz (the "KDOC Defendants") respectfully

request, through Assistant Attorney General Matthew L. Shoger, that this Court grant summary

judgment in their favor pursuant to Fed. R. Civ. P. 56. The KDOC Defendants attach ten new

exhibits, outlined in the table below, and state the following in support.

### INDEX OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| A | KASPER Information Sheet |
| B | Declaration of Armen Gaboian |
| C | Declaration of Javier Diaz |
| D | Declaration of Pat Douglas |
| E | Declaration of Joel Hrabe |
| F | Declaration of Doug Burris |
| G | Declaration of Melissa Waldock |
| H | *[Removed]*[1] |
| I | **(Sealed)** Declaration of Dr. Harold Stopp DO |
| J | **(Sealed)** IMPP 12-110A<br>*all versions in effect since: April 23, 2019* |

---

[1] Plaintiff's deposition, which occurred on April 12, 2024 – the same day as the deadline for this motion – placed some additional matters into dispute. Accordingly, comparing this Motion to Doc. 66-1, the KDOC Defendants have removed one exhibit, some paragraphs from their statement of materials facts, and one argument section. To expedite these adjustments in light of the same-day deadline for this Motion, some removed items have simply been marked with *[Removed]* to avoid renumbering other items and the consequent need to adjust many citations.

**NATURE OF THE CASE**

Plaintiff Benton Gene Baskin – currently incarcerated at Hutchinson Correctional Facility (HCF) – alleges that on October 23, 2019 – while being transported from HCF to Saguaro Correctional Center (SCC) in Arizona – his restraints were put on him too tightly, damaging his wrists and preventing him from consuming part of a meal. He alleges that the actions of Gaboian in placing restraints on him and the actions of Gaboian and Diaz in not adjusting his restraints constitute cruel and unusual punishment in violation of the Eighth Amendment.

Baskin filed his Complaint (Doc. 1) on November 8, 2021, in the United States District Court for the District of Arizona. On screening under the Prison Litigation Reform Act, the court dismissed Counts I (regarding medical care) and III (regarding deliberate indifference) along with four defendants (three Arizona defendants and the HCF warden) on October 4, 2022. (Doc. 14 at 3, 14; *see also* Doc. 1 at 5, 7, 23.). Although the court dismissed Count III regarding deliberate indifference, the court described the remaining claims under Count II as follows:

> Plaintiff sufficiently alleges facts to support that Defendants Giaboian, Diaz, and Westbrook acted with deliberate indifference to a threat to Plaintiff's safety by repeatedly failing to adjust Plaintiff's restraints, particularly the failure to adjust his wrist restraints for hours.

(Doc. 14 at 14[2]; *see also* Doc 1 at 7, 22.) As discussed herein, many cases analyzing an alleged failure to loosen handcuffs do so under the framework of excessive force. So the remaining claims after screening are for Eighth Amendment violations (either deliberate indifference or excessive force) by Gaboian, Diaz, and Westbrook for not adjusting Baskin's restraints.

In September 2023, the District of Arizona, ruling on motions to dismiss or transfer by

---

[2] Although the District of Arizona referred to an alleged collective failure to adjust Baskin's wrist restraints "for hours," the Complaint has not alleged that Defendant Gaboian interacted with Baskin for more than a few minutes. (*See* Doc. 1 at ¶¶ 20-21.)

the remaining defendants, transferred the case to the District of Kansas because the District of Arizona lacked personal jurisdiction and venue over the case. (Docs. 40, 50–52.) Before transferring, the court denied the KDOC Defendants' motion to dismiss – which had raised failure to exhaust administrative remedies as a defense – along with the KDOC Defendants' motion to reconsider, but did so without prejudice to defendants raising an exhaustion defense at a later stage. (Doc. 40 at 16-19; Doc. 50 at 6 ("KDOC Defendants will have the opportunity to litigate this issue . . . and the District of Kansas, which has personal jurisdiction over Defendants, is an appropriate forum to consider their arguments").) The KDOC Defendants now file their motion for summary judgment.

Baskin's medical records show no injuries beyond bruises, blisters, and abrasions on his wrists. (Sealed Exhibit I.) KDOC policy and safety-and-security reasons prohibited Defendant Diaz from entering the rear cabin of the transport bus while inmates were being transported. (Exhibit C at ¶¶ 17-19; *see also* Sealed Exhibit J at 10-11, 29-30, 48-49.) Before and after each leg of the transport, Baskin's restraints were checked or adjusted by the appropriate officers. (Exhibit B at ¶¶ 3-9, 13; Doc. 1 at ¶¶ 21, 30-32; Exhibit D at ¶¶ 7-8; Exhibit C at ¶¶ 20, 25.)

The KDOC Defendants are entitled to summary judgment due to Eleventh Amendment immunity, § 1983 not supporting individual-capacity injunctive or declaratory relief, lack of constitutional standing for injunctive or declaratory relief, and failure to establish an Eighth Amendment violation. Baskin has failed to establish an Eighth Amendment violation in light of qualified immunity due to: the KDOC Defendants' actions not violating clearly established law, Baskin experiencing no more than de minimis injuries, lack of a serious medical need, and the KDOC Defendants not having a sufficiently culpable state of mind. Alternatively, Baskin is not entitled to punitive damages due to lack of the requisite subjective intent.

## STATEMENT OF MATERIAL FACTS AS TO WHICH
## NO GENUINE ISSUE EXISTS

1. On or around October 23, 2019, Baskin was housed at Hutchinson Correctional Facility (HCF). (Exhibit A at 4; Doc. 1 at ¶¶ 17-18.)

### *Admissions and Discharge at HCF*

2. On or around October 23, 2019, Defendant Gaboian, a corrections officer at HCF, helped prepare a group of inmates at HCF to travel to Saguaro Correctional Center (SCC), a private prison facility in Arizona. (Exhibit B at ¶¶ 1, 10; Exhibit D at ¶ 5; *see also* Doc. 1 at ¶¶ 17-18, 59.)

3. Gaboian was assigned to the Special Security Team at HCF and his responsibilities included preparing inmates for transportation in and out of the facility. (Exhibit B at ¶ 2.)

4. Defendant Gaboian assisted in the Admissions and Discharge section of HCF, where he and other officers placed restraints on the inmates heading to the Arizona facility from HCF. (Exhibit B at ¶ 11; Exhibit C at ¶ 7.)

5. Gaboian placed many restraints on inmates that day and does not recall whether he placed restraints on Baskin. (Exhibit B at ¶ 12.)

6. Per Baskin's statement, Gaboian was the officer that placed restraints on Baskin that day. (Doc. 1 at ¶¶ 20-21.)[3]

7. As part of Gaboian's duties as a corrections officer on the Special Security Team, Gaboian routinely placed belly irons and leg irons on inmates in their preparation for transport. (Exhibit B at ¶ 3.)

8. *[Removed]*

---

[3] Some facts are undisputed for the limited purpose of this motion for summary judgment.

9.  Gaboian always made sure belly irons or leg irons were properly secured for the individual and created a routine to check their security to ensure they were done correctly every time. This was influenced by his experience in the military, which required safety checks and procedures for every task. (Exhibit B at ¶ 4-8, 12.)

10. Gaboian's safety check and procedure included attempting to put one of his fingers between the handcuffs and the inmate's wrist. Gaboian did this to check the tightness of the handcuffs on the inmate, allowing for up to an inch gap. Once completed, Gaboian would double lock the cuff so it would not tighten. (Exhibit B at ¶ 5.)

11. *[Removed]*

12. *[Removed]*

13. *[Removed]*

14. Gaboian would only place handcuffs on an inmate tightly if circumstances demanded it, such as when he needed to quickly get someone out of a fight or when an inmate became violent or belligerent. (Exhibit B at ¶ 9.)

15. Gaboian followed his usual procedure of checking for a one-finger gap when placing handcuffs on each inmate transported that day. (Exhibit B at ¶ 13; *see also* Doc. 1 at ¶ 21.)

16. If an inmate had requested medical treatment, Gaboian would have referred the inmate to medical immediately. (Exhibit B at ¶ 14.)

### *Bus Transport*

17. The inmates were then escorted to a bus where Defendant Diaz, a Corrections Officer at HCF, was waiting as the driver. (Exhibit C at ¶¶ 2, 6-8.)

18. The front cabin of the bus was separated from the rear cabin of the bus by a partition with a window in it. (Exhibit C at ¶ 9.)

19. In the front cabin of the bus, Diaz sat in the driver's seat and another officer sat in the passenger seat of the bus as Diaz's partner. (Exhibit C at ¶ 10.)

20. The inmates sat in the rear cabin of the bus behind the partition. (Exhibit C at ¶ 11.)

21. Diaz and the other officer could communicate with the inmates in the rear cabin through the window between the cabins. (Exhibit C at ¶ 12.)

22. Once inmates were on the bus, at least one of the two officers would have stayed with the bus at all times. (Exhibit C at ¶ 13.)

23. KDOC often provided sack lunches to inmates when transporting them between facilities if they would otherwise miss a meal. (Exhibit C at ¶ 14; *see also* Sealed Exhibit J at 6, 26, 44-45.)

24. Diaz does not recall providing sack lunches to inmates on that particular day. (Exhibit C at ¶ 15; *see also id.* at ¶ 5.)

25. Per Baskin's statement, he was provided with a "sack lunch" for breakfast that day. (Doc. 1 at ¶¶ 20, 23, 38, 42.)

26. Diaz was not aware of any complaints by the inmates until the inmates were loaded onto the transport bus and the bus started pulling away from HCF. At that point, Diaz recalls that Baskin started to complain about his handcuffs being too tight. (Exhibit C at ¶ 16; *see also* Doc. 1 at ¶ 22 (Baskin had boarded and was seated on the transport bus when he complained to Diaz about his restraints).)

27. Under strict KDOC policy, which Diaz had been trained on, once the bus had started moving, the officers conducting the transport were not permitted to enter the rear cabin. This policy exists to ensure safety and security. For example, a complaint about tight restraints could be a ploy to set up an ambush on officers, which could then potentially

allow inmates to escape. (Exhibit C at ¶ 17; *see also* Sealed Exhibit J at 10-11, 29-30, 48-49.)

28. For security reasons, the inmates being transported did not know long in advance, if at all in advance, that they were heading to Arizona. (Exhibit C at ¶ 18.)

29. Diaz knew from training and experience that inmates often did not like the change of moving to a different facility, especially when it is unexpected or sudden. For these reasons, Diaz believed some inmates were likely upset about going to Arizona. (Exhibit C at ¶ 18.)

30. In light of this, in addition to the strict KDOC policies prohibiting entering the rear cabin, knowing that inmates were likely upset about the transport gave Diaz an additional reason to believe, in light of his training and experience, that entering the rear cabin was inadvisable. (Exhibit C at ¶ 19.)

31. The proper officers to adjust handcuffs prior to transport would have been the team of officers who applied them in the secure environment of A&D. (Exhibit C at ¶ 20.)

32. Accordingly, Diaz asked Baskin why he had not raised the handcuffs issue earlier while he was in A&D. (Exhibit C at ¶ 20; *see also* Doc. 1 at ¶ 22.)

33. Diaz did not hear Baskin give any response. (Exhibit C at ¶ 21.)

34. Diaz does not recall taking the inmates to El Dorado Correctional Facility (EDCF) that day. (Exhibit C at ¶ 22; *see also id.* at ¶ 5.)

35. Per Baskin's statement, the transport bus stopped at EDCF, where the inmates disembarked and entered EDCF. (Doc. 1 at ¶ 28.)

36. Baskin's handcuffs were adjusted by Officer Reau at EDCF. (Doc. 1 at ¶¶ 30-32.)

37. Officer Reau concluded that the handcuffs were too small even at their loosest setting –

not that they were adjusted too tightly. (Doc. 1 at ¶ 31.)

38. Officer Reau notified some other personnel at EDCF of the condition of Baskin's wrists and arms. (Doc. 1 at ¶ 32.)

39. Baskin received a medical evaluation at EDCF from a medical provider. Baskin was told there was nothing that the medical provider or EDCF personnel could do. (Doc. 1 at ¶¶ 32-34.)

40. The inmates then re-boarded the bus, which then continued on to the airport in Salina. (Doc. 1 at ¶¶ 35-36, 38.)

41. Diaz drove the transport bus that transported the inmates to the airport in Salina. (Exhibit C at ¶ 23; *see also* Doc. 1 at ¶ 36.)

42. After the bus departed, Baskin complained to Diaz about his restraints. (Doc. 1 at ¶¶ 36-37.)

43. At the airport, Diaz remained in the bus as other KDOC officers escorted the inmates from the bus. (Exhibit C at ¶ 24.)

### *Flight to Arizona*

44. Pat Douglas has served as the Security and Emergency Manager for the Kansas Department of Corrections (KDOC) since July 2016. (Exhibit D at ¶¶ 1-4.)

45. Douglas was the coordinator for KDOC's operations and logistics for transportation to the airport, site security, and inmate movement to the airplane. (Exhibit D at ¶ 6.)

46. Once the airplane was loaded, Douglas observed the airplane transport by TransCor America (TCA). TCA was the third-party private security firm conducting the air transport. Douglas was on the flight as a "contract monitor" on behalf of KDOC to monitor the transport, to talk with the inmates, and to ensure that inmates had answers to their questions. (Exhibit D at ¶ 7.)

47. TCA checked all restraints prior to boarding, changed some, and handled all restraint and movement on the trip. (Exhibit D at ¶ 8; Exhibit C at ¶ 25.)

48. Douglas did not have a key to the inmates' restraints. (Exhibit D at ¶ 9.)

49. The restraints included belly chains and a pair of handcuffs attached at the front of the belly chain. (Exhibit D at ¶ 10.)

50. A rigid "black box" handcuff cover was placed in the middle of the handcuffs to prevent lock-picking. (Exhibit D at ¶¶ 11-12, 16.)

51. For the flight, the inmates were secured in groups of three by TCA, with chains connecting the restraints of each trio in a line. (Exhibit D at ¶¶ 13-14.)

52. The seating on the plane was in rows of six, divided by a central aisle into half-rows of three. Each trio of connected inmates sat in a half-row with the other inmates in that trio and were connected to each other at the sides with a plastic restraint by TCA. (Exhibit D at ¶¶ 15-16.)

53. The armrests on the plane happened to pull on the restraint between some inmates, causing the restraint to restrict movement more. (Exhibit D at ¶ 17.)

54. TCA adjusted some restraints during the flight. (Exhibit D at ¶ 18.)

55. Douglas received some complaints from inmates near him on the flight regarding the tightness of their restraints. Douglas personally asked TCA staff to check those inmates' restraints. (Exhibit D at ¶ 19.)

56. Douglas remembers that several inmates who had come in on one particular bus (not from the Hutchinson or El Dorado Correctional Facilities) had their restraints placed incorrectly, and TCA staff had to adjust those restraints. (Exhibit D at ¶ 20.)

57. When they eventually arrived at SCC, all inmates received a medical intake check.

(Exhibit D at ¶ 25; Sealed Exhibit I at ¶¶ 4-5, pgs. 4-8.)

58. Douglas did not personally check all of the inmates' restraints. (Exhibit D at ¶ 26.)

59. Douglas does not recall if he observed Baskin's handcuffs being too tight on the flight to Arizona or at any other time that day. (Exhibit D at ¶ 26.)

### *Saguaro Correctional Center*

60. From October 23, 2019 to December 2020, KDOC housed about 120 inmates, including Baskin, out of state in SCC. (Exhibit D at ¶ 27; Exhibit E at ¶ 5; Exhibit F at ¶ 5; Exhibit G at ¶ 6.)

61. Although these inmates were housed temporarily in SCC, their home facility remained the facility they were at prior to being transferred to SCC. For examples, these inmates had some of their property kept at their respective home facilities. (Exhibit E at ¶ 6.)

62. Although Baskin was housed in SCC, his home facility remained as HCF. (Exhibit E at ¶ 7.)

### *Baskin's Allegations of Injury*

63. Baskin complains that the handcuffs:

    a.  caused him pain (Doc. 1 at ¶¶ 22, 24-26, 35, 40-41, 48, 50, 54-56, 58, 89, 96, 99, 107);

    b.  caused him anxiety (Doc. 1 at ¶ 33);

    c.  caused redness of his wrists (Doc. 1 at ¶¶ 31);

    d.  caused swelling of his wrists (Doc. 1 at ¶¶ 24, 26, 28-29, 31, 34, 37, 40, 44, 48, 51, 54-55, 61-62, 66, 98, 100);

    e.  caused blisters on his wrists (Doc. 1 at ¶¶ 62, 64);

    f.  "cut into" his wrists (Doc. 1 at ¶¶ 22, 24, 34); and

    g.  cut his wrists and caused some bleeding (Doc. 1 at ¶¶ 48, 62, 65-66, 100).

64. Baskin complains that the tightness of his restraints made him unable to eat a portion of his breakfast "sack lunch." (Doc. 1 at ¶¶ 20, 23, 38, 42.)

65. But Baskin says a TCA employee adjusted Baskin's restraints so he *was* able to eat a sack lunch provided to him for lunch. (Doc. 1 at ¶ 53.)

***Medical Records***

66. On October 23, 2019, Baskin's medical record shows that during his initial intake screening by a Registered Nurse (RN) at Saguaro Correctional Center (SCC), Baskin reported that he was not experiencing any pain. (Sealed Exhibit I at ¶ 4, pg. 5.)

67. Baskin also reported during that screening that he did not have any special health care needs or current medical complaints. (Sealed Exhibit I at ¶ 4, pg. 5.)

68. Baskin did report that he had bruises and "blisters on wrist," which the RN noted. (Sealed Exhibit I at ¶ 5, pg. 6.)

69. On November 15, 2019, Baskin's medical record shows that he had abrasions on both wrists. The abrasion on his right wrist measured 4 cm x 1 cm. The abrasion on his left wrist measured 3 cm x 1 cm. (Sealed Exhibit I at ¶ 6, pgs. 11-13.)

70. The RN who documented the abrasions noted they were "clean" and "well healing wounds." (Sealed Exhibit I at ¶ 7, pg. 13; *see also* Doc. 1 at ¶¶ 66, 102.)

71. Baskin reported to the RN, "When I was transferred over here the cuffs cut my wrists. I would like it documented." (Sealed Exhibit I at ¶ 8, pg. 12.)

72. The RN instructed the patient to keep the wound clean and dry and to notify medical if the condition worsened in any way. (Sealed Exhibit I at ¶ 9, pgs. 10, 14.)

73. On March 31, 2020, an RN documented "no injuries noted" during a pre-segregation health evaluation of Baskin. (Sealed Exhibit I at ¶ 10, pg. 19.)

74. On October 13, 2020, an Advanced Practice Nurse (APN) conducted a periodic appraisal

of Baskin's health. (Sealed Exhibit I at ¶ 11, pgs. 22-26.)

75. In a box labelled "Present Complaints: Describe any current symptoms or complaints," the APN noted an elevated blood pressure but did not note any complaints by Baskin regarding his wrists. (Sealed Exhibit I at ¶ 12, pg. 22.)

76. The APN found Baskin's upper extremities – which includes the arms, forearms, wrists, and hands – to be within normal limits, without any abnormal findings. (Sealed Exhibit I at ¶ 13, pg. 24.)

77. The APN did not find any lesions (a term that includes wounds such as cuts, abrasions, bruises, or scabs) on Baskin's extremities. (Sealed Exhibit I at ¶ 14, pg. 25.)

## QUESTIONS PRESENTED

I.   Does the Eleventh Amendment bar Baskin's § 1983 claims against the KDOC Defendants in their official capacities?

II.  Are the individual-capacity claims under § 1983 for injunctive and declaratory relief effectively official-capacity claims that are barred under the Eleventh Amendment?

III. Does Baskin fail to establish constitutional standing for his claims for prospective and declaratory relief when he does not allege an ongoing injury?

IV.  Are the KDOC Defendants entitled to qualified immunity when their actions did not violate clearly established law of which reasonable state officials would have known?

V.   Does Baskin fail to establish an Eighth Amendment violation when he experienced no more than de minimis injuries, has not demonstrated a serious medical need, and the KDOC Defendants did not have a sufficiently culpable state of mind?

VI.  Alternatively, should partial summary judgment be granted regarding punitive damages when Baskin cannot show the requisite subjective intent?

## ARGUMENTS AND AUTHORITIES

### *Summary Judgment Standard*

Summary judgment is appropriate when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018). The court views the evidence and draws all reasonable inferences in a light most favorable to the nonmoving party. *Id.* "[W]hile courts must construe pro se pleadings liberally, pro se plaintiffs may not rely on conclusory allegations to overcome their burden." *Hastings v. Campbell*, 47 F. App'x 559, 560 (10th Cir. 2002) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)). Facts must be shown through affidavits, deposition transcripts, or incorporated exhibits. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

> [T]he mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a genuine issue or dispute of material fact. [citation omitted] To create a genuine issue, the nonmovant must present facts upon which a reasonable jury could find in favor of the nonmovant.

*Sinclair Wyo. Refin. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 765 (10th Cir. 2021).

### *Qualified Immunity Standard*

Qualified immunity protects from civil liability government officials whose actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). When a defendant raises the qualified immunity defense, it creates a presumption that the defendant is immune from suit. *Janny v. Gamez*, 8 F.4th 883, 913 (10th Cir. 2021). To overcome this presumption, the burden shifts to the plaintiff to show (1) the defendant's alleged conduct violated a federal statutory or constitutional right, and (2) that right was clearly established at the time of the alleged violation. *Id.* "The court has discretion to decide which of the two prongs of the qualified-immunity analysis to address first." *Grissom v. Roberts*, 902 F.3d 1162, 1167 (10th Cir.

2018) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). The clearly-established right must be clear from applicable case law, *Colbruno v. Kessler*, 928 F.3d 1155, 1161 (10th Cir. 2019), and must be defined with specificity, *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019).

   **I.    The Eleventh Amendment bars Baskin's § 1983 claims against the KDOC Defendants in their official capacities.**

   "The Eleventh Amendment bars suits in federal court against a nonconsenting state brought by the state's own citizens." *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1212 (10th Cir. 2019) (citing *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974)). "This immunity extends to arms of the state and to state officials who are sued for damages in their official capacity." *Id.* As such, employees of KDOC share the state's immunity from suits against them in their official capacities for money damages or declaratory relief. *See White v. Colorado*, 82 F.3d 364, 366 (10th Cir. 1996). Because of the presumption that statutes do not abrogate this immunity, state agencies do not even count as "persons" amenable to suit under § 1983, and neither do state officials sued in their official capacities for monetary damages or declaratory relief. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 & n.10 (1989).

   A narrow exception to sovereign immunity allows a plaintiff to seek prospective injunctive relief against a state official for ongoing violations of federal law. *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012) (citing *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). But the Eleventh Amendment bars claims for "retrospective declaratory relief" against state officials. *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1232 (10th Cir. 2004). "Once effectively asserted, Eleventh Amendment immunity constitutes a bar to the exercise of federal subject matter jurisdiction." *Williams*, 928 F.3d at 1212.

   Here, Baskin requests monetary damages in the form of compensatory and punitive damages (Doc. 1 at ¶¶ 114, 116), which are barred by the Eleventh Amendment as asserted

14

against the KDOC Defendants in their official capacities.[4] Baskin further requests a retrospective declaratory judgment stating that the KDOC Defendants violated his constitutional rights. (Doc. 1 at ¶ 112.) This too is barred by the Eleventh Amendment. And although Baskin requests prospective injunctive relief against the KDOC Defendants (Doc. 1 at ¶ 113), he does not allege an *ongoing* violation of federal law. He only alleges *past, completed* violations, so his request for injunctive relief is not exempt from Eleventh Amendment immunity. *See Johnston v. Prairie View, Inc.*, No. 19-2041-HLT, 2020 WL 1984287, at *3 (D. Kan. Apr. 27, 2020) (saying the "ongoing violation" requirement relates to constitutional standing to invoke the exception). Therefore, Baskin's claims against the KDOC Defendants in their official capacities should be dismissed for lack of subject-matter jurisdiction due to Eleventh Amendment immunity.

## II.  Claims for injunctive and declaratory relief under § 1983 cannot be brought against a defendant in their individual capacity.

Claims for declaratory or injunctive relief against government officials, even if phrased as individual capacity claims, are effectively official capacity claims because "plaintiff seeks to change the behavior of the governmental entity." *DeVargas v. Mason & Hanger-Silas Mason Co.*, 844 F.2d 714, 718 (10th Cir. 1988). Accordingly, under § 1983, which necessarily involves actions under the color of state law, "a plaintiff cannot sue an official in their individual capacity for injunctive or declaratory relief." *Chilcoat v. San Juan Cnty.*, 41 F.4th 1196, 1214 (10th Cir. 2022), *cert. denied*, 143 S. Ct. 1748 (2023).[5] Here, Baskin cannot bring claims under § 1983 for

---

[4] Baskin's complaint seeks "Compensatory damages against defendant Thomas only" (Doc. 1 at ¶ 115), and defendant Thomas has been dismissed from the case (Doc. 14 at 14). But to the extent the Court interprets Baskin's complaint as making damages claims against Defendants Gaboian and Diaz, Eleventh Amendment immunity bars damages claims against them.

[5] *But see Idaho v. Couer d'Alene Tribe of Idaho*, 521 U.S. 261, 269 (1997) (in dicta, describing the *Ex Parte Young* exception as applying to "suits seeking declaratory and injunctive relief against state officers in their individual capacities").

declaratory and injunctive relief against the KDOC Defendants in their individual capacities. Those claims are effectively official capacity claims and should be dismissed for lack of subject matter jurisdiction due to Eleventh Amendment immunity as discussed in the previous section.

III.   **Baskin also fails to establish constitutional standing for his claims for injunctive and declaratory relief because of lack of an ongoing injury.**

Article III of the Constitution requires standing to bring a claim. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). The "irreducible constitutional minimum of standing" contains a triad of three requirements: injury in fact, causation, and redressability. *Id.* at 102-03. This triad "constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Id.* at 103-04. And "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

A.   **Baskins fails to establish an injury in fact for his claims for injunctive relief.**

"The 'injury in fact' requirement differs depending on whether the plaintiff seeks prospective or retrospective relief." *Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1211 (10th Cir. 2014). To recover damages, a form of retroactive relief, it suffices to demonstrate a past harm that is concrete and particularized. *See Tandy v. City of Wichita*, 380 F.3d 1277, 1284, 1290 n.16 (10th Cir. 2004). But "[w]hen prospective relief—such as an injunction—is sought, the plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future." *Colorado Cross*, 765 F.3d at 1211. Here, Baskin only alleges past injuries. So he does not have standing to request injunctive relief.

B.   **Baskin fails to establish redressability for his claims for declaratory relief.**

Redressability is established when the relief sought serves to either reimburse the plaintiff for losses or to eliminate lingering effects of losses. *See Steel Co.*, 523 U.S. at 105-06. "Relief

that does not remedy the injury suffered" does not count. *Id.* at 107. Accordingly, standing to request declaratory relief requires an ongoing injury. *See Barney v. Pulsipher*, 143 F.3d 1299, 1306 n.3 (10th Cir. 1998) ("A plaintiff cannot maintain a declaratory or injunctive action unless he or she can demonstrate a good chance of being likewise injured in the future."). Here, declaratory relief would not remedy any of the past, completed harms alleged in the complaint, so Baskin lacks standing to request declaratory relief due to lack of redressability.

**C.   Alternatively, Baskin's claim for injunctive and declaratory relief is moot.**

In the alternative, Baskin's requested injunctive and declaratory relief is moot due to lack of an ongoing injury. *See Arizonans for Off. Eng. v. Arizona,* 520 U.S. 43, 67 (1997) ("an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed"); *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1224 (10th Cir. 2009) (saying that "a declaratory or injunctive action" becomes moot when the plaintiff can no longer "demonstrate a good chance of being likewise injured by the defendant in the future").

**IV.   Baskin's Eighth Amendment claim fails because of qualified immunity, no more than de minimis injuries, no serious medical need, and lack of a culpable state of mind.**

**A.   Failing to loosen handcuffs or to switch handcuffs to large-sized handcuffs does not violate clearly established law.**

Defendants are entitled to qualified immunity because there was no clearly established law within this Circuit, or a robust consensus of cases outside of it, that their alleged actions violated clearly established law, particularized to the facts of this case. Specifically, Baskin has not shown any law that put Defendants on notice that failing to loosen handcuffs or failing to switch an inmate's handcuffs to large-sized handcuffs violates the Eighth Amendment. Indeed, "the Tenth Circuit has recently held . . . that a failure to loosen handcuffs or to use regular-sized handcuffs on an inmate who may need large-sized handcuffs does not violate the Eighth

Amendment." *Grissom v. Bell*, No. 20-3163-JWB, 2022 WL 4534620, at *8 (D. Kan. Sept. 28, 2022) (citing *Grissom v. Palm*, No. 21-3194, 2022 WL 3571410, at *7 (10th Cir. Aug. 19, 2022)). "[T]he Tenth Circuit has held that while loosening tight handcuffs may be the most compassionate action, the failure to do so does not rise to a clearly established constitutional violation." *Palmer v. Unified Gov't of Wyandotte Cnty./Kan. City*, 72 F. Supp. 2d 1237, 1248 (D. Kan. 1999) (quoting *Morreale v. City of Cripple Creek*, 113 F.3d 1246 (table opinion), 1997 WL 290976, *5 n.10 (10th Cir. May 27, 1997)). Therefore, qualified immunity applies and the Court should grant summary judgment to the KDOC Defendants.

   **B.  Baskin has not suffered more than a de minimis injury.**

   The District of Arizona described the claims remaining in the case as alleging deliberate indifference because of repeated failure to adjust Baskin's restraints. But most cases involving a failure to loosen handcuffs analyze the alleged failure under the framework of excessive force. This may be because most of those cases are brought against the person who applied the restraints – that is, the person who applied the allegedly excessive force. Here, two of the remaining defendants (Diaz and Westbrook) did not apply any force to Baskin at all, so a deliberate indifference framework may possibly be more appropriate for those defendants. Defendant Gaboian, however, applied the handcuffs to Baskin, so excessive force appears to be the appropriate framework to analyze Baskin's claims against at least Gaboian.

   The Eighth Amendment protects inmates from "cruel and unusual punishments." U.S. Const. amend. VIII. The primary concern of the drafters was to outlaw torture and other barbarous methods of punishment. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). "After incarceration, only the 'unnecessary and wanton infliction of pain' constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). To prevail on his Eighth Amendment excessive force claim, Baskin must allege and prove both

an objective and a subjective element. *Grissom v. Palm*, No. 21-3194, 2022 WL 3571410, at *4 (10th Cir. Aug. 19, 2022) (citing *Redmond v. Crowther*, 882 F.3d 927, 936 (10th Cir. 2018)).

For the objective component, Baskin must show that "the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Id*. Not every allegedly malevolent touch by a prison guard gives rise to a federal cause of action. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id*. at 37-38.

For handcuffing cases where the handcuffing itself is permissible (as is common in the arrest and correctional contexts), "[a]n excessive force claim based on tight handcuffs requires the plaintiff to show some actual injury that is not de minimis." *Watkins v. Wunderlich*, No. 22-1358, 2023 WL 4145904, at *12 (10th Cir. June 23, 2023); *Koch v. City of Del City*, 660 F.3d 1228, 1247-48 (10th Cir. 2011); *see also Wilkins*, 559 U.S. at 37 (saying the extent of injuries is related to the extent and reasonableness of force). The Tenth Circuit has "rejected minor, temporary injuries – like pain, numbness, or swelling – as de minimis in handcuff-related excessive-force cases." *Scott v. City of Albuquerque*, 711 F. App'x 871, 881 (10th Cir. 2017). Indeed, federal courts have found no constitutional violation from minor injuries such as:

- blisters,[6]

- bruises,[7]

---

[6] *Booth v. City of Jackson*, No. 3:21-CV-763, 2022 WL 1164414, at *3 (S.D. Miss. April 19, 2022).

[7] *Ellsworth v. City of Broken Arrow*, 850 F. App'x 619, 627 n.9 (10th Cir. 2021) (citing *Donahue v. Wihongi*, 948 F.3d 1177, 1196 (10th Cir. 2020)) (saying a plaintiff "sustained only minor abrasions or bruises, which is insufficient as a matter of law"); *Winter v. Mansfield*, No. 21-3171, 2022 WL 3652464, at *10 to *11 (10th Cir. Aug. 25, 2022); *City of Albuquerque*, 711 F. App'x at 880-81.

- swelling,[8]

- abrasions and scratches,[9]

- redness (or erythema),[10]

- pain,[11]

- numbness,[12]

- decreased grip strength,[13] and

- bleeding.[14]

This is true even when injuries are still present weeks later[15] or when the alleged tightness of the

handcuffs continued for hours.[16]

      Missing a single meal is also a de minimis injury, which does not rise to the level of an

Eighth Amendment violation. *Watkins v. Rogers*, 525 F. App'x 756, 758-59 (10th Cir. 2013)

(holding that an inmate having to forego dinner was "not sufficient to demonstrate an Eighth

---

[8] *City of Albuquerque*, 711 F. App'x at 880-81.

[9] *Ellsworth*, 850 F. App'x at 627 n.9 (citing *Donahue*, 948 F.3d at 1196) (saying a plaintiff "sustained only minor abrasions or bruises, which is insufficient as a matter of law")

[10] *Folts v. Grady Cnty. Bd. of Cnty. Comm'rs*, 2017 WL 11557929, at *5 (W.D. Okla. Sept. 29, 2017), *report and recommendation adopted*, 2017 WL 11558076 (W.D. Okla. Nov. 22, 2017).

[11] *City of Albuquerque*, 711 F. App'x at 881; *Watkins v. Wunderlich*, No. 22-1358, 2023 WL 4145904, at *8, *12 (10th Cir. June 23, 2023).

[12] *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011).

[13] *Folts*, 2017 WL 11557929, at *5 (W.D. Okla. 2017), *report and recommendation adopted*, 2017 WL 11558076 (W.D. Okla. 2017).

[14] *Winter*, 2022 WL 3652464, at *10 to *11 (scab); *Ford v. Gruwell*, 961 F.2d 219 (table opinion), 1992 WL 74266, at *1, *3 (10th Cir. Apr. 7, 1992) ("lacerations" or "skin scratch" that drew blood); *Evans v. Heimgartner*, No. 16-3095-DDC, 2018 WL 3055843, at *8 to *9 (D. Kan. June 20, 2018) ("started bleeding from the cuffs"); *Wendt v. City of Kan. City*, No. 89-2463, 1991 WL 49786, at *1, *4 to *5 (D. Kan. Mar. 29, 1991) ("Although two small cuts resulted from application of the handcuff, the extent of injury was minimal.").

[15] *Winter*, 2022 WL 3652464, at *10 to *11 (scab and bruising present two weeks later); *Koch*, 660 F.3d at 1234, 1248 (numbness present a month later and abrasions present four days later); *City of Albuquerque*, 711 F. App'x at 880-81 (swelling, bruising, and pain lasted for a week).

[16] *Watkins v. Wunderlich*, No. 22-1358, 2023 WL 4145904, at *8, *12 (10th Cir. June 23, 2023).

Amendment violation"); *Lindsey v. O'Connor*, 327 F. App'x 319, 321 (3d Cir. 2009) (holding for purposes of an Eighth Amendment claim that "[t]he purported deprivation of a single meal is not of such a magnitude as to rise to the level of a constitutional violation"); *Romero v. Lann*, 305 F. App'x 242, 243 (5th Cir. 2008) (holding for purposes of an Eighth Amendment claim that "the denial of two meals over an eight month period" was "de minimis").[17]

In contrast, courts *have* found violations in more serious situations involving:

- medical diagnosis of (or medical operations on) permanent nerve damage produced by handcuffing,[18]

- serious gunshot wounds being exacerbated,[19]

- punitive cuffing of an inmate to a hitching post in a painful position, causing the inmate to burn shirtless in the sun for seven hours while being refused water and bathroom breaks and being taunted.[20]

---

[17] *See also Moore v. Liewert*, No. 22-2056, 2023 WL 8378827, at *3 (6th Cir. Aug. 16, 2023) (collecting cases and finding "the denial of a single meal" to be "a de minimis event" in the context of a First Amendment retaliation claim); *Neal v. McKune*, No. 11-3155-JTM, 2013 WL 1446791, at *5 (D. Kan. Apr. 9, 2013) (finding no constitutional violation under the First Amendment's free exercise clause when an inmate allegedly missed three meals and was hurried during six others over the course of two Ramadan months).

[18] *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1208-10 (10th Cir. 2008) ("permanent nerve injury" diagnosed by a neurologist and an orthopedist); *Deville v. Marcantel*, 567 F.3d 156, 168-69 (5th Cir. 2009) (evidence presented "that the handcuffs were applied so tightly as to cause long-term nerve damage that was severe enough to require four surgeries"); *Bamdad v. Gavin*, No. 13-0296, 2014 WL 12852245, at *3, *5 (C.D. Cal. June 6, 2014) (noting that a physician diagnosed "injuries to the median and ulnar nerves of [the plaintiff's] right wrist and hand," plaintiff "underwent surgery for his right median nerve injury; the injury to his ulnar nerve was inoperable," and "Plaintiff still suffers from pain, numbness, and functional limitations").

[19] *Fisher v. City of Las Cruces*, 584 F.3d 888, 899-900 (10th Cir. 2009) (plaintiff alleged two fresh, serious gunshot wounds to his bicep and stomach were exacerbated when officers forced his arms behind his back for handcuffing); *see also Howard v. Dickerson*, 34 F.3d 978, 979, 981 (10th Cir. 1994) (finding a plausible claim for deliberate indifference under the Fourteenth Amendment when handcuffing of a pretrial detainee behind her back exacerbated a known neck fracture).

[20] *Hope v. Pelzer*, 536 U.S. 730, 734-35, 738 & n.8, 745-46 (2002).

Here, the evidence shows nothing more than a *de minimis* injury. Baskin complains only of blisters, redness, swelling, pain, anxiety, and bleeding. (*See* KDOC Defendants' Statement of Facts (KDSF) ¶ 63.) He also complains that he was unable to eat a portion of a single meal. (KDSF ¶¶ 64-65.) His medical records show blisters and bruises on his wrists the day of the incident. (KDSF ¶ 68.) Any pain had apparently resolved the same day as the incident. (KDSF ¶¶ 66-67.) His medical records show that three weeks later he had small, well-healing abrasions on his wrists, 4 cm x 1 cm on the right wrist and 3 cm x 1 cm on the left wrist. (KDSF ¶¶ 69-70.) Later evaluations showed all issues had resolved. (KDSF ¶¶ 73-77.) Nothing indicates the kind of long-lasting or serious injury that is necessary to state an Eighth Amendment claim for handcuffing. For example, Baskin has not alleged or shown nerve damage, that any conditions such as gunshot wounds were exacerbated, or that he was cuffed in a punitive manner under extreme conditions. Because Baskin fails to show more than a *de minimis* injury as required for the objective prong, the KDOC Defendants are entitled to summary judgment on Baskin's Eighth Amendment claim when analyzed under an excessive force theory.

Additionally, Baskin does not allege that Defendant Diaz applied any force at all, so for this reason too Baskin fails to state a claim for excessive force against Defendant Diaz.

### C.  Baskin has not demonstrated a serious medical need.

Baskin's claims also fail when analyzed under a deliberate indifference theory. "[B]ecause the State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities," *Whitley v. Albers*, 475 U.S. 312, 320 (1986), the Eighth Amendment's prohibition on cruel and unusual punishment "include[s] an entitlement to a certain minimum standard of medical care while incarcerated." *Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018) (citing *Estelle v. Gamble*, 429 U.S. 97, 101-05 & n.6 (1976)). "Prison officials violate the Constitution when they act with 'deliberate

indifference to an inmate's serious medical needs.'" *Estate of Beauford v. Mesa Cnty.*, 35 F.4th 1248, 1262 (10th Cir. 2022).

Deliberate indifference has both an objective component and a subjective component. *Beauford*, 35 F.4th at 1262 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). For the objective component, the plaintiff must show that the prisoner's medical need was "sufficiently serious." *Id.* (citing *Farmer*, 511 U.S. at 834). "A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* A showing of substantial harm – which may be satisfied by showing "lifelong handicap, permanent loss, or considerable pain" – also meets the objective component. *Id.*

Because Tenth Circuit precedent establishes that *de minimis* injuries from handcuffing are not sufficient to establish an Eighth Amendment claim for excessive force against the persons who actually placed the handcuffs, *de minimis* injuries from handcuffing should not count as "sufficiently serious" medical needs for purposes of the objective prong of the deliberate indifference analysis. To hold otherwise would undermine the rationale of those cases, finding a possible Eighth Amendment violation where those cases have already said none occurred.

Rather, something *additional* must be pled and shown to establish a deliberate indifference claim regarding handcuffing. Specifically, "an allegation of use of excessive force in handcuffing could be based on a claim of deliberate indifference to medical needs when there is a claim that the plaintiff had an injury or medical restriction." *Grissom v. Bell*, No. 20-3163-JWB, 2022 WL 4534620, at *5 (D. Kan. Sept. 28, 2022) (citing *Wells v. Okla. ex rel. Dep't of Pub. Safety*, 97 F.3d 1465 (table opinion), 1996 WL 557722, *2 (10th Cir. 1996)). For example, In *Howard v. Dickerson*, 34 F.3d 978, 979-81 (10th Cir. 1994), the plaintiff had recently

undergone neck surgery, was wearing a neck brace, and requested that the officer handcuff her in front rather than behind her back so as to avoid injury to her neck. Despite the plaintiff's request and the officer's knowledge of the injury, the officer handcuffed her behind her back, which exacerbated the still-healing neck injury and caused pain. *Id.* The officer later also refused the plaintiff's request for a doctor. *Id.* Those facts stated a plausible claim. *Id.*

In *Grissom v. Bell*, the Court analyzed an Eighth Amendment claim under the deliberate indifference framework because the plaintiff allegedly "had a medical order for large and double cuffs" not accommodated by handcuffing policy or in the specific events complained of. *Grissom*, 2022 WL 4534620, at *5. These cases, *Grissom* and *Howard*, show that a "serious medical need" in the handcuffing context involves a known pre-existing injury or a known medical restriction that may affect how handcuffing should be done. However, the Court in *Grissom* did not find a serious medical need that would prevent officers from using regular-sized handcuffs with extra links on the plaintiff despite the medical order saying the plaintiff required larger handcuffs and the officers knowing about the medical order. *Id.* at *7.

Here, Baskin has not alleged or shown any preexisting injury or medical restrictions that may affect handcuffing like those in *Grissom* or *Howard* or that the KDOC Defendants were aware of any such injuries or restrictions. Because Baskin fails to show a serious medical need as required for the objective prong, the KDOC Defendants are entitled to summary judgment on Baskin's Eighth Amendment claim when analyzed under a deliberate indifference theory.

**D.  The KDOC Defendants did not have a sufficiently culpable state of mind.**

Baskin's claims also fail to meet the subjective components under both frameworks.

*1.  The subjective component standard for excessive force claims*

For excessive force, to establish the subjective component, Baskin must show that the Defendants "acted with a sufficiently culpable state of mind." *Grissom v. Palm*, No. 21-3194,

2022 WL 3571410, at *4 (10th Cir. Aug. 19, 2022) (quoting *Redmond v. Crowther*, 882 F.3d 927, 936 (10th Cir. 2018)). In *Sampley v. Ruettgers*, 704 F.2d 491, 495 (10th Cir. 1983), the Tenth Circuit Court of Appeals provided three elements for excessive force claims: The inmate must show that (1) the guard intended to harm the prisoner; (2) the guard used more force than appeared reasonably necessary at the time to maintain or restore institutional order; and (3) the guard's actions caused severe pain or lasting injury to the prisoner. *See also Scott v. Clune*, No. 17-3024-JAR, 2018 WL 3222612, at *3 (D. Kan. July 2, 2018) (citing the *Sampley* elements approvingly). The first element, intent to harm, clearly falls under the subjective prong. The second element, reasonableness of force, has both an objective aspect and a subjective aspect, so it spans both prongs. The third element, severe pain or lasting injury, has already been analyzed with regard to *de minimis* injuries under the objective prong above. As both the first and second elements involve the subjective prong, both will be analyzed in this section.

For the first element, intent to harm, the conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Rather, Baskin must show that the Defendants took their actions "maliciously and sadistically for the very purpose of causing harm" and not in a "good faith effort to maintain or restore discipline." *Id.* at 320-21; *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). "The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Whitley*, 475 U.S. at 319.

For the second element, reasonableness of force, the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than

with the 20/20 vision of hindsight." *Kisela v. Hughes*, 584 U.S. 100, 103 (2018). The analysis must consider "the highly-charged prison environment and accord wide-ranging deference to prison officials." *McCoy v. Kan. Dep't of Corr.*, No. 16-3239-SAC, 2018 WL 1726344, at *4 (D. Kan. Apr. 10, 2018) (citing *Hudson*, 503 U.S. at 6, and *Sampley*, 704 F.2d at 495-96). Courts may consider: (1) the need for the application of force; (2) the relationship between that need and the amount of force used; (3) any threat reasonably perceived by the officers; and (4) any efforts made to temper the severity of a forceful response. *Hudson*, 503 U.S. at 7.

   2.   *The subjective component standard for deliberate indifference claims*

   For deliberate indifference, the subjective component requires showing that the official had a culpable state of mind. *Estate of Beauford v. Mesa Cnty.*, 35 F.4th 1248, 1262 (10th Cir. 2022) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). This is only met if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

   Even if both the objective and subjective prongs are met for deliberate indifference, "a constitutionally legitimate justification" may still be shown. *Arocho v. Nafziger*, 367 F. App'x 942, 952 (10th Cir. 2010). This should be determined, not with the benefit of hindsight, but based on what the official reasonably knew at the time. *See Strain v. Regalado*, 977 F.3d 984, 996 (10th Cir. 2020) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (saying in the context of the deliberate-indifference standard that "courts do not judge the constitutionality of particular actions 'with the 20/20 vision of hindsight'"). The Supreme Court has described "internal security" as "perhaps the most legitimate of penological goals." *Overton v. Bazzetta*, 539 U.S. 126, 133 (2003); *see also Washington v. Harper*, 494 U.S. 210, 225 (1990)).

3. *Analysis*

Here, Baskin has failed to establish the subjective component of either an excessive force claim or a deliberate indifference claim. On the day Baskin was transported to Arizona, Gaboian followed his usual procedure of checking for a one-finger gap when placing handcuffs on each inmate transported that day. (KDOC Defendants' Statement of Facts (KDSF) ¶¶ 7, 9-10, 14-15.) Baskin does not allege, and the evidence does not support, that Gaboian applied the handcuffs too tightly. (*See* KDSF ¶ 37.) Rather, Baskin alleges and states that the handcuffs themselves were too small. (KDSF ¶ 37.)

Baskin complained to Diaz only while on the transport bus after the bus started to move. (KDSF ¶¶ 26.) For safety and security reasons, Diaz could not enter the rear cabin where Baskin was. (KDSF ¶¶ 27-30.) The proper officers to adjust handcuffs prior to transport would have been the officers who applied them in the secure environment of A&D – not Diaz, who was serving as the driver. (KDSF ¶¶ 31, 17.)

When the first leg of the transport was complete and Baskin arrived at EDCF, Baskin entered EDCF and an officer at EDCF adjusted his restraints. (KDSF ¶¶ 35-36.) That officer concluded that the handcuffs were too small even at their loosest setting – not that they were adjusted too tightly. (KDSF ¶ 37.) Medical personnel examined Baskin at EDCF. (KDSF ¶¶ 38-39.) The medical personnel and an EDCF officer concluded there was nothing they could do for Baskin. (KDSF ¶ 39.) Adjusting his restraints would not have helped.

On the second leg of the transport, from HCF to EDCF, Baskin again complained to Diaz only while on the transport bus after the bus started to move, and Diaz could not enter the rear cabin. (KDSF ¶¶ 40-43.) At the airport in Salina, TCA officials checked the inmates' restraints. (KDSF ¶ 47.) So Baskin's restraints were checked or adjusted at HCF, at EDCF, and at the airport in Salina.

Under an excessive force framework, these facts do not show that the KDOC Defendants intended to harm Baskin, as required for the first element under *Sampley*. Rather, at every point where safety and security concerns allowed, Baskin's restraints were checked or adjusted. Baskin even received medical attention at EDCF. As an officer at EDCF concluded, no looser setting for Baskin's handcuffs was possible. Regarding the second element under *Sampley*, these facts do not show that the amount of force applied was more than appeared reasonably necessary at the time. Baskin's own statement says that the handcuffs were too tight even at their loosest setting, and that EDCF personnel concluded that there was nothing they could do for him. Loosening the handcuffs was not possible. For safety and security reasons, the approximately 120 convicted felons being transported across state lines needed to be in restraints while being transported.[21] Baskin does not suggest any reasonable alternative to being handcuffed.

Under a deliberate indifference standard, even if *de minimis* injuries like swelling counted as a "serious medical need" for purposes of a deliberate indifference claim, Baskin has not alleged or shown that the KDOC Defendants at any time observed any such injuries. Baskin does not allege that any swelling occurred until he was away from Gaboian and on the transport bus. (*See* Doc. 1 at ¶ 24.) If Baskin had requested medical treatment, Gaboian would have referred him to medical immediately. (KDSF ¶ 16.) And Baskin does not allege or show that Diaz at any point stopped and observed Baskin's symptoms. Rather, Baskin complains that Diaz did not do so. Diaz, the bus driver, did not need to do so because at HCF, at EDCF, and at the airport at Salina, the appropriate personnel checked or adjusted Baskin's restraints.[22]

Therefore, Baskin fails to establish both the subjective and objective prongs for both

---

[21] Baskin was incarcerated for violent felonies, including kidnapping and rape. *See Baskin v. State*, 520 P.3d 293 (table opinion), 2022 WL 17172021, at *1 (Nov. 23, 2022).

[22] Additionally, during the flight, a TCA employee adjusted Gaboian's restraints. (KDSF ¶ 65.)

excessive force and deliberate indifference. Alternatively, Diaz was justified by legitimate safety and security concerns for not entering into the rear cabin of the transport bus. The KDOC Defendants are entitled to summary judgment on Baskin's Eighth Amendment claims.

**V.      Alternatively, Baskin is not entitled to punitive damages when he cannot show any conduct was motivated by evil intent or was undertaken with reckless or callous indifference to his constitutional rights.**

Federal Rule of Civil Procedure 56 allows for "partial summary judgment," not necessarily on whole claims, but on a "part of each claim or defense." Here, even if Baskin's claims otherwise survive summary judgment, he is not entitled to punitive damages under § 1983 because he has not alleged or provided any evidence that any defendants acted with the required maliciousness, evil motive, or with reckless indifference to Baskin's civil rights, or that they subjectively knew their actions were unconstitutional under clearly established law. *See Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992); *Searles v. Van Bebber,* 251 F.3d 869, 879 (10th Cir. 2001) (citing *Smith v. Wade,* 461 U.S. 30, 56 (1983)). Therefore, in the alternative, partial summary judgment for Defendants is appropriate on Baskin's punitive damages claims.

**CONCLUSION**

For the reasons above, the KDOC Defendants request that the Court grant summary judgment in favor of the KDOC Defendants.

Respectfully submitted,

KRIS W. KOBACH
ATTORNEY GENERAL OF KANSAS

*/s/ Matthew L. Shoger*
Matthew L. Shoger, KS No. 28151
Assistant Attorney General
Office of the Attorney General
120 SW 10th Ave., 2nd Floor
Topeka, Kansas 66612-1597
matt.shoger@ag.ks.gov
(785) 296-2215
Fax: (785) 291-3767
*Attorney for the KDOC Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 12th day of April, 2024, the foregoing document was filed with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to the following:

Thomas A. Rottinghaus
Wagstaff & Cartmell, LLP
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
*Attorney for Defendant Westbrook*

I also certify that a copy of the above will be served by means of first-class mail, postage prepaid, addressed to:

Benton Gene Baskin #52888
Hutchinson Correctional Facility
P.O. Box 1568
Hutchinson, KS  67504
*Plaintiff, pro se*

*/s/ Matthew L. Shoger*
Matthew L. Shoger
Assistant Attorney General